**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------x

ADAMS FAMILY, *et al.*                    :        **No. 4-09 Civ. 01208 (VDG)**
    *Plaintiffs,*                          :
                                  :        <u>CLASS ACTION</u>
    *v.*                                      :
                                    :
MCDERMOTT INTERNATIONAL, INC.,   :
BRUCE W. WILKINSON, MICHAEL       :
S. TAFF AND ROBERT A. DEASON,     :
    *Defendants.*                             :

---------------------------------------------------x

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... iii

NATURE AND STAGE OF THE PROCEEDING........................................................ vi

STATEMENT OF THE ISSUE..................................................................................... vi

STANDARD OF REVIEW ........................................................................................... vi

SUMMARY OF ARGUMENT .................................................................................... viii

FACTUAL BACKGROUND .........................................................................................1

ARGUMENT .................................................................................................................3

I.      THE COMPLAINT IDENTIFIES DEFENDANTS' FALSE AND MISLEADING
        STATEMENTS WITH PARTICULARITY ......................................................3

        A.      Defendants' False and Misleading Statements About Backlog .............................4

        B.      Defendants' False and Misleading Statements About the Profitability of
                Backlog ...........................................................................................5

        C.      Defendants' False and Misleading Statements About the Impact of Delays on the
                Profitability of Backlog ........................................................................6

        D.      Defendants' False and Misleading Statements About the Reasons for the Project
                Delays ............................................................................................7

        E.      Defendants' Failure To Recognize Losses As They Were Incurred ......................8

        F.      Defendants' Misrepresentations On Forms 144 .......................................10

        G.      The Statements By Confidential Witnesses Concerning the Falsity of
                Defendants' Class Period Statements.......................................................10

II.     THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER ....................12

i

      A.      The Scienter Allegations Are Cogent and Compelling...........................................12

      B.      Insider Stock Sales Strongly Support an Inference of Scienter ............................15

      C.      Defendants' Other Scienter Arguments Lack Merit.................................................17

III.      THE PSLRA'S SAFE-HARBOR DOES NOT SHIELD DEFENDANTS' MISREPRESENTATIONS ....................................................................................................18

IV.      THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY................................19

CONCLUSION..........................................................................................................................20

# TABLE OF AUTHORITIES

## *Cases*

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
   291 F.3d 336 (5th Cir. 2002) ......................................................................4, 11

*Barrie v. Intervoice-Brite, Inc.* 397 F.3d 249 (5th Cir. 2005),
   *modified and reh'g denied*, 409 F.3d 653 (5th Cir. 2005) ...............................11

*Bell Atl. Corp. v. Twombley,*
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)................................ vii

*Berson v. Applied Signal Technology, Inc.*,
   527 F.3d 982 (9th Cir. 2008) .............................................................4, 13, 18

*Brody v. Zix Corp.,*
   No. 04-CV-1931-K, 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ...............11

*Central Laborers' Pension Fund v. Integrated Elec. Servs., Inc.,*
   497 F.3d 546 (5th Cir. 2007) ......................................................x, 11, 15, 16

*Cooper v. Pickett,* 137 F.3d 616 (9th Cir.1997) ........................................................10

*Cuvillier v. Taylor,*
   503 F.3d 397 (5th Cir. 2007) ........................................................................ vii

*In re Enron Corp. Sec.,*
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ...........................................................8

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,*
   565 F.3d 200 (5th Cir. 2009) ................................................................ vii, viii

*Goldstein v. MCI Worldcom,*
   340 F.3d 238 (5th Cir. 2003) ....................................................................... viii

*Hampton Co. Nat. Sur., LLC v. Tunica County, Miss.,*
   543 F.3d 221 (5th Cir. 2008) ........................................................................ vi

*In re Immucor Inc. Sec. Litig.,*
   No. 1:05-cv-2276-WSD, 2006 WL 3000133 (N.D. Ga. Oct. 4, 2006)..............16

*Kunzweiler v. Zero.net, Inc.,*
No. 3:00-CV-2553-P, 2002 WL 1461732 (N.D. Tex. 2002)...........................................4, 5

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,*
507 U.S. 163, 113 S. Ct. 1160, 122 L.Ed. 2d 517 (1993)................................... vii

*Lormand v. US Unwired, Inc.,*
565 F.3d 228 (5th Cir. 2009) .................................................................... *passim.*

*Lovick v. Ritemoney, Ltd.,*
378 F.3d 433 (5th Cir. 2004) ....................................................................... vii

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
513 F.3d 702 (7th Cir. 2008) ........................................................................13

*Mazza v. Berk & Michaels, P.C.,*
No. 90 Civ. 4066 (SWK), 1992 WL 150381 (S.D.N.Y. Jun. 12, 1992)............................6

*Nathenson v. Zonagen, Inc.,*
267 F.3d 400 (5th Cir. 2001) ....................................................................x, 15

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.West Holding Corp.,*
320 F.3d 920 (9th Cir. 2003) ........................................................................13

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000)....................................................................12, 13

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
380 F.3d 1226 (9th Cir. 2004) .......................................................................14

*Plotkin v. IP Axess, Inc.,*
407 F.3d 690 (5th Cir. 2005) .................................................................x, 12, 19

*In re Refco, Inc. Sec. Litig.,*
503 F. Supp. 2d 611 (S.D.N.Y. 2007)...............................................................17

*Scheuer v. Rhodes,*
416 U.S. 232, 94 S. Ct. 1683, 40 L.Ed. 2d 90 (1974)....................................... vii

*Southland Secs. Corp. v. Inspire Ins. Solutions,*
365 F.3d 353 (5th Cir. 2004) ................................................................15, 16, 19

*In re Stone Energy Corp. Sec. Litig.,*
No. 05-2088 (MEM), 2007 WL 2903178 (W.D. La. Aug. 17, 2007) ..............................11

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308, 127 S. Ct. 2499 L.Ed. 2d 179 (2007) ................................................... vii, 17

*Test Masters Educ. Servs., Inc. v. Singh,*
    428 F.3d 559 (5th Cir. 2005) ........................................................................................ vii

*In re UICI Sec. Litig.,*
    No. 04-CV-1149-P, 2006 U.S. Dist. LEXIS 73753 (N.D. Tex. Sep. 29, 2006) ..........18, 19

## *Statutes*

15 U.S.C. § 78u-4 ............................................................................................................. vi

15 U.S.C. § 78u-4(b)(1) .........................................................................................vii, viii, 4

15 U.S.C. § 78u-4(b)(2) ................................................................................................... vii

## *Court Rules*

Rule 56(f) ............................................................................................................... vi, 9, 17

Rule 12(b)(6) .............................................................................................................. vi, vii

v

## NATURE AND STAGE OF THE PROCEEDING

This is a securities fraud action filed on behalf of a class of all persons (the "Class") who purchased the publicly-traded common stock of Defendant McDermott International, Inc. between February 27, 2008 and November 5, 2008, inclusive (the "Class Period"). Plaintiffs filed the Consolidated Complaint (Docket No. 46) (the "Complaint") on May 22, 2009. Defendants McDermott International, Inc. ("McDermott" or the "Company"), Bruce W. Wilkinson ("Wilkinson"), Michael S. Taff ("Taff"), and Robert A. Deason ("Deason"), collectively the "Defendants," filed Defendants' Motion to Dismiss Plaintiffs' Complaint (Docket No. 71) (Defendants' "Motion") on July 1, 2009. Because Defendants' Motion improperly requested that the Court resolve factual issues, Plaintiffs contend that it should be considered a Motion for Summary Judgment and filed a Motion for Relief Pursuant to Rule 56(f) on July 10, 2009 (Docket No. 74) ("Plaintiffs' 56(f) Motion") which has not yet been ruled upon by the Court.[1]

## STATEMENT OF THE ISSUE

Whether the allegations in the Complaint meet the pleading standards of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* ("PSLRA") and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## STANDARD OF REVIEW

The Fifth Circuit has recently articulated the standard of review for a PSLRA Motion to Dismiss:

---

[1] If the Court determines that Defendants' Motion should be treated as a Motion for Summary Judgment, the standards governing a Motion to Dismiss under the Private Securities Litigation Reform Act ("PSLRA") do not apply, and the motion should be denied as material facts clearly are in dispute. *Hampton Co. Nat. Sur., LLC v. Tunica County, Miss.,* 543 F.3d 221, 224 (5th Cir. 2008). At the very least, a ruling on the Motion should be deferred until after Plaintiffs have taken appropriate discovery pursuant to Rule 56(f).

Motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005). When faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2509, 168 L.Ed. 2d 179 (2007) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L.Ed. 2d 517 (1993)).  We must also draw all reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed. 2d 90, 1974); *Lovick v. Ritemoney, Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief – including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier*, 503 F.3d at 401 (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)).

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

The PSLRA has two relevant pleading requirements:

[T]he PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading, the so-called "particularity" requirement.  15 U.S.C. §78u-4(b)(1).  The PSLRA also provides that a plaintiff must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind."  15U.S.C. §78u-4(b)(2).

*Id.* at 239.  The "required state of mind" is knowledge or severe recklessness.  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009).  A "plaintiff alleging fraud in a §10(b) action must only 'plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.'"  *Lormand*, 565 F.3d at 250 (quotation omitted).  "However, [the scienter inference] 'need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences.'"  *Id.* at 251 (quotation omitted).  In conducting its scienter analysis, the court must "accept[] all of the factual allegations in the complaint as true," "must consider the complaint in its entirety," and must

consider "whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 251 (citation omitted). "Allegations of circumstantial evidence justifying a strong inference of scienter will suffice." *Id.*, *quoting Goldstein v. MCI Worldcom*, 340 F.3d 238, 246 (5th Cir. 2003). In addition, "motive and opportunity allegations may meaningfully enhance the strength of the inference of scienter." *Flaherty*, 565 F.3d at 208. The Complaint's allegations satisfy these standards.

## SUMMARY OF ARGUMENT

The Motion should be denied because Plaintiffs have alleged all of the elements of a securities fraud claim.

First, Plaintiffs have specified "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The Complaint specifically alleges that Defendants repeatedly made false and misleading statements about the profitability and amount of the "backlog" of the Company's largest business segment (the Offshore Oil and Gas Construction segment of its J. Ray McDermott subsidiary),[2] (¶¶ 25, 70, 75, 76),[3] and that the Company's work in connection with this "backlog" was generating profits of at least 10-12%. ¶¶ 26-27, 43, 45, 47, 57, 78, 81-83. The Complaint also specifically alleges that Defendants misrepresented that certain construction-related delays reported in April and May 2008 were not due to performance problems at J. Ray (¶¶ 35, 39, 43, 45) and that those delays did not reduce or adversely impact the profitability of the reported backlog (¶¶ 44-46, 80, 83). Plaintiffs also specifically allege that the Company's reported financial results were materially

---

[2] As used herein, "J. Ray" refers to J. Ray, J. Ray McDermott Holdings, LLC and their respective subsidiaries. The "Oil and Gas Segment" refers to the Offshore Oil and Gas Construction segment of J. Ray.
[3] All references to paragraphs ("¶ ") in this brief are to paragraphs in the Consolidated Complaint.

misstated because they did not account for the actual costs to complete the construction of three J. Ray fixed-price contracts for installation of major oil and gas wellhead and pipeline facilities in Qatar (the "Three Qatar Projects"). ¶¶ 120-127.

In compliance with the PSLRA, the Complaint alleges each of these misrepresentations was false or misleading when made because (1) the Three Qatar Projects accounted for up to one-third of J. Ray's backlog, worth $1.4 billion (¶¶ 94, 107-111); (2) the profitability of the Three Qatar Projects required that they be performed in the peak summer construction months (the "Peak Season") (¶ 98); (3) delays in earlier projects in J. Ray's construction queue going back as far as 2007, coupled with labor, facility space and quality issues at J. Ray and bad weather in the first quarter of 2008, caused a "domino effect" which, by the beginning of the Class Period, made it impossible for the work on the Three Qatar Projects to be performed during the Peak Season (¶¶ 98-100; 112-19); and (4) McDermott failed to record promptly its losses from the Three Qatar Projects in its quarterly financial statements (¶¶ 120-27).

Plaintiffs have also alleged many facts creating a strong inference of scienter.  For example, Defendants knew throughout the Class Period that the Three Qatar Projects were unprofitable because the profitability of these projects was based on an *internal* conclusion that they had to be completed during "peak summer construction months" that would result in high productivity and few downtime days.  ¶ 98.  Furthermore, as Defendants took pains to assure investors, the Company had elaborate systems in place to monitor every project's progress towards completion.  ¶¶ 130-32.  As established by Confidential Witnesses ("CWs"), Defendants also knew that J. Ray suffered from severe welding problems and delays which predated the Class Period and extended throughout it, and which resulted in exorbitant costs and substantial

delay of the Three Qatar Projects.  ¶¶ 112-19.  Even absent the CW testimony, the Fifth Circuit

has held that a court may infer knowledge of matters having so great an importance to the

Company.  *See Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 700 (5th Cir. 2005).

Moreover, insider stock sales during the Class Period confirm this strong inference that

Defendants' misrepresentations were knowing or reckless.  *See Central Laborers' Pension Fund*

*v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 553 (5th Cir. 2007) ("In this circuit, officer trading

may give rise to an inference of scienter if it is unusual in timing or scope."), *citing Nathenson v.*

*Zonagen, Inc.*, 267 F.3d 400, 421 (5th Cir. 2001).  McDermott insiders profited handsomely

from their misrepresentations, reaping ***more than $53 million*** during the Class-Period from

unlawful insider sales of McDermott common stock at artificially inflated prices.  ¶ 134(a)-(h).

These sales were unusual in both timing and amount.  For example, defendant Deason alone sold

132,000 shares (over 65% of his McDermott stock) (¶ 134(a)), while defendant Taff sold 73% of

his McDermott stock (¶ 134(b)), and defendant Wilkinson sold over 52% of his McDermott

stock.  ¶ 134(c).  The timing of these defendants' stock sales is particularly unusual because the

underlying stock options exercised as part of many of these sales had not been due to expire for

many years.  ¶¶ 29, 38, 59, 61, 66, 74, 134(b).

## FACTUAL BACKGROUND

McDermott is a large, publicly-traded, multi-national corporation that provides products and services to customers in the energy and power industries. ¶ 18. Its Oil & Gas Segment business is conducted through J. Ray, which, *inter alia*, designs, engineers, fabricates and installs offshore drilling and production facilities and marine pipelines. ¶ 19.

The Three Qatar Projects at issue in this case were referred to as "Ras Gas Phase II," "Qatar Gas 3 and 4" and "Shell Pearl GTL I." ¶ 107. Each was a major project involving procurement, construction and engineering of wellhead platforms and the laying of undersea pipeline in Qatar. ¶¶ 108-111. As McDermott's CEO, John Fees, acknowledged in November of 2008, McDermott's profitability assumptions for the Three Qatar Projects depended on the projects being performed during what he referred to as "peak summer construction months" (the "Peak Season") when productivity is maximized and there are few weather delays. ¶ 98.[4]

By the beginning of the Class Period, welding defects and delays in other projects in the Middle East made it impossible for J. Ray to complete the Three Qatar Projects during that Peak Season. ¶¶ 3, 98. The construction site for the Three Qatar Projects – J.Ray's Jebel Ali facility – was experiencing a severe shortage of qualified employees, with those workers who were available being constantly shifted among seven large-scale ongoing wellhead projects all underway simultaneously, with the uncompleted projects continuing to take up available construction space. ¶ 114. Delays in one project necessarily created delays in others that were further down the production queue, including the Three Qatar Projects. *Id.* For example, although fabrication on both wellheads in the Ras Gas project was supposed to have been

---

[4] In light of these statements, Defendants' repeated argument that Plaintiffs do not "point to any source, industry-related or otherwise, to support their Peak-Season theory" (Motion at 8, n. 28; *see also id.* at 12), is directly contradicted by the statements of McDermott's CEO, as quoted in the Complaint.

completed by March, 2008, and they were supposed to have been taken off for installation in Qatar at that time, as a result of these delays both wellheads remained in the fabrication yard until September of 2008.  ¶¶ 112-113.

In addition, during the Spring of 2008, an underwater pipeline segment J. Ray was laying "buckled" while being lowered into position due to a sequencing mistake.  ¶ 115.  Recovering it from the bottom of the sea cost J. Ray hundreds of millions of dollars.  *Id.*  Other quality control issues at J. Ray included poor welding work, which caused significant excess cost and delay.  ¶ 116.  Because pipes used by J. Ray were very expensive – approximately $400 - $500 per foot – the Company incurred millions in added expenses mending or replacing defective pipes.  *Id.*

Finally, J. Ray's derrick barges and support vessels were in poor repair throughout the Class Period and consequently incurred considerable "down time" during which they were unable to lay pipe.  ¶¶ 117-119.  Requests to have the barges refurbished were submitted to McDermott's Board of Directors every year from 2005-08, but were always declined by the Board.  Consequently, the barges were often out of commission.  ¶¶118-19.

As a result of these cascading problems, the Three Qatar Projects could not be performed on time or profitably.  *See*, *e.g.*, ¶ 98 (CEO Fees stated: (i) "These projects were affected by delays from preceding jobs in the queue. The delays on earlier jobs . . . caused us to start projects later than the bid schedules proposed;" (ii) "These issues have caused some ripple impact on other projects in the Middle East and we have revised our estimates in our backlog to account for this ripple effect;" and (iii) "We recognize that we got ourselves too tight with no buffer room and when slippage started, regardless of whether it was our fault…it produced a domino effect. In a strong market there was no reason to get ourselves into this position.").  Taff stated,

"There's no doubt we were planning on laying these projects all with the same vessel and we basically had this vessel scheduled out over about a year and a half period . . . we got behind on the first job and then we had that snowball effect . . . ." ¶ 100.

However, investors did not learn of these concealed, adverse facts until after the markets closed on November 5, 2008, when the Company revealed that, far from profit margins in the 10-12% range, the Three Qatar Projects would actually **cost** the Company $90 million to complete. ¶¶ 94, 97. Moreover, the Company revealed that the Three Qatar Projects were not just delayed, they were ***300 days behind schedule*** (¶ 98), and further disclosed that these delays could subject the Company to $110 million in liquidated damages. ¶ 94. Market reaction to these revelations was swift and negative in the form of analyst downgrades, a 33% drop in the Company's stock price and a loss of $1.2 billion in its market capitalization, in one day. ¶¶ 101-104.

On March 2, 2009, McDermott announced that the Securities and Exchange Commission ("SEC") had commenced an inquiry "regarding the three construction contracts in Qatar and the events leading to the related write downs [McDermott] recorded." ¶ 105. Taff added that the SEC's inquiry "[is] specifically related to the accounting related to these three pipeline projects." ¶ 105. Work did not resume on two of the Three Qatar Projects until April and May 2009, respectively – approximately one year after the work was supposed to have been completed in order for it to have been profitable. ¶ 106.

## ARGUMENT

## I.     THE COMPLAINT IDENTIFIES DEFENDANTS' FALSE AND MISLEADING STATEMENTS WITH PARTICULARITY

Contrary to Defendants' claims (Motion, at 5-13), the Complaint properly "identify[ies] each allegedly misleading statement with particularity and explain[s] why it is misleading." 15

U.S.C. 78u-4(b)(1).  The Complaint "specif[ies] the statements contended to be fraudulent, identif[ies] the speaker, state[s] when and where the statements were made, and explain[s] why the statements were fraudulent."  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).  Consequently, Defendants' arguments concerning each of the types of allegedly false or misleading statements are without merit, as set forth below.[5]

### A.    Defendants' False and Misleading Statements About Backlog

The Complaint alleges that Defendants made misrepresentations about the amount of J. Ray's backlog (¶¶ 21, 25, 26, 40, 70, 75, 76), and that these statements were misleading because they failed disclose the critical fact that a substantial portion of the backlog - $1.4 *billion* worth – was unprofitable.  (¶ 87).  "[O]nce defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors . . . ."  *Berson v. Applied Signal Technology, Inc.,* 527 F.3d 982, 987 (9th Cir. 2008).  Thus, the Complaint adequately alleges what was said, by whom, and when, and why it was misleading.

Defendants wrongly claim that this argument is "nonsensical" because backlog is "a measure of expected *revenue,* not *profit.*"  (Motion, at 7).  A statement is misleading if a reasonable investor would have received a false impression from it.  *Kunzweiler v. Zero.net, Inc.,* No. 3:00-CV-2553-P, 2002 WL 1461732, at *10 (N.D. Tex. July 3, 2002).  Investors focus on backlog *only* because it is a gauge of the Company's ability to generate profits on a go-forward basis.[6]  Thus, it was misleading for Defendants to report backlog numbers without disclosing that

---

[5] Defendants' argument that the Complaint amounts to "puzzle pleading" (Motion, at 1, n.4), is meritless, and is belied by the fact that Defendants were easily able to identify exactly which statements Plaintiffs claim to be false or misleading (Motion, at 5) and  to figure out why based on Paragraphs 87-92.  (Motion, at 6-10).

[6] Otherwise, one would have to assume that the announcement "We have just signed a contract worth $1 billion" would generate the same market reaction as the announcement, "We have just signed a contract worth $1 billion, *but we are going to lose money on it*."  At very least, "[b]ecause this determination requires delicate assessments of the

a substantial percentage of the contracts in backlog were unprofitable.  Indeed, McDermott acknowledged that it was misleading to report backlog without disclosing that the backlog was unprofitable in its November 2008 10-Q Report, where the Company finally admitted that approximately $1.3 billion of its backlog was "in or near loss positions . . . ." ¶ 96.

**B.      Defendants' False and Misleading Statements About the Profitability of Backlog**

The Complaint alleges that Defendants misrepresented that McDermott's reported backlog was profitable and would have profit margins of between 10-12%.  ¶¶ 26, 35, 43-46, 78, 80, 83.  As evidenced by Defendants' own admissions (¶¶ 93-100), and on information from the CWs (¶¶ 112-19), Defendants' statements about the profitability of backlog were misleading because they concealed the fact that, by the beginning of the Class Period, it was impossible for the Three Qatar Projects to be performed profitably because they could not be performed during the Peak Season.  ¶¶ 3-6, 94-100.  Defendants' arguments (Motion, at 7-8) attacking the sufficiency of these allegations fail because they ignore the allegations in the Complaint.  First, Defendants erroneously argue that Plaintiffs fail to "quantify" the extent to which estimates were misrepresented.  *Id.* at 7.  However, the difference between what Defendants represented during the Class Period (that McDermott would generate 10-12% profit margins) and at the end of the Class Period (that the Three Qatar Projects would be *un*profitable, and that, as a result, J. Ray's collective margins would drop to the 6-8% range for "the next 4-5 quarters") (¶ 102), adequately quantifies the magnitude of the problem.  Second, Defendants argue that Plaintiffs have not "identified specific, material information that was known but not disclosed" (Motion, at 7), but

---

inferences a reasonable shareholder would draw from a given set of facts, it is generally a question of fact for the jury." *Kunzweiler,* 2002 WL 1461732, at *10 (internal citations omitted and quotations omitted).

the Complaint alleges that Defendants were aware that the Three Qatar Projects could not be performed during the Peak Season, and thus could not be performed profitably. ¶¶ 94-100, 112-19. Defendants' final argument – that their statements about profitability were mere "puffery" (Motion, at 8) – is also without merit, as Defendants made very specific representations concerning the profitability of their backlog, purportedly based on concrete facts – *i.e.*, negotiated pricing, historical cost estimates, etc. These are not the kind of "vague" statements or "generalizations" that are considered mere puffery. *Lormand,* 565 F.3d at 249 n.14; *see also Mazza v. Berk & Michaels, P.C.,* No. 90 Civ. 4066 (SWK), 1992 WL 150381, at *2 n.5 (S.D.N.Y. June 12, 1992) (specifying rate of return is not mere puffery). Reasonable investors would have viewed the statements as material; indeed, analysts focused considerable attention on Defendants' statements about the profitability of their backlog. ¶¶ 27, 47, 57, 81, 82, and 83.

### C. Defendants' False and Misleading Statements About the Impact of Delays on the Profitability of Backlog

Contrary to Defendants' arguments (Motion, at 8-9), the Complaint properly alleges that Defendants misrepresented the effect of project delays on the profitability of J. Ray's backlog, stating that project delays would result in profits merely being deferred to later quarters, or, as Defendant Wilkinson phrased it, being "moved to the right,"[7] when in fact, these delays had already rendered the Three Qatar Projects *unprofitable.* ¶ 98. Defendants' argument that they never said that project delays "would have *no* adverse effect on profitability" (Motion, at 8), ignores the fact that they continued to state that their backlog would generate 10-12% profit margins following the announcement of weather-related delays in May of 2008. ¶ 44. Indeed,

---

[7] ¶ 44; *see also* ¶ 35 (delays causing "the deferral of unrecognized project revenue *and income* to future periods"); ¶ 44 (still projecting 10-12% profit margins for J. Ray despite project delays).

even in September of 2008, when the summer months were almost over, Defendants *still* assured investors that McDermott's margins were in the 10-12% range.  ¶ 83.  Analysts, in particular, understood these statements to mean that McDermott's profits would be unaffected by the delays.  *See, e.g.,* ¶¶ 37, 47.  However, as set forth in detail in the Complaint (¶¶ 93-100), the profitability of the Three Qatar Projects, which made up one-third of J. Ray's backlog, had been erased by these delays.[8]

### D.    Defendants' False and Misleading Statements About the Reasons for the Project Delays

The Complaint alleges that Defendants misrepresented the reasons for project delays at J. Ray.  For example, an April, 2008, press release quoted Wilkinson as saying that delays impacting profitability in the first quarter of 2008 "are not systemic, but related to extraordinary events within the period" and describing J. Ray's results as having been affected "by external events" and "primarily due to harsh weather."  ¶ 35; *see also* ¶ 39 (decrease in segment income "due to poor weather conditions in major areas of operation").  Plaintiffs specifically allege that these statements were materially misleading, because they concealed undisclosed "systemic" problems that contributed to J. Ray's project delays (¶ 90), such as severe labor and space shortages at the Jebel Ali construction facility (¶ 114), the buckling of an undersea pipeline during the installation process (¶ 115), welding defects involving pipelines costing $400-$500 per foot (¶ 116), and the poor condition of J. Ray's derrick barges and support vessels, which impaired their ability to lay pipe.  ¶ 119.

---

[8] Defendants also argue (Motion, at 9) that the Complaint fails to allege how exposure to liquidated damages rendered their statements false or misleading.  It is misleading to state that delays will not affect profitability when the delays will trigger six-figure liquidated damages, even if it *possible* that the contracting party will waive such damages.  *Lormond,* 565 F.3d at 248 (materially misleading not to disclose known risks, particularly when there are signs that the risks have begun to materialize).   Defendants' additional argument that there is no support for Plaintiffs' "Peak Season" theory is also without merit.  *See supra* pp. ix, 1.

Defendants argue (Motion, at ¶ 9-10) that they never said that bad weather was the "only" problem affecting the Three Qatar Projects or that "no other factors impacted" them.  Once Defendants decided to discuss the delays and, particularly, to describe the reasons for the delays, they were obligated to disclose *all* of the reasons for the delays, including the severe operating problems plaguing J. Ray.  *In re Enron Corp. Sec.*, 235 F. Supp. 2d 549, 602 (S.D. Tex. 2002). Defendants are also incorrect that the Complaint fails to allege any material financial impact from these severe operational problems (Motion, at 10); the Complaint alleges that they cost many millions of dollars (¶¶ 115-16) and materially contributed to the delays and cost-overruns that rendered the Three Qatar Projects unprofitable.  ¶¶ 113-19.  Finally, Defendants' argument that Plaintiffs fail to substantiate their claim that the profitability of the Three Qatar Projects depended on their being performed during the Peak Season (Motion, at 8) ignores the fact that McDermott's CEO – not Plaintiffs – specifically stated that McDermott's bids for the these fixed-price contracts assumed performance during this peak period, that delays made performance during this period impossible and that, consequently, the projects were unprofitable. ¶ 98.[9]

### E.      Defendants' Failure To Recognize Losses As They Were Incurred

The Complaint properly alleges accounting misrepresentations (¶¶ 22-24, 41, 77) and the reasons why they were false (¶¶ 92, 93-100, 105-06, 113-19, 120-27).  Specifically, it alleges that Defendants violated GAAP by failing timely to recognize losses as they were incurred, which, in turn, rendered materially false the Company's repeated Class-Period statements on Forms 10-Q and 10-K that, as of each quarterly period-end, "in accordance with the percentage-

---

[9] Defendants improperly argue that the Court should draw the factual inference, from statements made by McDermott, that weather *was* the primary cause for the delays.  (Motion, at 10, n. 34) ("Fees explained at length the impact of bad weather").  This is improper on a motion to dismiss.  *See* Plaintiffs' 56(f) Motion.

of-completion method of accounting, [McDermott] ha[d] provided for [the] estimated costs to complete all of [its] ongoing contracts." ¶126. The Complaint alleges that Defendants should have recorded the $90 million loss on the Three Qatar Projects when it became clear that the projects could not be performed during the Peak Season, as was required for the profitability assumptions built into McDermott's contract price. ¶¶ 126-27.

Defendants' attempts to avoid liability for these material overstatements of J. Ray's financial results (Motion, at 11-12) are without merit. First, Defendants' assertion that Plaintiffs' "fail to substantiate their 'Peak Season' theory" (Motion, at 12), is incorrect (*see supra* pp. ix, 1), and moreover, improperly suggests that Plaintiffs must make an evidentiary showing in order to defeat a motion to dismiss. Moreover, Plaintiffs did provide a "standard of comparison to what the correct numbers would have been" (Motion, at 12), as the Complaint specifically alleges that "Defendants caused the Company to defer recording losses in connection with the Three Qatar Projects" (¶¶ 94, 125, 126), and that these losses were $90 million (¶ 127). Finally, Defendants' argument that they "regularly accounted for and reported the effect of the delays, in compliance with 'percentage-of-completion' ('POC') accounting and related SEC disclosure requirements" (Motion, at 3), contradicts the Complaint, which alleges that Defendants failed to timely record the $90 million loss on the Three Qatar Projects. ¶¶ 126-27. Such factual arguments are improper in a Motion to Dismiss. If the Court is to adjudicate disputed facts, the Motion is properly characterized as one for summary judgment, and Plaintiffs are entitled to appropriate discovery. *See* Plaintiffs' 56(f) Motion.

### F.    Defendants' Misrepresentations On Forms 144

Although the Court may end its inquiry after finding that any of the foregoing statements satisfied the particularity requirements of the PSLRA,[10] the Complaint also alleges that Defendants misrepresented, in certifications on Forms 4 filed in connection with their Class-Period stock sales, that they did not "know any material adverse information in regard to the current and prospective operations of [McDermott] which has not been publicly disclosed." ¶¶ 29, 31, 38, 56, 59, 61, 66, 74.  These statements were materially misleading because Defendants knew: (1) about undisclosed systemic problems with J. Ray's operations, (2) that the Three Qatar Projects could not be performed during the Peak Season and had become unprofitable, and (3) that such facts had not been properly reflected in McDermott's quarterly backlog calculations and reported financial results.  ¶¶ 91, 93-100, 105-106, 113-119, 120-134. Thus, Defendants' argument that Plaintiffs have failed to allege why these statements were false or misleading when made (Motion at 10-11) is without merit.

### G.    The Statements By Confidential Witnesses Concerning the Falsity of Defendants' Class Period Statements

The Fifth Circuit has held that Plaintiffs may rely on confidential witnesses to satisfy the pleading requirements of the PSLRA under either of two circumstances:

> "(1) if plaintiffs rely on confidential personal sources and other facts, their sources need not be named in the complaint so long as the other facts, i.e., documentary evidence, provide an adequate basis for believing that the defendants' statements or omissions were false or misleading;
>
> (2) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as

---

[10] *See, e.g., Cooper v. Pickett,* 137 F.3d 616, 623 (9th Cir.1997) (court need not analyze every potentially false or misleading statement once it has determined that any statement was false or misleading; such "judgments should be made after discovery is complete.").

> they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief . . . ."

*Barrie v. Intervoice-Brite, Inc*. 397 F.3d 249, 259 (5th Cir. 2005), *modified and reh'g denied*, 409 F.3d 653 (5th Cir. 2005) (quoting *ABC Arbitrage,* 291 F.3d at 352)).

Although it is only necessary to establish one of the two conditions set forth in *Barrie,* the Complaint here establishes both.  First, much of the evidence provided by the Confidential Witnesses, such as project delays at the Jebel Ali facility (¶¶ 113-114), McDermott's detailed system for tracking and reporting project progress (¶¶ 130, 131), problems with McDermott's derrick barges (¶ 119) and J. Ray's problems with welding defects (¶ 116), are substantiated by other post-Class Period statements by Defendants and by McDermott CEO John Fees, which are cited in the Complaint.  *See, e.g.,* ¶¶ 98, 100, 132).  Moreover, the Complaint alleges that each witness worked at J. Ray during the Class Period, had first-hand knowledge of the information provided, and job titles and responsibilities that support their claim of knowledge.  ¶¶ 112, 115-118.  Nothing more is required.  *See, e.g., Barrie*, 397 F.3d 249 at 259; *In re Stone Energy Corp. Sec. Litig.*, No. 05-2088 (MEM), 2007 WL 2903178, *5 (W.D. La. Aug. 17, 2007) (denying in part motion to dismiss where plaintiffs provided general descriptions of the employment duties of each of the confidential witnesses, the field in which they worked, the dates that they were employed, and what the witness knew).[11]  Viewed collectively, these detailed allegations strongly confirm the sufficiency of Plaintiffs' allegations.

---

[11] *See also Central Laborers' Pension Fund*, 497 F.3d at 552 (complaint should give details such as the person's job description, individual responsibilities, and specific employment dates); *Brody v. Zix Corp.*, No. 04-CV-1931-K, 2006 WL 2739352, at *5 (N.D. Tex. Sept. 26, 2006) (same).

## II.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

### A.    The Scienter Allegations Are Cogent and Compelling

Plaintiffs allege misrepresentations and omissions concerning the profitability of the Three Qatar Projects, which comprised $1.4 billion in backlog, one-third of J. Ray's total backlog. These were fixed-price contracts, which meant that McDermott bore the entire risk of loss if the contract price was insufficient to cover the costs of completion. ¶ 102. The key assumption on which McDermott based its successful bid for the Three Qatar Projects was that they would be performed during the Peak Season. *See*, *e.g.*, ¶¶ 98-100. On November 6, 2008, the day after the end of the Class Period, Defendants announced that the Three Qatar Projects were almost ***300 days*** behind schedule. ¶ 98.

A strong inference of scienter should be imputed to the Individual Defendants by virtue of their positions as the Company's most senior officers. The key undisclosed facts – that the profitability of these three fixed-price contracts was absolutely dependent on their performance during the peak summer months, and that performance during those months was foreclosed by systemic problems at J. Ray, cascading delays from earlier projects, and weather-related problems in the first quarter of 2008 – were critical to the Company's business, involving hundreds of millions of dollars of profit and a substantial portion of its operations. Consequently, the Court should infer that Defendants were aware of these key facts. *See*, *e.g.*, *Plotkin*, 407 F.3d at 700 (plaintiff not required to allege specific facts conclusively establishing that IPaxess knew about the financial condition of partners to major contracts, as "[i]t is reasonable to assume, given the importance of these deals to the company, that IPaxess would have familiarized itself" with those facts), *citing Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir.

2000) (an egregious refusal to see the obvious, or to investigate the doubtful, may give rise to an inference of recklessness); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 711 (7th Cir. 2008) (Posner, *J.*) (inferring that CEO knew about problems with the Company's two primary products; contrary inference was "conceivable . . . but exceeding unlikely"); *Applied Signal,* 527 F.3d at 987-88 (defendant officers' high level position in company raises inference of knowledge of financial issue with "devastating effect on the corporation's revenue"); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.,* 320 F.3d 920, 942-43 (9th Cir. 2003) (it was "patently incredible" and "absurd" to suggest that even *outside directors* were unaware of airline's major undisclosed maintenance and operational problems). Consequently, Defendants are simply wrong in arguing (Motion, at 15) that the Complaint does not allege scienter as to the Individual Defendants.

The inference that Defendants were aware that progress on the Three Qatar Projects had fallen so far behind that they could not be performed during the peak summer months is bolstered by the allegations in the Complaint that McDermott used a sophisticated software tool for tracking J. Ray projects and regularly reported the status of projects to senior management, including: (1) monthly Project Status Reviews between J. Ray's Dubai management team and Houston offices regarding all projects, including presentations on start and estimated completion dates for project tasks and percentage completion; (2) project team meetings 3-4 times weekly discussing all facets of a project with client representatives, with detailed documentation of problems or issues discussed; (3) oversight by Area Vice Presidents of all geographic areas in which J. Ray's Marine Division operated, with reports to senior management in Houston regarding schedules; and (4) frequent meetings between Deason, J. Ray's President/CEO, and

employees regarding J. Ray performance.  ¶¶ 130-132.

Indeed, Defendant Wilkinson himself assured investors that these systems permitted extremely close monitoring of the progress of all projects:

> we've a project review methodology, for every month all the major projects go through a project review that ***cover[s] productivity, target schedules[,] absolutely everything going on in it*** and ***so what you have is the best judgment of management*** on a month-to-month basis in effect rescheduling every project and recalibrating every project looking at its then reality.

¶ 132 (quoting Wilkinson on an 11/11/07 investor conference call). (emphasis added).  Contrary to Defendants' criticism that Plaintiffs have failed to identify specific facts in the reporting system (Motion, at 16), which are presumably confidential Company information, the Court should infer from Wilkinson's acknowledgement that the system contains "absolutely everything going on," that top management was well aware that the Three Qatar Projects had fallen hundreds of days behind schedule, and the reasons why.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1231 (9th Cir. 2004) (Oracle CEO's assurance that management tracked detailed sales tracking system contributed to strong inference of scienter).

Additionally, Defendant Taff acknowledged that McDermott was "planning on laying these [Three Qatar Projects] all with the same vessel."  ¶ 100 (quoting 11/6/08 investor conference call).  But delays with earlier projects going back to 2007, well before the beginning of the Class Period, had monopolized the same pipe-laying derrick barge that J. Ray planned to use for the Three Qatar Projects, making their delay inevitable (and foreseeable to Defendants). ¶¶ 4, 79.  And J. Ray's derrick barges were in poor repair, causing excessive down-time – a fact well-known to senior management, as it was frequently brought to the attention of McDermott's Board of Directors.  ¶¶ 4, 119.

- 14 -

### B.     Insider Stock Sales Strongly Support an Inference of Scienter

The Individual Defendants' Class-Period stock sales further support a strong inference of scienter.  As Defendants admit (Motion, at 17), it is well-settled that such allegations give rise to a strong inference of scienter if the stock sales were suspicious in timing or amount.  *See, e.g., Central Laborers*, 497 F.3d at 553 ("In this circuit, officer trading may give rise to an inference of scienter if it is unusual in timing or scope") (citing *Nathenson*, 267 F.3d at 421); *see also Southland Secs. Corp. v. Inspire Ins. Solutions*, 365 F.3d 353, 368 (5th Cir. 2004) (same).  Here, the Complaint alleges that, during the Class Period, Company insiders sold over $50 million in McDermott stock (¶ 134), and Individual Defendants alone sold over $27 million worth of their personal holdings, at artificially inflated prices (¶¶ 8, 29, 31, 38, 52, 56, 59, 61, 62, 66, 74, 134).

Furthermore, contrary to Defendants' arguments (Motion, at 17), the Complaint alleges many facts which support the allegation that these insider sales were suspicious in timing and amount.  For example, the amount of stock sold during the Class Period was suspicious, as Defendant Deason sold over 132,000 McDermott shares (over 65% of his stock holdings) for proceeds exceeding $6 million (¶¶ 31, 52, 56, 134(a)); Defendant Taff sold 26,500 shares of his McDermott stock (including 73% of his exercisable options holdings) for proceeds of over $1.6 million (¶¶ 59, 62, 134(b)); and Defendant Wilkinson sold over 400,000 McDermott shares (including 52% of his exercisable options holdings) for proceeds exceeding $20 million.  ¶¶ 29, 38, 52, 61, 66, 74, 134(c).[12]  Consequently, the amounts of these sales were extraordinary.  In

---

[12] Other Company insiders engaged in sales of McDermott stock of similar scope.  During the Class Period, John T. Nesser sold over 192,000 shares (including 100% of his options holdings) for proceeds exceeding $10.6 million (¶¶ 30, 52, 53, 134(d)); Louis Sannino sold over 112,000 shares (over 52% of his holdings) for proceeds exceeding $6.8 million (¶¶ 33, 52, 64, 134(e)); John Fees sold over 55,000 shares (including nearly 51,000 shares, representing 100% of his exercisable options, in a single day) for proceeds exceeding $4.5 million (¶¶ 34, 52, 55, 134(f));  Liane Hinrichs sold over 26,000 shares (including 25,290 options exercised in a single day) for proceeds exceeding $1.5

addition, the Complaint alleges facts showing that the timing of these sales was extremely suspicious because *all* of the sales from the exercise of options were derived from options that were not set to expire for several *years*.  ¶¶ 29-30, 34, 38, 53-55, 59-61, 64, 66, 74, 134.[13]

Defendants are also incorrect (Motion, at 17) that the Complaint's allegations are somehow "misleading" concerning the insider trading by Defendants Wilkinson and Deason during the Class Period.  For example, contrary to Defendants' factual assertions, Wilkinson's Class Period stock sales were not "made pursuant to a *pre-determined* trading plan" (*id.,* emphasis added), as *all but one* of his Class Period trades were made pursuant to a plan that was created ***during*** the Class Period.[14]  Courts have repeatedly rejected similar attempts by defendants to make factual arguments concerning scienter by relying on the purported relevance of a 10b5-1 plan enacted during the class period at issue.  *See*, *e.g.*, *Central Laborers*, 497 F.3d at 554 (plaintiff "convincingly suggests that the attempt to use the 10b5-1 Plan as a non-suspicious explanation is flawed because, *inter alia*, Reynolds entered into the Plan during the Class Period").[15]  The Defendants are also incorrect (Motion, at 17 and n.64) that the Complaint mischaracterizes the percentage of stock sold by Deason, as the information underlying ¶ 31 of the Complaint (67,620 shares sold; 142,928 beneficially owned shares remaining) was taken

---

million (¶¶ 52, 54, 134(g)); and Ronald Cambre sold 18,600 shares (all from options exercised in a single day for proceeds exceeding $1.1 million (¶¶ 60, 134(h)).

[13] *See*, *e.g.*, *Southland Securities,* 365 F.3d at 380 ("We conclude that these Dunham sales and this sequence of events, considered in light of all the other facts and circumstances alleged, including Dunham's position as CEO, [and] . . . his total sales throughout the class period of over 40 percent of his INSpire stock, and his personal involvement in promoting the Arrowhead contract and touting the increased revenues and earnings it would produce, suffice…to create a strong inference of the requisite scienter on Dunham's part . . . .").

[14] *Compare* Appendix to Defendants' Motion to Dismiss Plaintiffs' Complaint (Docket No. 71), Ex. 17 at page 2 of Form 4 dated 3/4/08 (referring to a 10b5-1 plan adopted on 3/6/07) *and* page 2 of the Forms 4 dated 4/4/08, 5/5/08, and 6/3/08 (referring to a 10b5-1 plan adopted on 3/3/08 – *after* the beginning of the Class Period on 2/27/08).  The later Forms 4, dated 7/3/08 and 8/5/08, refer to a 10b5-1 plan, but do not say when it was adopted.  Presumably, however, those sales were made pursuant to the plan adopted on or after March 3, 2008.

[15] *See also In re Immucor Inc. Sec. Litig.*, No. 1:05-cv-2276-WSD, 2006 U.S. Dist. LEXIS 72335, at *53 n.8 (N.D. Ga. Oct. 4, 2006) ("a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan").

directly from Deason's own Form 4 filing regarding those sales.

### C.    Defendants' Other Scienter Arguments Lack Merit

Defendants' argument that they promptly disclosed negative information (Motion, at 18-19) is directly contrary to the factual allegations of the Complaint (which at this stage must be accepted as true), and improperly requests that the Court adjudicate a disputed factual question. *See* Plaintiffs' 56(f) Motion.  Moreover, the evidence cited by Defendants establishes that they only disclosed *some selected* negative information, not that they disclosed all material adverse information.  As such, Defendants have failed to raise an inference of non-fraudulent intent that is more compelling than the strong inference of fraudulent intent raised by Plaintiffs' allegations. *See Tellabs*, 551 U.S. at 324 (complaint should not be dismissed if inference of scienter is at least as compelling as contrary inference).

Defendants' remaining arguments also lack merit.  First, Defendants incorrectly argue (Motion, at 15) that the Complaint relies on the "group-pleading doctrine" to allege scienter.  To the contrary, as discussed above, the Complaint's scienter allegations are based upon Defendants' admissions, knowledge of material adverse facts and insider trading.  Moreover, the group pleading doctrine has nothing to do with scienter; it has to do with whether statements issued on behalf of an organization can be attributed to senior officers.  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007).  Defendants are also incorrect (Motion, at 18) that Plaintiffs rely upon Defendants' GAAP violations as evidence of scienter; rather, Plaintiffs cite Defendants' representations concerning GAAP compliance as additional materially false and misleading statements.  *See* ¶¶ 22-24, 41, 77, 92, 123; 128-34.  Finally, Defendants erroneously dismiss (Motion, at 19) the CW allegations as failing to support an inference of their scienter.

Significantly, Defendants do ***not*** contend that Plaintiffs have failed to describe the position and duties of the CWs. Moreover, much of the information supplied by the CWs – that senior management carefully tracked the progress and scheduling of projects – merely corroborated Defendants' own admissions. *Compare*, *e.g.*, ¶¶ 130-131 and ¶ 132.

## III.    THE PSLRA'S SAFE-HARBOR DOES NOT SHIELD DEFENDANTS' MISREPRESENTATIONS

Defendants' claim (Motion, at 19-20) that their statements regarding J. Ray's backlog and profitability are protected by the PSLRA's "safe harbor" for forward-looking statements fails for several reasons. First, backlog is "a snapshot of how much work the company has under contract right now, and descriptions of the present aren't forward-looking." *Applied Signal,* 527 F.3d at 990; *see also In re UICI Sec. Litig*., No. 04-CV-1149-P, 2006 U.S. Dist. LEXIS 73753, at *17 (N.D. Tex. Sept. 29, 2006) ("The statutory safe harbor provision does not protect misrepresentations made concerning historical/hard or current facts."). Second, Plaintiffs have alleged that Defendants knew throughout the Class Period that the Three Qatar Projects could not be performed during the Peak Season, and this prevented them from being profitable. Where Plaintiffs allege that "defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations." *Lormand,* 565 F.3d at 244. Third, even assuming, *arguendo*, that Defendants' statements had been identified as forward-looking, the accompanying warnings were not "meaningful" in light of the fact that Defendants did not disclose (1) that the profitability of the Three Qatar Projects depended on their being performed during the Peak Season; and (2) that delays had already prevented performance during the Peak Season.[16] Rather than disclosing these specific, critical

---

[16]    The cautionary language must describe specific, then-existing factors that could undermine the predictive

risks, the cautionary language cited by Defendants (Motion, at 20 n.72) is classic boilerplate. *See Lormand*, 565 F.3d at 244 -245 (finding similar boilerplate warnings insufficient for safe-harbor protection); *Plotkin,* 407 F.3d at 694 (same). Nor can the generic risk factors listed by Defendants reasonably be read to speak to the risks applicable to the backlog and circumstances surrounding the Three Qatar Projects.[17]

Finally, Defendants have failed to identify, as they must, how each allegedly false or misleading statement is specifically and meaningfully protected by the safe harbor, electing instead to attach a massive number of exhibits and improperly burdening the Court with such a determination. *See Lormand*, 565 F. 3d at 245 (requiring that **"**[e]ach statement that benefits from the safe harbor must be addressed individually" and holding that failure to do so provides grounds for rejection of defendants' safe harbor defense) (citation omitted) (collecting cases).

## IV.    THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY

Defendants do not dispute that Plaintiffs properly alleged that Defendants are "control persons" under Section 20(a) of the Exchange Act.    Motion, at 20.    Accordingly, as the Complaint sufficiently alleges a primary violation of the Exchange Act, the Court should sustain Plaintiffs' Section 20(a) claim.

---

statement.  Boilerplate or generic disclaimers will not suffice.  *See Lormand.*, 565 F.3d at 244 ("The requirement for 'meaningful cautionary statements' calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors") (quoting *Southland Sec. Corp.,* 365 F.3d at 372)).

[17] *See Lormand*, 565 R.3d at 246 (refusing safe harbor protection based on similarly vague and generalized cautions, *e.g.* that Sprint may "make decisions that adversely affect our business." *See also UICI,* 2006 U.S. Dist. LEXIS 73753, at *20 (cautionary language bore "no relation to the actual risk").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' Motion to Dismiss should be denied in its entirety.


Date:   August 3, 2009

Respectfully submitted,


SCHWARTZ, JUNELL, GREENBERG
   & OATHOUT, LLP

By:    */s/ Roger B. Greenberg*                     
Roger B. Greenberg
Texas State Bar No 08390000
Federal I.D. No. 3932
Two Houston Center
909 Fannin, Suite 2700
Houston, Texas 77010
Telephone: 713/752-0017
Facsimile: 713/752-0327

*Liaison Counsel for Plaintiffs*

IZARD NOBEL LLP
Robert A. Izard
Jeffrey S. Nobel
Mark P. Kindall
Matthew L. Tuccillo
29 South Main Street
Suite 215
West Hartford, CT 06107
Tel.:  (860) 493-6292
Fax:   (860) 493-6290

*Lead Counsel for Plaintiffs*

- 20 -

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Gregory M. Castaldo
Benjamin J. Sweet
Bharati O. Sharma
Michelle Newcomer
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056

COUGHLIN STOIA
GELLER RUDMAN & ROBBINS, LLP
58 South Service Road, Suite 200
Melville, NY 11747
Tel:  (631) 367-7100
Fax:  (631) 367-1173

*Additional Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2009, I electronically filed the foregoing ***Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint*** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email address denoted below, and I hereby certify that I have mailed the foregoing documents via the United States Postal Service to the non-CM/ECF participants as indicated below:

Mark Glasser:  mark.glasser@bakerbotts.com

Richard B. Harper
Seth T. Taube
Baker Botts LLP
30 Rockefeller Plz, 4th Floor
New York, NY 10112

_____*/s/ Roger B. Greenberg*_____
ROGER B. GREENBERG

- 21 -