**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ADAMS FAMILY, et. al., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-1208 |
| | § | |
| MCDERMOTT INTERNATIONAL, INC., | § | |
| BRUCE W. WILKINSON, MICHAEL S. | § | |
| TAFF, and ROBERT A. DEASON, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION
ON DEFENDANTS' MOTION TO DISMISS**

This matter was referred by United States District Judge Vanessa D. Gilmore, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #99). In this putative class action for securities fraud, lead Plaintiffs George R. Adams, Mina J. Adams, and George L. Adams ("Plaintiffs") complain that Defendant McDermott International, Inc. ("McDermott") "made a series of material misrepresentations," in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission Rule 10b-5, codified at 17 C.F.R. § 240.10B-5. (Consolidated Complaint ["Complaint"], Docket Entry #46). Defendants Bruce W. Wilkinson ("Wilkinson"), Michael S. Taff ("Taff"), and Robert A. Deason ("Deason") (collectively the "Individual Defendants") allegedly made similarly fraudulent representations in their capacities as officers of McDermott or its subsidiaries. (*Id*.). Before addressing the merits of Plaintiffs' suit, Defendants have moved to dismiss this action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Defendants' Motion to Dismiss Plaintiffs' Complaint ["Defendants' Motion"], Docket Entry #71). Responses and replies have followed that motion. (Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs'

1

Complaint ["Plaintiffs' Response"], Docket Entry #86; Defendants' Reply in Support of Motion to Dismiss Plaintiffs' Complaint ["Defendants' Reply"], Docket Entry #90). After a review of the pleadings, the evidence provided, and the applicable law, it is **RECOMMENDED** that Defendants' motion be **GRANTED**.

### BACKGROUND

Plaintiffs are each McDermott investors who "purchased the [company's] publicly-traded common stock . . . between February 27, 2008 and November 5, 2008" (the "Class Period"). (Complaint ¶ 1). Plaintiffs allegedly purchased the stock based, at least in part, on the potential profitability of three constructions projects in Qatar that had been awarded to a McDermott subsidiary. (*Id*. ¶ 137). In this lawsuit, Plaintiffs contend that the profitability of those projects was dependent on performance during the summer months, or the "Peak Season." Plaintiffs claim, however, that, as early as February 2008, Defendants knew, but did not disclose, that substantial delays had rendered that "Peak Season" performance impossible. Plaintiffs allege that when Defendants revealed, in November 2008, that the projects were not profitable, they were injured by the resulting devaluation of McDermott stock.

Accepting Plaintiffs' allegations as true, as the court must on a motion to dismiss[1], the following facts are critical to the pending motion: McDermott, a Panamanian corporation, "provides products and services to customers in the energy and power industries, including utilities and other power generators, major and national oil companies, and the United States Government." (Complaint ¶¶ 14, 18). McDermott's operations are divided among three broad business segments: Offshore Oil & Gas Construction (the "Offshore Segment"); Government Operations; and Power Generation Systems. (*Id*. ¶18). The Offshore Segment "provides

---

[1] In considering a motion to dismiss under Rule 12(b)(6), a court must accept the plaintiffs' allegations as true and draw all reasonable inferences in their favor. *See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

services primarily to offshore oil and gas field developments worldwide, including design, engineering, fabrication and installation of offshore drilling and production facilities, and the installation of marine pipeline and subsea production systems." (*Id*. ¶19). The Offshore Segment is operated through J. Ray McDermott, S.A., J. Ray McDermott Holdings, L.L.C., and the subsidiaries of those companies (collectively "J. Ray"). (*Id*. ¶19). This action arises from J. Ray's pipeline construction operations off the coast of Qatar.

Between 2005 and 2007, J. Ray was awarded four construction projects in the territorial waters of Qatar (the "Qatar Projects"). (*Id*. ¶107-111). The first project, announced in September 2005, was for the construction of offshore facilities and pipelines to "supply feed gas produced from the [Qatar] North Field" to the mainland. (*Id*. ¶108). In the second half of 2006, J. Ray announced that it had been awarded two additional contracts to "engineer, construct, transport, install hook-up and pre-commission two wellhead platforms in Qatar's North Field," and to "engineer, procure, construct and install" the corresponding pipelines. (*Id*. ¶109-110). Finally, in June 2007, J. Ray announced that it had been awarded a contract for the "construction, engineering, transportation and installation of pipelines to connect three wellhead platforms in Qatar's North Field to onshore facilities." (*Id*. ¶111). These contracts represented a potential $1.4 billion in Offshore Segment revenue. (*Id*. ¶ 3). Allegedly, when "J. Ray fixed its prices for the work to be performed in connection with the [Qatar Projects], it determined that the only way that [it] could derive any profit from the $1.4 billion in revenue . . . would be if [it] was able to perform its work during certain months in the Spring and Summer of 2008," the so called "Peak Season." (*Id*. ¶ 4).

Following the announcement of the contracts, the record is silent on any other public statement by McDermott regarding those projects, until February 27, 2008.  On that date, McDermott filed its Form 10-K financial report, as required, with the Securities and Exchange

Commission. (Id. ¶ 20). The 10-K was signed by Wilkinson, the former McDermott CEO and Chairman of the Board, and Taff, McDermott's CFO and Senior Vice-President. In that 10-K, McDermott presented its annual financial report for the 2007 fiscal year. (Id.). It reported that, as of December 31, 2007, the Offshore Segment had approximately $4.8 billion in backlog.[2] (*Id*. ¶21). The 10-K stated further that,

> We recognize our contract revenues and related costs on a percentage-of-completion basis. Accordingly, we review contract price and costs estimates periodically as the work progresses and reflect adjustments in income proportionate to the percentage of completion in the period when we revise those estimates.

(Id. ¶22). Finally, the 10-K reported that "[i]n accordance with the percentage-of-completion method of accounting, we have provided for our estimated costs to complete all of our ongoing contracts." (Id. ¶ 24).

On February 27, 2008, McDermott also issued a press release which repeated the backlog information reported in the 10-K. (Id. ¶ 25). The next day, McDermott held a conference call with analysts and investors to "discuss our financial results which we reported" to the SEC. (Id. ¶ 26). During the question and answer phase of the conference call, Wilkinson engaged in the following exchange regarding the profitability of J.Ray's backlog:

> Q. In the past you've talked about the offshore [profit] margins in the . . . low mid teen [percent] levels and then you seem to do a little better than that. Any update on your comments there?
>
> A. I think you've talked about them in the low and mid teens. We've talked about them 10 to 12% . . . and people are always tickled when we do. Looking back again at '07, its about 16% . . . If we just look at the year, and yet you see wide variation in the quarter-by-quarter. I think that will continue but really the pricing remains strong. We're able to book with good margin with considerable contingency. . . . [W]e have the chance to beat all these numbers down in the 10, 12% as we've been doing consistently.

(Id ¶ 26).

---

[2] A segment's "backlog" refers to "the amount of revenue that the Company was contractually entitled to recognize as revenue under its existing construction contracts." (Complaint ¶ 2).

On March 3, 2008, Wilkinson exercised options to buy 140,000 shares of McDermott stock, at $4.84 per share. He immediately sold those shares for between $51.63 and $52.99 per share. Wilkinson reported these sales on a Form 144 certification with the SEC, in which he certified that he was not aware of "any material adverse information in regard to the current and prospective operations of [McDermott] which have not been publicly disclosed." (*Id*. ¶ 29). On the same day, McDermott Vice-President John T. Nesser, III, exercised options to buy 47,460 shares of McDermott stock at $6.7267 per share. Nesser then immediately sold those shares for $52.00 and $52.18 per share. (*Id*. ¶ 30). Likewise, in March 2008, Deason sold 80,000 shares of McDermott stock, and stated, in a Form 144 SEC certification, that he "did not know any material adverse information in regard to the current and prospective operations of [McDermott] which has not been publicly disclosed." (*Id*. ¶ 31). On March 10, 2008, McDermott Vice President Louis J. Sannino sold 60,000 shares of stock, and John Fees, the CEO of a McDermott subsidiary, exercised options to buy 4000 shares at $6.72 per share, which he immediately sold at $50.00 per share. (Id. ¶ 33-34).

The following month, on April 28, 2008, McDermott issued a press release which purported to provide a "preview of the Company's expected segment financial results, and other major items, for the first quarter of 2008 based on management's recent operating reviews." (Id. ¶ 35). That press release revealed that 2008 first quarter revenues in the Offshore Segment were approximately $100 million less than what had been estimated in the February 2008 10-K. In fact, McDermott reported the decrease in the following manner:

> The Offshore Oil & Gas Construction segment was adversely affected by external events in the three month period ending March 31, 2008, which is expected to moderate both segment revenues and segment income for the 2008 first quarter. During the quarter, over one-half of McDermott's planned offshore working days for major construction vessels were unproductive, primarily due to harsh weather in certain parts of the Asia-Pacific and Middle East regions. As a result, the financial impact to McDermott's first quarter is anticipated to be twofold, comprised of an approximate $20 million period

expense and the deferral of unrecognized project revenue and income to future periods.

(Id.). The April 2008 press release also quoted Wilkinson as stating the following:

> [a]lthough we are expecting a mixed first quarter from the segments, the outlook for 2008 remains solid. . . . The Offshore Oil & Gas Construction business was negatively affected during the period, but in spite of external events, I continue to anticipate a strong year in this segment. . . . We expect 2008 to be another robust year at McDermott. . . . Our expected first quarter results from Offshore Oil & Gas are not systemic, but related to extraordinary events within the period, which we do not expect to overly impact the balance of the year.

(Id.).

Approximately one week later, on May 1, 2008, Wilkinson exercised options to buy an additional 43,640 shares of McDermott stock at $4.84 per share. He immediately sold those shares for between $52.76 and $53.80 per share. He also certified, in a Form 144 SEC certification, that he "did not know any material adverse information in regard to the current and prospective operations of [McDermott] which has not been publicly disclosed." (Id. ¶ 38). Eleven days later, McDermott issued a press release regarding its financial results for the first quarter of 2008. In that press release, McDermott reported first quarter revenues for the Offshore Segment to be $645.9 million. The company acknowledged that the numbers were lower than expected, but stated that the "decrease in segment income was primarily attributable to a high-level of unproductive offshore working days for major construction vessels during the 2008 first quarter, due to poor weather conditions in major areas of operation." (Id. ¶ 39).

That same day, McDermott filed its Form 10-Q quarterly report with the SEC for the first quarter of 2008. (Id. ¶ 40). The 10-Q was signed by Taff, and it reported that the amount of the Offshore Segment backlog, expected to be realized in 2008, had increased to $3.8 billion. (Id.). The 10-Q also stated that "[a]s of March 31, 2008, in accordance with the

percentage-of-completion method of accounting, we have provided for our estimated costs to complete all of our ongoing contracts." (Id. ¶ 41).

On May 13, 2008, Taff and Wilkinson held a conference call with analysts and investors to discuss the 10-Q report. (Id. ¶ 42). In that call, Taff repeated that the first quarter numbers for 2008 were "adversely affected by harsh weather in a number of our regions in or Offshore Oil and Gas Construction segment, which resulted in a period expense of about $20 million plus the deferral of project revenue and income to future periods." (Id. ¶ 43).

On July 16, 2008, McDermott issued another press release, regarding its recent credit upgrades. That press release quoted Taff as stating that "[t]hese credit ratings upgrades are further external recognition of our strong operating performance, record backlog, and conservative balance sheet." (Id. ¶ 70). On August 11, 2008, McDermott issued a press release concerning its second quarter results for 2008. In that press release, McDermott reported that the Offshore Segment had a backlog of $5.272 billion. (Id. ¶ 75). On the same day, McDermott filed its second quarter 10-Q, which was signed by Taff. (Id. ¶ 76). In that 10-Q, the company also reported an Offshore Segment backlog of $5.272 billion, and it stated that "[a]s of June 30, 2008, in accordance with the percentage-of-completion method of accounting, we have provided for our estimated costs to complete all of our ongoing contracts." (Id. ¶ 77).

On August 12, 2008, Wilkinson and Taff conducted a conference call with analysts and investors to discuss the latest financial results. (Id. ¶ 78). Wilkinson reported that the Offshore Segment income "was lower than we anticipated," but that the profit margin remained "right in the middle of the 10 to 12% range we've consistently suggested." (Id.). He then acknowledged that the Qatar projects had been delayed, but he stated that the "delay in some of the work [did not] eliminate the profitability." (Id. ¶ 80). Finally, on September 2,

2008, Wilkinson, Taff, and Fees attended a Lehman Brothers "2008 CEO Energy/Power Conference," during which they "continued to represent that the work underlying J. Ray's backlog was profitable and would realize profit margins of at least 10%-12%." (Id. ¶ 83).

In November 2008, however, Defendants made significant disclosures which revealed that McDermott was unlikely to realize a profit on the Qatar Projects. For instance, on November 5, 2008, McDermott issued a press release which reported that delays on the Qatar Projects would result in lowered profitability for the Offshore Segment. (*Id*. ¶ 94). That press release also reported that the Offshore Segment had incurred "approximately $90 million of contract losses on the expected costs to complete various projects." (*Id*.). The same day, McDermott filed its 2008 third quarter Form 10-Q financial results with the SEC. (*Id*. ¶¶ 95-97). That 10-Q reported that, as of "September 30, 2008 the [Offshore Segment] backlog included approximately $1.3 billion related to contracts in or near loss positions, which are estimated to recognize future revenues with approximately one percent gross margins on average." (*Id*.). In that same 10-Q, McDermott also disclosed that some of the contracts "have milestone due dates that must be met or we may be subject to penalties for liquidated damages if claims are asserted and we are ultimately responsible for the delays." (*Id*.). Those potential damages were estimated to be "approximately $110 million." (*Id*.).

During a November 6, 2008, conference call with analysts and investors, McDermott's CEO John Fees summarized the status of the Qatar Projects and their financial impact on the Offshore Segment:

> The vast majority of the segment shortfall this quarter relates to just three projects out of an active oil and gas portfolio of about 30 major jobs. The problems with these three contracts all relate to the pipeline installation phase. . . . We still have about $1 billion of revenue left to recognize on our backlog of these projects as of September 30. However, with our increased estimated cost to complete, virtually all the gross margin has been eliminated.

(*Id*. ¶ 98). Fees then stated that the "majority of the cost increases on these jobs relate to three issues: namely, productivity, schedule delays and excessive downtime." (*Id*.). Fees elaborated on each cause, in turn:

> First, productivity. The estimates used in our bid for all three projects were based upon similar completed successful projects. These reference projects were performed during peak summer construction months so they experienced high productivity and few downtime days. Productivity is measured in how many joints of pipe a day we expect to accomplish. In hindsight this joints per day, or what we call lay rates, were proved to be too aggressive and we've not been able to achieve production at these levels. As is typically the case in the Construction business, when you start a project with a poor bid assumption it's hard to recover.

(*Id*.). Fees also reported that scheduling problems caused cost increases as well. (*Id*.). More specifically, he detailed that "delays from preceding jobs in the queue . . . caused us to . . . us[e] a different vessel than what we assumed in the bid," and "this change in assumptions increased our cost." (*Id*.). Finally, Fees blamed the increased costs on "excessive downtime" caused by "weather, mechanical issues, support vessel availability and some customer ordered stand-bys." (*Id*.).

With respect to all three designated causes for the construction delays, Fees emphasized that "[a]ny of these problems alone would be a concern, but how they compound when taken together is really the issue." (*Id*.). Fees provided the following example:

> Because our productivity is less than anticipated we're spending more days in the field, which increases our exposure to weather and mechanical downtime. These extra days spent on the job also mean the next projects in the queue have schedule impacts as well. With the schedule being compromised we found ourselves starting projects in historically bad weather windows, which further hampered productivity and increased our downtime days. And every time a vessel goes down, and what we mean by that is it stops laying pipe, for whatever reason, the interruption impacts productivity because starts and stops never permit our crews to build any type of momentum.

(*Id.*). Plaintiffs allege that, in reaction to these disclosures, the price of McDermott stock, which closed at $15.56 per share on November 5, 2008, fell to $10.39 per share at the close of the market on November 6, 2008. (*Id.* ¶ 104).

On May 22, 2009, Plaintiff filed their Consolidated Complaint.[3] (Complaint). In that pleading, Plaintiffs contend that "Defendants repeatedly represented that the Company's reported backlog for the [Offshore Segment] was profitable," but that Defendants "concealed the known, material, adverse fact that the [Qatar Projects] . . . could not be performed profitably due to events that had already taken place." (*Id.* ¶ 4). Plaintiffs argue that Defendants knew that the projects' profitability depended on performance during "Peak Season," and that various delays had already rendered such performance impossible. (*Id.* ¶ 5). In response to these allegations, Defendants filed their motion to dismiss, under Federal Rule of Civil Procedure 12(b)(6), on July 1, 2009. (Defendants' Motion). In that motion, Defendants insist that Plaintiffs have not alleged with sufficient particularity that any representations by McDermott or its employees were materially false at the time they were made. (*Id.*). In particular, Defendants are adamant that "Plaintiffs never allege a factual basis to demonstrate that any Defendant knew or believed that the Projects must be performed during a particular part of the year to be profitable, much less that any Defendant had such knowledge or belief before construction began." (Defendants' Reply p. 3). Defendants argue, further, that Plaintiffs have not alleged, with the required specificity, that any Individual Defendant or other McDermott officer was aware of systemic problems at J. Ray, or that those problems impacted the Qatar projects in any way. (*Id.*). After a review of the pleadings, the

---

[3] This case joins three separate actions filed against Defendants in the Southern District of New York. (Order Consolidating Cases, Docket Entry #26). Those cases were consolidated on January 30, 2009. (Id.). Approximately one month later, Plaintiffs here were appointed as lead plaintiffs. (Order Appointing Adams Family Lead Plaintiffs, Docket Entry #35). On April 22, 2009, the case was transferred to the Southern District of Texas. (Docket Entry #40). Plaintiffs filed their Consolidated Complaint one month later. (Docket Entry #46).

evidence provided, and the applicable law, it is **RECOMMENDED** that Defendants' motion

be **GRANTED**. Even if Plaintiffs have properly alleged materially false statements, which

Defendants contest, the Complaint does not show that any particular statement was made with

the requisite intent to defraud.

## STANDARD OF REVIEW

### *Rule 12(b)(6)*

Under Rule 12(b)(6), a party may move to dismiss an action for "failure to state a

claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In considering such a

motion, a court must accept the plaintiffs' allegations as true and draw all reasonable

inferences in their favor. *See, e.g., Leatherman v. Tarrant County Narcotics Intelligence &*

*Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Further, a

court may not look beyond the face of the pleadings to determine whether relief should be

granted based on the alleged facts. *See St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.*, 937 F.2d

274, 279 (5th Cir.1991). While, typically, a complaint need not contain detailed factual

allegations, the Supreme Court has held that a plaintiff's "obligation to provide the 'grounds'

of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544 (2007). A plaintiff must instead allege "enough facts to state a claim to relief

that is plausible on its face" and "raise a right to relief above the speculative level." *Id*. at

1974; *Nationwide Bi-Weekly Admin. v. Belo Corp.*, 512 F.3d 137, 140 (5th Cir.2007). More

recently, the Supreme Court has addressed the standard applicable to motions to dismiss,

under Rule 12(b)(6), in the following terms:

> To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, to state a claim to relief that is plausible on its face. A
> claim has facial plausibility when the plaintiff pleads factual content that
> allows the court to draw the reasonable inference that the defendant is liable

> for the misconduct alleged. The plausibility standard is not akin to a
> probability requirement, but it asks for more than a sheer possibility that a
> defendant has acted unlawfully. Where a complaint pleads facts that are merely
> consistent with a defendant's liability, it stops short of the line between
> possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal

citations and quotation marks omitted). Two "working principles" underlie this standard. *Id.*

at 1949-50. The first principle is "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions." *Id.* The second

principle holds that "only a complaint that states a plausible claim for relief survives a motion

to dismiss." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the

pleader is entitled to relief.'" *Id.* (quoting Fed.R.Civ.P. 8(a)(2)).

### *The PSLRA and Rule 9(b)*

Because Plaintiffs here have raised complaints of fraud and securities law violations,

their allegations are also subject to unique, and stringent, pleading requirements.  The Federal

Rules of Civil Procedure dictate that "in all averments of fraud or mistake, the circumstances

constituting fraud or mistake shall be stated with particularity."  Fed.R.Civ. P. 9(b).  More

importantly, Congress has increased the quantum of factual detail required in complaints

seeking recovery under the federal securities laws. The Private Securities Litigation Reform

Act ("PSLRA"), requires that,

> In any private action arising under this chapter in which the plaintiff alleges
> that the defendant–
>
> (A) made an untrue statement of material fact; or
>
> (B) omitted to state a material fact necessary in order to make
> the statements made, in light of the circumstances in which they
> were made, not misleading:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Under this statute, a plaintiff must "lay out the who, what, when, and where in the pleadings *before* access to the discovery process is granted, to prevent abusive, frivolous strike suits." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 257 (5th Cir. 2003). These requirements, taken together, guide the courts in "winnowing out meritless claims by imposing more stringent pleading requirements on plaintiffs." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 407 (5th Cir. 2001).

**DISCUSSION**

Plaintiffs make claims against Defendants under § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 promulgated under it. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Those claims stem from the overarching contention that, in SEC filings, press releases, and conference calls, McDermott and the Individual Defendants violated federal securities law by making material misrepresentations or omissions. (Complaint at ¶¶ 168-174). Plaintiffs allege, in particular, that Defendants knew, but failed to disclose that the profitability of the Qatar Projects depended on "Peak Season" performance, that delays had rendered the Qatar Projects unprofitable, and that the delays were caused by systemic operational issues at J. Ray. (Plaintiffs' Response p.12).

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). In relevant part, SEC Rule 10b-5, promulgated pursuant to Section 10(b), makes it unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. A valid claim under § 10(b) and Rule 10b-5, then, requires a plaintiff to allege that, in connection with the purchase or sale of securities, the defendant (1) made a misrepresentation or omission (2) of a material fact (3) with scienter (4) on which plaintiff relied (5) that resulted in his injury. *R2 Investments*, 401 F.3d at 640-42; *Nathenson*, 267 F.3d at 406-07 (both quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

Here*,* Plaintiffs identify thirty-one allegedly false or misleading statements that they claim violate Section 10(b) and Rule 10b-5. Those representations can be grouped into five broad categories. First, Plaintiffs identify representations about the amount and profitability of the Offshore Segment's backlog. Next, Plaintiffs point to representations about the cause of the Qatar Projects' delays, and the effect of those delays on the projects' profitability. Plaintiffs also complain that Defendants falsely stated that McDermott had properly accounted for the projects' costs. Finally, Plaintiffs complain that, when the Individual Defendants sold their own McDermott stock, they falsely stated that they were not aware of any adverse information. Defendants insist that, with respect to all five categories, Plaintiffs' action should be dismissed because they do not "cite any document, or quote any witness, to show that any Defendant acted with scienter in making any particular statement." (Defendants' Motion p.15).

In actions for securities fraud, scienter is defined as "an intent to deceive, manipulate, or defraud," or "severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs.*, 401 F.3d at 643; *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir.2005). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations

that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *R2 Invs.*, 401 F.3d at 643 (quotation omitted). It is critical that a complaint allege facts to show that a defendant had the requisite scienter *at the time* a particular representation was made. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009). Courts will not infer "that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly," or so-called "fraud by hindsight." *Id.* Courts employ a three step approach to review allegations of scienter when weighing a motion to dismiss based on the PSLRA. *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir.2008). First, the allegations must be taken as true. *Id.* Second, the facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled. *Id.* Further, the court may consider any documents that have been incorporated in the complaint by reference, as well as matters subject to judicial notice. *Id.* Third, a court must take into account any "plausible inferences opposing as well as supporting a strong inference of scienter." *Id.* Most importantly, the inference of scienter must be "cogent and compelling," not merely "reasonable" or "permissible." *Id.*

Plaintiffs contend that Defendants acted with the requisite scienter because McDermott knew, but did not disclose, two "key" facts: (1) "that the profitability of [the Qatar Projects] was absolutely dependent on their performance during the peak summer months"; and (2) "that performance during those months was foreclosed by systemic problems at J. Ray." (Plaintiffs' Response p.12). In response, Defendants insist, first, that "Plaintiffs never allege a factual basis to demonstrate that any Defendant knew or believed that the Projects must be performed during a particular part of the year to be profitable, much

less that any Defendant had such knowledge or belief before construction began." (Defendants' Reply p. 3).

To show that McDermott's officers were aware that profitability depended on "Peak Season" performance, Plaintiffs rely on a single statement by John Fees. (Plaintiffs' Response p.ix). During the November 6, 2008, conference call with analysts and investors, Fees summarized the status of the Qatar Projects and their financial impact on the Offshore Segment. (Complaint ¶ 98). Fees identified "productivity" as a primary cause of the project delays, stating that McDermott's productivity estimates "proved to be too aggressive." (*Id.*). He reported that those estimates, or "lay rates," were based on "similar completed successful . . . reference projects" that were "performed during peak summer construction months." (Id. ¶ 98). While relying exclusively on this statement, Plaintiffs do not explain how it purportedly supports the premise on which their allegations are founded. (*See* Plaintiffs' Response). The statement is silent, for instance, on when the Qatar Projects were scheduled, when they had to be profitably completed, or whether profitability was dependent on "Peak Season" performance. A plain reading of the statement reveals only that the estimated "lay rates" for the Qatar Projects "proved to be too aggressive." But courts will not infer "that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly," *See Lormand*, 565 F.3d at 254. Further, while J. Ray's "lay rates" were based on "successful . . . reference projects" that happened to have been performed during "peak summer construction months," there is no indication that their success or profitability necessarily depended on performance during that time period.

Even if the court were to imbue Fees' statement with the significance the Plaintiffs afford it, the statement would be, at best, ambiguous. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind.'" *Flaherty*, 565 F.3d at 208 (quoting *Tellabs*, 127 S.Ct. at 2511). Notably, in *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, the plaintiffs argued that the defendant company had improperly recorded its revenue in an attempt to defraud investors. 537 F.3d 527 (5th Cir.2008). To show that the company's CEO was aware of the improper accounting, the plaintiffs alleged that the CEO had "scream[ed] at a company financial analyst . . . because Shaw's revenue numbers were too low and [the analyst] 'needed to do something to fix that.'" *Id*. 537-538. While the plaintiff inferred scienter from this statement, the Fifth Circuit observed that the CEO "may have simply been pointing out an error that needed to be corrected." *Id*. The court held that "the statement cannot contribute to a strong inference of scienter because it is 'susceptible to many interpretations, including innocent ones.'" *Id*. (quoting *In re Integrated Elec. Servs., Inc.*, No. 4:04-CV-3342, 2006 WL 54021, at *4 (S.D.Tex. Jan. 10, 2006) (unpublished) (holding that comment by corporate manager to employee was too ambiguous to support strong inference of scienter), *aff'd*, *Central Laborers*, 497 F.3d 546 (5th Cir.2007)).

Here, a plain reading of Fees' statement does not suggest that the Qatar Projects' profits depended on "Peak Season" performance. In fact, accepting Plaintiffs' contrary interpretation of it merely shows that the statement is susceptible to many readings, some of them innocent. As in *Shaw*, the Fees comments cannot be said to be "cogent and compelling" inferences of scienter. *See Shaw*, 537 F.3d at 533. On these pleadings, Plaintiffs have failed to show that any Defendant knew, but did not disclose, "that failure to perform the Three Qatar Projects during peak season would render them unprofitable." (Complaint ¶ 129).

This finding is fatal to three of the five categories of misrepresentations on which Plaintiffs' action is based. Plaintiffs complain that "Defendants' representations concerning

the amount [and profitability] of the [Offshore Segment's] backlog . . . were materially false or misleading because [the Qatar Projects were] unprofitable."[4] (Complaint ¶¶ 87-88). Likewise, Plaintiffs complain that "Defendants' representations that delays did not adversely affect the profitability of the [Qatar Projects] . . . were materially false or misleading because the failure to perform the Three Qatar Projects during the Peak Season rendered the work

---

[4] Plaintiffs cite the following statements regarding the amount and profitability of the Offshore Segment backlog:

- On February 27, 2008, McDermott filed its Form 10-K financial results for 2007, in which it reported that the Offshore Segment "had approximately $4.8 billion in backlog" (*Id.* ¶ 21);

- On February 27, 2008, McDermott issued a press release, in which it reported that "the backlog for [the Offshore Segment] was $4.8 billion" (*Id.* ¶ 25);

- During a February 28, 2008, conference call with analysts and investors, Wilkinson and Taff "repeated the financial results reported . . . in the 2007 10-K and the February 27, 2008 Press Release," and "Wilkinson represented that the work underlying J.Ray's reported backlog was profitable, and that the profit margins . . . were at least 10-12 percent" (*Id.* ¶ 26);

- On April 28, 2008, McDermott issued a press release, in which it reported that "the only effect of . . . delays would be to defer revenue and profits . . . to later quarters" (Id. ¶ 35);

- On May 12, 2008, McDermott filed its Form 10-Q financial results for the first quarter of 2008, in which it reported that the Offshore Segment "was presently scheduled to report higher 2008 revenues than the amounts reported" earlier in the year" (*Id.* ¶ 40);

- During a May 13, 2008 conference call with analysts and investors, Wilkinson and Taff reported that "the work underlying the reported backlog in the [Offshore Segment] was profitable," but that, due to delays, "revenue and profits . . . had been deferred to other quarters in 2008" (*Id.* ¶¶ 43-46);

- On July 16, 2008, McDermott issued a press release which quoted Taff as stating that "recent credit ratings upgrades are further external proof of our . . . record backlog" (*Id.* ¶ 70);

- On August 11, 2008, McDermott issued a press release in which it reported that the Offshore Segment had $5.272 billion in backlog (*Id.* ¶ 75);

- On August 11, 2008, McDermott filed its Form 10-Q financial results for the second quarter of 2008, in which it reported "that the [Offshore Segment] had backlog of $5.272 billion" (*Id.* ¶ 76);

- During an August 12, 2008, conference call with analysts and investors, Wilkinson stated that the profit margins for the Offshore Segment remained in "the middle of the 10 to 12% range we've consistently suggested," and that "the delay in some of the work [did not] eliminate the profitability" (*Id.* ¶¶ 78, 80); and,

- On September 2, 2008, "Defendants Wilkinson and Taff, together with John Fees . . . had a series of meetings with analysts during which they continued to represent that the work underlying J. Ray's backlog was profitable and would realize profit margins of at least 10%-12%" (*Id.* ¶ 83).

underlying these projects unprofitable, and subjected McDermott to liquidated damages of as much as $100 million."[5] (*Id.* ¶ 89). Finally, Plaintiffs complain that "Defendants' representations that McDermott had already recognized and accounted for all of the costs required to complete its ongoing contracts . . . were materially false or misleading because J. Ray had not recognized and accounted for approximately $90 million of contract costs to complete [the] Three Qatar Projects."[6] (Id. ¶ 92). Plaintiffs argue that Defendants knew that these contract losses should have been recorded prior to the Class Period, because Defendants knew that the projects could not be profitably completed during the "Peak Season." (*Id.* ¶ 7; Plaintiffs' Response p.9: "Defendants should have recorded the $90 million loss on the Three

---

[5]  Plaintiffs cite the following statements regarding the effect of delays on the profitability of the Offshore Segment backlog:

- On April 28, 2008, McDermott issued a press release, in which it reported that "the only effect of . . . delays would be to defer revenue and profits . . . to later quarters" (*Id.* ¶ 35);

- On May 12, 2008, McDermott filed its  Form 10-Q financial results for the first quarter of 2008, in which it reported no decline in Offshore Segment profits due to delays (*Id.* ¶ 40);

- During a May 13, 2008, conference call with analysts and investors, Wilkinson and Taff reported that, due to delays on the Qatar Projects, "revenue and profits . . . had been deferred to other quarters in 2008" (*Id.* ¶¶ 43-46); and,

- During an August 12, 2008, conference call with analysts and investors, Wilkinson stated that the profit margins for the Offshore Segment remained in "the middle of the 10 to 12% range we've consistently suggested," and that "the delay in some of the work [did not] eliminate the profitability" (*Id.* ¶¶ 78, 80).

[6]  Plaintiffs cite the following statements regarding the McDermott's accounting:

- In its February 27, 2008, Form 10-K, McDermott reported that "We recognize our contract revenues and related costs on a percentage-of-completion basis. Accordingly, we review contract price and cost estimates periodically as the work progresses and reflect adjustments in income proportionate to the percentage of completion in the period when we revise those estimates" (*Id.* ¶¶ 22-23);

- Also in that 10-K, McDermott reported that "we recognize estimated contract revenue and resulting income based on costs incurred to date as a percentage of total estimated costs" (*Id.*); and,

- In its 10-K, its May 12, 2008, Form 10-Q, and its August 11, 2008, Form 10-Q, McDermott reported that, in "accordance with the percentage-of-completion method of accounting, we have provided for our estimated costs to complete all of our ongoing contracts (*Id.* ¶¶ 24, 41, 77).

Qatar Projects when it became clear that the projects could not be performed during the Peak Season, as was required for the profitability assumptions built into McDermott's contract price").

It is easily seen that each of these categories turns on whether Defendants knew that the profitability of the Qatar Projects depended on "Peak Season" performance. To make this showing, Plaintiffs rely exclusively on Fees' statements to infer that Defendants had such knowledge. But because Fees' statement is, at best, ambiguous on the necessity of "Peak Season" performance, it is insufficient to raise an inference of scienter. *See Shaw*, 537 F.3d at 533. For that reason, the Complaint does not allege that the representations in these three categories were made with the requisite "intent to deceive, manipulate, or defraud," or even with "severe recklessness." *See R2 Invs.*, 401 F.3d at 643. Plaintiffs' action should be dismissed, to the extent that it is based on Defendants' representations regarding the amount and profitability of the Offshore Segment backlog, or the effect of project delays on that backlog, or on Defendants' representations that it had accounted for all contract losses due to the failure to complete the projects during the "Peak Season."

Plaintiffs also attempt to infer scienter based on Defendants' purported knowledge, but failure to disclose, "that performance during ["Peak Season"] was foreclosed by systemic problems at J. Ray." (Plaintiffs' Response p.12). On this point, Plaintiffs complain that "Defendants' representations that pipeline installation delays in the [Offshore Segment] were due to poor weather and not due to any 'systemic' issues concerning J. Ray" were materially false or misleading because the pipeline installation delays "were caused by material manufacturing delays . . . [and the] failure to complete pipeline installation projects prior to the Class Period."[7] (*Id*. ¶ 90). Plaintiffs contend that Defendants were also aware that the poor

---

[7]  Plaintiffs cite the following statements regarding the cause of the Qatar Projects' delays:

condition of J. Ray's pipe-laying barges delayed the Qatar Projects, as well. In support of these allegations, Plaintiffs rely on five Confidential Witnesses, all former J. Ray employees, who purportedly describe the causes of the Qatar Projects delays. (*Id*. ¶¶ 112-119).

Plaintiffs' first Confidential Witness ("CW-1") was employed as a Senior Planning Engineer from March 2008 until January 2009. (Id. ¶ 112-114). CW-1 stated that, as of March 2008, the first of the Qatar projects was already "materially delayed" because J. Ray's Jebel Ali facility had not yet assembled the required wellheads. (Id.). The delays at the Jebel Ali facility were allegedly due to a lack of manpower and space constraints, which created a "domino effect of additional" delays for projects "lower in the queue." (*Id*.).

Plaintiffs' second Confidential Witness ("CW-2") was employed as a Quality Manager in Houston, Texas, from 2006, until February 2009. (Id. ¶ 115). CW-2 reported that, "during the Spring of 2008, an underwater pipeline segment J. Ray was laying 'buckled' while in the process of being lowered." Retrieving the buckled pipeline allegedly cost J. Ray "hundreds of millions of dollars." (*Id*.).

---

- On April 28, 2008, McDermott issued a press release in which it reported that the Offshore Segment was "adversely affected by external events," "primarily due to harsh weather," and that decreased revenue was "not systemic" (*Id*. ¶ 35);

- On May 12, 2008, McDermott issued a press release in which it stated that the "decrease [Offshore Segment] income was primarily attributable to a high level of unproductive offshore working days for major construction vessels during the 2008 first quarter, due to poor weather conditions in major areas of operation" (*Id*. ¶ 39);

- During a May 13, 2008, conference call with analysts and investors, Taff stated that the Offshore segment "was adversely affected by harsh weather" (*Id*. ¶ 43);

- On July 16, 2008, McDermott issued a press release which quoted Taff as stating that "recent credit ratings upgrades are further external proof of our strong operating performance" (*Id*. ¶ 70); and,

- During an August 12, 2008, conference call with analysts and investors, Wilkinson acknowledged "project delays," be did not disclose the alleged systemic causes of those delays (*Id*. ¶ 78).

Plaintiffs' third Confidential Witness ("CW-3") was employed as a Corporate Project Quality Control Manager in Houston, Texas, from the middle of 2005, until late 2007. (Id. ¶ 116). CW-3 stated that "J. Ray experienced substantial quality control issues before the Class Period involving poor welding work, which caused significant cost and delay." (Id.) In fact, according to CW-3, "one of J. Ray's major projects in Qatar" had used "millions of dollars worth of" defective pipe. (Id.).

Plaintiffs' fourth Confidential Witness ("CW-4") was employed as a Business Development Manager "from 2006 throughout the Class Period." (Id. ¶¶ 117, 119). CW-4 reported that "J. Ray's derrick barges and other support vessels were in very poor condition throughout the period and caused extensive 'down time' when they were unable to lay pipe." (Id.).

Plaintiffs' final Confidential Witness ("CW-5") was employed as a Senior Sub-Contract Specialist "from 2005 through August 2008." (Id. ¶¶ 118-119). CW-5 also commented on the poor condition of J. Ray's barges, adding that "requests to have the barges refurbished were submitted to McDermott's Board of Directors every year [from 2005 to 2008], but the Board refused to approve[] the requests." (Id.).

As a threshold matter, Plaintiffs have not shown that any of the events described by CW-2, CW-3, C2-4, or CW-5 actually delayed the Qatar Projects. For example, CW-2 does not allege that any "buckling" occurred in relation to the Qatar Projects. Likewise, CW-3 does not allege that the Qatar Projects were delayed by any welding defects when Defendants made their disputed representations in 2008. Finally, although CW-4 and CW-5 describe the poor condition of J. Ray's barges, neither witness states that those problems actually delayed the Qatar Projects in any way.

Indeed, the only witness that links a problem at J. Ray to the Qatar Projects is CW-1, who alleged that two wellheads for one of the projects were not completed until September 2008. To show that Defendants were aware of this delay, Plaintiffs point to the internal reporting systems that McDermott allegedly used to monitor the progress of J. Ray projects. (Id. ¶¶ 130-133). For instance,

> CW-1 stated that J. Ray used a sophisticated software program called "Primavera" to measure the manufacturing and installation work performed [on] J. Ray's projects, including the [Qatar Projects], prior to and during the Class Period. "Primavera" Contract Management is a software management program developed by Oracle Corp., which describes it as a document management, job cost and field controls solution that keeps construction projects on schedule and on-budget through complete project control.

(*Id*. ¶ 130). CW-1, CW-2, and CW-5 also claim that "J. Ray employees regularly met to measure the progress" of projects, "and reported the results of those meetings to senior management." (*Id*. ¶ 131). CW-1 stated that, for example,

> there were monthly Project Status Review, or "PSR," meetings between the J. Ray management team in Dubai and the corporate office in Houston for all of J. Ray's current projects, which included presentations on start and estimated completion dates for critical project tasks and percent of completion.

(*Id*. ¶ 131(a)). CW-2 reported that,

> Each of the geographic areas in which J. Ray's Marine Division operated was overseen by an Area Vice President who reported to senior management in Houston, keeping them up-to-date on project scheduling. CW-2 also confirmed that J. Ray President and CEO Deason met frequently with J. Ray personnel and was well-informed at all times concerning J. Ray's performance.

(Id. ¶ 131(c)). Finally, CW-5 stated that,

> J. Ray project teams meet 3-4 times each week to go over in detail all facets and details of a project, generally with representatives of the client in attendance. Documentation of any problem or issue with the schedule is well-organized and meticulous.

(Id. ¶ 131(a)). In addition to these Confidential Witnesses, the Complaint also points to a November 2007 conference call between Wilkinson and analysts and investors. In that call,

23

Wilkinson stated that "every month all the major projects go through a project review that cover[s] productivity, target schedules [ – ] absolutely everything going on in it." (*Id*. ¶ 132).

The Fifth Circuit has considered, on several occasions, whether the mere existence of internal reporting systems is sufficient to raise a strong inference of scienter. In *Shaw*, the plaintiffs argued that the "defendants knew or should have known that Shaw was prematurely recognizing revenue," because management received "monthly reports on the progress of contracts, which were discussed at meetings." *Shaw*, 537 F.3d at 540. The court held that such allegations did not raise an inference of scienter because the complaint did not "allege that the reports or the meetings included information at odds with Shaw's public statements." *Id*. Likewise, in *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, the plaintiffs complained that the defendants "failed to disclose adverse" financial information "known only to the defendants due to their access to internal" data." 365 F.3d 353, 370 (5th Cir.2004). The Fifth Circuit rejected that "access" as a basis for scienter because the plaintiffs had not alleged any details regarding the contents of those reports. *Id*. ("An unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss"). Finally, in *Abrams v. Baker Hughes Inc.*, the plaintiffs sought to establish scienter based on the fact that the defendants "allegedly received unidentified daily, weekly, and monthly financial reports that apprized them of the company's true financial status." 292 F.3d 424, 430 (5th Cir.2002). The Fifth Circuit found that this allegation did not raise a strong inference of scienter, holding that,

> The plaintiffs' allegations regarding non-specific internal reports are also inadequate. An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. *Such allegations must have corroborating details regarding the contents of allegedly contrary reports*, their authors and recipients.

*Id*. (emphasis added)

Here, the Confidential Witnesses describe various systems used to monitor J. Ray projects. But no witness ever alleges that these systems were utilized to alert any McDermott corporate officer that the Qatar projects had been delayed by the unfinished well-heads, or the conditions of the barges. Nor do the witnesses allege which individual McDermott officers utilized the reporting systems, or when. Nor have Plaintiffs alleged any specific information to show that the reports or software contained statements that were in conflict with Defendants' representations during the class period. As with the reporting systems in *Shaw*, *Southland*, and *Abrams*, Plaintiffs have failed to allege "details regarding the contents" of the reporting systems that were "at odds with [Defendants'] public statements at the time those statements were made." *Shaw*, 537 F.3d at 540; *Abrams*, 292 F.3d at 430. For that reason, Plaintiffs' action, based on Defendants' representations regarding the causes of the Qatar Project delays, should be dismissed.

Finally, Plaintiffs contend that McDermott must have known that its representations were false because the Qatar Projects were "critical" to the company's operations. (Plaintiffs' Response p. 12). In support of their contention, Plaintiffs cite *Plotkin v. IP Axess, Inc.*, 407 F.3d 690 (5th Cir.2005). In that case, the plaintiffs alleged that the defendant, a "struggling company," announced that it had reached "multimillion dollar" agreements with two buyers. The prospective revenue from those agreements amounted to a *thirty-fold increase* over that generated the year before. *Id*. at 700. The buyers were unable to complete the sale, however, which allegedly led to financial losses for the plaintiff investors. *Id*. The Fifth Circuit observed that, given the importance of the prospective revenue to the struggling defendant, it was reasonable to assume that it would have been familiar with the financial condition of the

entities making the agreements, and so, would have discovered their precarious financial condition. *Id*. The court held that, on the facts presented,

> plaintiffs had thus alleged specific facts that gave rise to a strong inference that the company knew or was severely reckless in not knowing that the purchasers were not able or were not likely to be able to make the contracted payments.

*Id*. On this point, Defendants also cite opinions from the Seventh and Ninth Circuits. In *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, the Seventh Circuit held that it was "exceedingly unlikely" that corporate officers were unaware of problems with the company's two "key products" which accounted "for more than half of its sales." 513 F.3d 702 (7th Cir.2008). And in *Berson v. Applied Signal Technology, Inc.*, the Ninth Circuit found it "hard to believe" that, when corporate officers promoted several government contracts that it had been awarded, those officers were unaware that the federal government had already effectively canceled those contracts. 527 F.3d 982 (9th Cir.2008). Finally, in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, the Ninth Circuit stated, in a footnote, that it was "absurd to suggest" that corporate officers were not aware that the company was being investigated by the FAA, or that the company was entitled to purchase stock in a second company undergoing bankruptcy reorganization. 320 F.3d 920, 937 n. 15 (9th Cir.2003).

None of these cases are helpful to Plaintiffs' contentions here. In their response to Defendant's motion, Plaintiffs merely state, in conclusory fashion, that the Qatar Projects "were critical to the Company's business, involving hundreds of millions of dollars of profit and a substantial portion of its operations." (Plaintiffs' Response p.12). But Plaintiffs do not detail any facts in the Complaint to support this conclusion. The record shows only that, when combined, the projects amounted to approximately one third of the potential revenue for one of McDermott's three business segments. On these pleadings, the court is not persuaded that the Qatar projects, alone or in combination, held the same significance for McDermott as did

the transactions in the cases Plaintiffs rely on. In contrast to *Plotkin*, Plaintiffs have not alleged that the Qatar Projects represented anywhere near a "thirty-fold revenue" increase for McDermott. Unlike *Makor*, which involved two "key products," the Qatar contracts were "just three projects out of an [Offshore Segment] portfolio of about 30 major jobs." (Complaint ¶ 98). Finally, Plaintiffs offer no reason to assume that a reasonable investor would consider the Qatar Projects as significant to McDermott as the government investigations, or bankruptcy proceedings alleged in *Employer-Teamster*. Cases in which courts have imputed knowledge to corporate defendants, "without particularized allegations about the defendants' access to the relevant information," are "exceedingly rare." *Killinger*, 542 F.3d at 785 n.3. In the end, Plaintiffs' allegation amounts to no more than "fraud by hindsight": that is, because the Qatar Projects ultimately had a significant impact on McDermott's stock price, the company must have been aware of the problems at an earlier date. *See Lormand*, 565 F.3d at 254. But it is well-settled that courts will not infer "that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." Id. Because such allegations are insufficient to raise an inference of scienter, Plaintiffs have not made the "exceedingly rare" showing that the Qatar Projects were so important that McDermott must have been aware of the projects' ultimate impact on the company's revenue. *Killinger*, 542 F.3d at 785 n.3.

### *Individual Defendants*

Plaintiffs complain that the Individual Defendants sold their shares of McDermott stock at inflated prices, and in doing so, filed Form 144 representations that were "materially false and misleading" because "Defendants knew . . . about undisclosed systemic problems with J. Ray's operations, . . . [and] that the Three Qatar Projects could not be performed during the Peak Season and [so] had become unprofitable." (Complaint ¶ 91; Plaintiffs'

Response p.10). However, Plaintiffs have failed to allege, with the requisite particularity, that any Individual Defendant knew or believed that the profitability of the Qatar Projects depended on performance during the "Peak Season." Again, the statement by Fees on which Plaintiffs rely is, at best, ambiguous as to the necessity of "Peak Season" performance, and so, it is insufficient to raise an inference of scienter. *See Shaw*, 537 F.3d at 533 ("the statement cannot contribute to a strong inference of scienter because it is 'susceptible to many interpretations'"). Nor have Plaintiffs sufficiently alleged that Defendants knew that the Qatar Projects were delayed by causes that were not publicly disclosed. Plaintiffs have not shown, for instance, that McDermott's' internal tracking systems alerted any of the company's corporate officers that the Qatar Projects had been delayed by causes other than those reported. *See Abrams*, 292 F.3d at 430 ("Such allegations must have corroborating details regarding the contents of allegedly contrary reports"). For those reasons, Plaintiffs have failed to raise a strong inference that the Form 144 certifications were made with the requisite "intent to deceive, manipulate, or defraud." *Rosenzweig*, 332 F.3d at 866. "If the plaintiff does not plead facts giving rise to a strong inference of scienter, the PSLRA directs that the district court 'shall ... dismiss the complaint.'" *Id*. (quoting 15 U.S.C. § 78u-4(b)(3)(A)). Plaintiffs' action, based on Defendants Form 144 certifications, should be dismissed. *Id*.

Plaintiffs also argue that a "strong inference of scienter should be imputed to the Individual Defendants by virtue of their positions as the Company's most senior officers." (Plaintiffs' Response p.12). The Fifth Circuit has considered and rejected similar contentions on several occasions. In *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, the plaintiffs insisted "that the individual defendants must have known of the [accounting] irregularities because of their executive positions in the company." 537 F.3d at 535. The court held that that allegation was insufficient to support an inference of scienter,

and stated that "this court's caselaw makes clear that 'pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company.'" *Id.* (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir.2002)); *see also Flaherty*, 565 F.3d at 211-212 (rejecting attempt to infer scienter based on the defendant's executive "position with TXU"). In light of the precedent in this circuit, the court cannot find that the Individual Defendants acted with the requisite scienter merely because of their positions as McDermott corporate officers. *Id.*

Finally, Plaintiffs contend that the sales of McDermott stock by "Defendants and other insiders . . . during the Class Period . . . giv[e] rise to a strong inference of scienter." (Complaint ¶ 134). In other words, Plaintiffs argue that the stock sales alone show a motive to defraud. (*Id.*). In response, Defendants contend that such allegations are "not sufficient to support a strong inference of scienter," and that, in any event, Plaintiffs have pleaded "[n]o facts . . . to suggest that the alleged trading . . . was any different in timing or amount" than Defendants prior trading history. (Defendants' Motion p.17). It is well-settled, however, that allegations of insider stock sales are considered "motive and opportunity" allegations, and so, can be used only to bolster an inference of scienter that arises from other sources. *See Southland*, 365 F.3d at 368; *Shaw*, 537 F.3d at 543; *Flaherty*, 565 F.3d at 208. In *Flaherty*, the Fifth Circuit found that, "[a]lthough we have stated that allegations of motive and opportunity standing alone will not suffice to meet the scienter requirement, motive and opportunity allegations may meaningfully enhance the strength of the inference of scienter." 565 F.3d at 208. And in *Shaw*, the court stated that, "[b]ecause corporate executives are often paid in stock and stock options, they will naturally 'trade those securities in the normal course of events,' and courts 'will not infer fraudulent intent from the mere fact that some officers

sold stock.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir.1997) (Alito, J.)).

Here, then, for Plaintiffs' allegations to have any relevance, the Complaint must have raised an inference of scienter that could be "meaningfully enhanced." *See Flaherty*, 565 F.3d at 208. However, no such inference has been raised. Plaintiffs have not demonstrated, for example, "that the profitability of [the Qatar Projects] was absolutely dependent on their performance during the peak summer months," or that "performance during those months was foreclosed by systemic problems at J. Ray." (Plaintiffs' Response p.12); *see Shaw*, 537 F.3d at 533; *Abrams*, 292 F.3d at 430. Nor have Plaintiffs shown that scienter can be imputed to the Individual Defendants' based on their positions at McDermott. *See Shaw*, 537 F.3d at 535. Because motive "standing alone will not suffice to meet the scienter requirement," and the Complaint does not otherwise raise an inference of scienter that the stock sales could "meaningfully enhance," Plaintiffs' action against the Individual Defendants should be dismissed. *See Flaherty*, 565 F.3d at 208.

### *Section 20(a) of the Exchange Act*

In addition to their § 10(b) and Rule 10b-5 claims, Plaintiffs contend that the Individual Defendants are liable for violations of Section 20(a) of the Exchange Act. (Complaint ¶¶ 157-160). Section 20(a) provides that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable." 15 U.S.C. § 78t. This so-called "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383. Here, Plaintiffs have not shown a violation of § 10(b), Rule 10b-5, or any other Exchange Act provisions or rules. Because the Complaint does not adequately state

primary securities law violations, Plaintiffs' secondary claims under § 20(a) should be dismissed as well.

**CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that Defendants' Motion to Dismiss be **GRANTED**. Plaintiffs have failed to allege that Defendants made any misrepresentation with the requisite scienter.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Vanessa D. Gilmore, Room 9513, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 23rd day of February, 2010.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**