**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

-------------------------------------------------------x

ADAMS FAMILY, *et al.*          :
    *Plaintiffs,*             :

                 :

      *v.*                    :

                 :

MCDERMOTT INTERNATIONAL, INC., :
BRUCE W. WILKINSON, MICHAEL     :
S. TAFF AND ROBERT A. DEASON,    :
    *Defendants.*            :

-------------------------------------------------------x

**No. 4-09 Civ. 01208 (VDG)**

<u>CLASS ACTION</u>

**PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM AND
RECOMMENDATIONS ON DEFENDANTS' MOTION TO DISMISS**

00159437

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... ii

NATURE AND STAGE OF THE PROCEEDING.................................................... iv

STATEMENT OF THE ISSUE.................................................................................. iv

STANDARD OF REVIEW ........................................................................................ iv

SUMMARY OF ARGUMENT .................................................................................. vi

INTRODUCTION ......................................................................................................1

ARGUMENT ..............................................................................................................2

I.      The Factual Allegations in the Complaint Give Rise to a Strong Inference that
        Defendants Were Aware that the Three Qatar Projects Were Supposed to Be Performed
        During the Peak Summer Construction Season ...............................................................2

II.     The Memorandum Wrongly Concludes That The Three Qatar Projects Were Not
        Sufficiently Important to the Company to Support an Inference of Scienter ......................6

III.    The Complaint Alleged Facts Demonstrating that Defendants Were Aware of Problems
        Affecting the Three Qatar Projects ...............................................................................12

IV.     The Magistrate Wrongly Failed to Consider Insider Stock Sales As Additional Evidence
        of Scienter ...................................................................................................................15

V.      Plaintiffs' Numerous Scienter Allegations, In the Aggregate, Give Rise to An Even
        Stronger Inference of Scienter ......................................................................................17

CONCLUSION........................................................................................................19

i

# TABLE OF AUTHORITIES

*Cases*

*Abrams v. Baker Hughes Inc.,* 292 F.3d 424 (5th Cir. 2002) ........................ vi

*In re Applied Signal Technology, Inc. Sec. Litig.,* No. C 05-1027 SBA, 2006 WL 1050174,
　(N.D. Cal. Feb. 8, 2006 ............................................................................10

*Berson v. Applied Signal Technology, Inc.,*
　527 F.3d 982 (9th Cir. 2008) ............................................................... 9-11

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,*
　565 F.3d 200 (5th Cir. 2009) ....................................................................5

*Goldstein v. MCI Worldcom,* 340 F.3d 238 (5th Cir. 2003) ........................ vi

*Gompper v. VISX, Inc.,* 298 F.3d 893 (9th Cir. 2002) .............................. vi

*Herman & MacLean v. Huddleston,* 459 U.S. 375 (1983) ...........................v

*Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,*
　537 F.3d 527 (5th Cir. 2008) ...................................................................5

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,*
　507 U.S. 163 1993) .................................................................................v

*Lormand v. US Unwired, Inc.,* 565 F.3d 228 (5th Cir. 2009)................... v, iv, ix, 17, 19

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702 (7th Cir. 2008) ...................11

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.,*
　320 F.3d 920 (9th Cir. 2003) ..............................................................10, 11

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
　380 F.3d 1226 (9th Cir. 2004) ................................................................14

*Plotkin v. IP Axess, Inc.,* 407 F.3d 690 (5th Cir. 2005) ........................v, 6, 11

*Silverman v. Motorola, Inc.,* No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) .......11

*South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776 (9th Cir. 2008).................... 11, 17, 18

ii

*Southland Secs. Corp. v. Inspire Ins. Solutions,* 365 F.3d 353 (5th Cir. 2004) ...................... vi, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007)........................... v, vi, 5, 17, 19

*Statutes*

Securities Exchange Act of 1934, §10(b), 15 U.S.C.A. § 78j(b) ...............................................v, 19

Securities Exchange Act of 1934, §20(a), 15 U.S.C.A. § 78t(a) .................................................19

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* ............ iv, v, vi, 2, 19

Private Securities Litigation Reform Act of 1995, § 21D(b)(2), 15 U.S.C. § 78u-4(b)(2) ........... vi

28 U.S.C. § 636(b)(1)(C) .......................................................................................................... iv

*Federal Regulations*

SEC Rule 10b-5, 17 C.F.R. § 240.10B-5 (2006) .........................................................................19

*Court Rules*

Rule 12(b)(6)..............................................................................................................................v

iii

## NATURE AND STAGE OF THE PROCEEDING

This is a securities fraud action filed on behalf of a class of all persons (the "Class") who purchased the publicly-traded common stock of Defendant McDermott International, Inc. between February 27, 2008 and November 5, 2008, inclusive (the "Class Period"). Plaintiffs filed the Consolidated Complaint (Docket No. 46) (the "Complaint") on May 22, 2009. Defendants McDermott International, Inc. ("McDermott" or the "Company"), Bruce W. Wilkinson ("Wilkinson"), Michael S. Taff ("Taff"), and Robert A. Deason ("Deason"), collectively the "Defendants," filed Defendants' Motion to Dismiss Plaintiffs' Complaint (Docket No. 71) (Defendants' "Motion") on July 1, 2009. The Court referred the Motion to Magistrate Judge Milloy for a report and recommendation on September 1, 2009, pursuant to 28 U.S.C. § 636(b)(1)(B). On February 24, 2010, Judge Milloy issued a Memorandum and Recommendation ("Memorandum," or "Mem."), recommending that the Motion to Dismiss be granted solely on the basis that the Complaint's factual allegations did not raise a strong inference that Defendants' material misrepresentations were made knowingly or recklessly. Plaintiffs now object.

## STATEMENT OF THE ISSUE

Whether the factual allegations in the Complaint raise a strong inference of scienter under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 et seq. ("PSLRA").

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C), "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which

iv

objection is made." The Magistrate Judge concluded that the Complaint should be dismissed solely on the grounds that Plaintiffs' factual allegations did not meet the PSLRA's scienter standards. Plaintiffs object to the Magistrate Judge's factual and legal conclusions concerning the adequacy of the Complaints' scienter allegations.[1]

Scienter is properly pled where it is specifically alleged that a defendant made public statements about a company while he was either aware of undisclosed facts that rendered those statements false or misleading, or was severely reckless in *not* knowing those facts. *Plotkin v. IPAxess, Inc.*, 407 F.3d 690, 699-700 (5th Cir. 2005). The standard for reviewing the sufficiency of scienter allegations under the PSLRA was recently articulated by the U.S. Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (U.S. 2007), and summarized by the Fifth Circuit in *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), as follows:

> When faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2509, 168 L. Ed.2d 179 (2007) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed.2d 517 (1993)). We must also draw all reasonable inferences in the plaintiff's favor."
>
> * * * *
>
> At trial, a plaintiff alleging fraud in a § 10(b) action must prove her case, including the element of scienter, by a preponderance of the evidence. *Tellabs*, 127 S. Ct. at 2513. That is, "she must demonstrate that it is more likely than not that the defendant acted with scienter." *Id.* (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S. Ct. 683, 74 L. Ed.2d

---

[1] Although Defendants moved to dismiss on the grounds that (i) the Complaint failed to allege that Defendants made false statements; (ii) the allegedly false statements were immaterial and (iii) Defendants' alleged misrepresentations were inactionable "forward-looking statements" under the PSLRA, the Magistrate Judge did address the merits of those arguments.

548 (1983) (emphasis in original)).  At the pleading stage, however, a plaintiff alleging fraud in a § 10(b) action must only "plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Id.* (emphasis in original). . . . . In addition to accepting all of the factual allegations in the complaint as true, courts must consider the complaint in its entirety . . . . The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Id.* (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431 (5th Cir. 2002); *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)). "Allegations of circumstantial evidence justifying a strong inference of scienter will suffice." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003).

\* \* \* \*

[The "strong" inference of scienter under the PSLRA] "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* (internal quotation marks and citations omitted). "To qualify as 'strong' within the intendment of § 21D(b)(2), . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2404-05. . . . [A] tie favors the plaintiff. *Tellabs*, 127 S. Ct. at 2510 ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and *at least as* compelling as any opposing inference one could draw from the facts alleged.") (emphasis added).

*Lormand*, 565 F.3d at 232, 250-52.  Moreover, factual allegations that Defendants obtained concrete benefits from their misrepresentations by engaging in insider stock sales that were suspicious in timing and amount (commonly referred to as "motive and opportunity" allegations) operate to "meaningfully enhance" the strength of the inference of scienter.  *Southland Secs. Corp. v. Inspire Ins. Solutions*, 365 F.3d 353, 368 (5th Cir. 2004).

## SUMMARY OF ARGUMENT

The Magistrate Judge's determination that the Complaint failed to allege a strong inference of scienter was erroneous, and should not be adopted for the following reasons.

vi

The Magistrate Judge erred in finding that the Complaint did not contain a factual basis for Plaintiffs' claims that Defendants were aware that the profitability of the three fixed-price construction projects at issue (the "Three Qatar Projects") was dependent upon the work being performed during the Summer of 2008 (the "Peak Season").  Contrary to the Magistrate Judge's Memorandum, (Mem. at 16-20), McDermott CEO John Fees expressly *admitted,* at the end of the Class Period, that the profitability of the Three Qatar Projects was based on the "assumption" that they would be performed during the Peak Season, when productivity rates were higher and costs lower.  The Magistrate Judge erred in finding Fees' statements did not unambiguously raise an inference that the profitability of the Three Qatar Projects was dependent on their performance during the Peak Season, and ignored Supreme Court precedent in finding that any ambiguity in the statements was "fatal" to finding scienter with respect to most of Defendants' materially false or misleading statements.  Finally, the Magistrate Judge erred in finding that Fees' statement was the only evidence that profitability of the Three Qatar Projects was dependant upon performance during the Peak Season.

Although the Magistrate Judge correctly recognized that Defendants could be charged with knowing about issues that were critical to the Company's business, the Magistrate Judge erroneously determined that the Complaint failed to allege facts sufficient to establish that the Three Qatar Projects were critical to McDermott.  Mem. at 25-27.  To the contrary, the Complaint alleges specific facts to show that the Three Qatar Projects were essential to McDermott's financial performance. The projects were worth $1.4 billion in revenue, and were projected to generate profits of between $140 million to $170 million; as a result of McDermott's failure to timely complete them, all of the profits for the three projects were *wiped out* and the

vii

Company was exposed to $110 million in liquidated damages. This caused McDermott to report a $19 million loss for the largest of its three business segments for the third quarter of 2008, take a $90 million charge against the cost of completing the projects, and project that the Company's profits would be substantially reduced for the next 4-5 quarters while work on the unprofitable Three Qatar Projects was completed. In addition, the problems that caused the Company to get 300 days behind schedule on the Three Qatar Projects – severe weather affecting undersea pipeline installation, downtime with pipeline-laying vessels, buckling of pipeline segments, multi-million pipeline welding problems, labor and space shortages at the Company's fabrication yard in Jebel Ali – were all major problems which Defendants would have known about.

The Magistrate Judge also incorrectly concluded that the Complaint failed to allege a connection between systemic problems at the Company identified by Confidential Witness and delays with performance of the Three Qatar Projects, when the Complaint quotes statements by the Company admitting the connection between the problems described and delays in the Three Qatar Projects. The Magistrate Judge further erred in determining that there were no facts to support the conclusion that Defendants were aware of the problems. Defendant Wilkinson admitted that he and other senior managers kept close track of all major projects with sophisticated contract management tracking systems, and there are ample facts alleged in the Complaint that demonstrate that this system successfully and timely alerted Defendants to the problems which caused the Three Qatar Projects to be delayed by nearly a year.

The Magistrate Judge additionally erred in refusing to even consider the "motive and opportunity" allegations specifically describing $54 million in insider stock sales that occurred at suspicious times and in suspicious amounts in evaluating Plaintiffs' scienter allegations (Mem. at

viii

29-30), despite the fact that it is well-settled that motive and opportunity allegations enhance the strength of other scienter allegations.

Finally, the Magistrate Judge erred by failing to evaluate "whether all of the facts alleged, *taken collectively*, give rise to a strong plausible inference of scienter," and instead considered only whether individual allegations, "scrutinized in isolation" met the standard. *Lormand,* 565 F.3d at 251.

ix

**INTRODUCTION**

McDermott's stock lost a third of its value in a single day when new CEO John Fees reported disastrous results in November of 2008. Fees disclosed that three large, fixed-price contracts for installation of oil and gas pipelines and wellheads in Qatar, worth $1.4 billion in revenue and originally intended to generate profits between $140-$170 million, would instead generate *no* profits at all because they had fallen 300 days behind schedule and experienced massive cost overruns as a result. The Company was compelled to recognize $90 million of contract losses in order to complete the Three Qatar Projects, and was exposed to liquidated damages of $110 million. Complaint, ¶ 94, 97.[2]  As a result of the failure of these Three Qatar Projects, the largest of the Company's three business segments (the "Offshore Oil and Gas segment," also referred to as "J. Ray McDermott" or "J. Ray") reported a $19 million loss for the quarter (compared to an $88 million profit for the same quarter the prior year), and projected severely depressed financial results for the next 4-5 quarters, wiping out another $100 million in projected future profits. ¶¶ 94, 102. Indeed, failure of the Three Qatar Projects caused over twenty percent of J. Ray's then-existing backlog (the uncompleted portions of existing contracts), of $5 billion to be unprofitable. ¶ 99. These disclosures shocked the market, compelled analysts to question Defendants' credibility (¶ 101), and caused the Company's stock price to plummet.

These disclosures came as such a surprise to the market because Defendants had, since

---

[2] References to paragraphs ("¶¶") throughout this brief refer to the paragraphs of the Complaint.

February of 2008, frequently represented that J. Ray's backlog was highly profitable. However, the Complaint alleges that the problems with the Three Qatar Projects that caused those Class Period representations to be materially false or misleading were well-known by Defendants throughout the Class Period. McDermott's profitability assumptions for the Three Qatar Projects, from the time that they were bid in 2005, 2006 and 2007, were based on the Three Qatar Projects being performed in the peak summer construction season. By February of 2008, as a result of weather delays and major, undisclosed systemic problems at J. Ray, it was no longer possible to perform the Three Qatar Projects during the summer months. When all of the specific facts in the Complaint are analyzed – Company admissions, the critical importance of the Three Qatar Projects, the detailed information provided by Confidential Witnesses – and are considered in conjunction with allegations of massive insider stock sales during the Class Period, the factual allegations meet the PSLRA's scienter pleading standard. Accordingly, the Magistrate Judge's recommendation that the Complaint be dismissed for failure to allege a strong inference of scienter should not be accepted.

## ARGUMENT

I.     **The Factual Allegations in the Complaint Give Rise to a Strong Inference that Defendants Were Aware that the Three Qatar Projects Were Supposed to Be Performed During the Peak Summer Construction Season**

The Magistrate Judge wrongly concluded that Plaintiffs had not alleged facts raising *any* inference that Defendants were aware that the profitability of the Three Qatar Projects depended on performance during the peak summer construction season. Mem. at 20. Contrary to the Magistrate Judge's conclusions, Fees' statement is *not* ambiguous, ambiguity is *not* "fatal," and Plaintiffs alleged substantial additional facts tending to show scienter with respect to the peak

- 2 -

summer construction issue; accordingly, the Magistrate Judge's scienter determination was incorrect.[3]

Contrary to the Magistrate Judge's ruling, Fees' remarks clearly and unequivocally indicate that the profitability assumptions for the Three Qatar Projects were tied to their being performed in the peak summer construction season. In relevant part, Fees explained that:

> *The estimates used in our bid for all three projects were based on similar completed successful projects. These reference projects were performed during peak summer construction months* so they experienced high productivity and few downtime days. Productivity is measure in how many joints of pipe per day we expect o accomplish. In hindsight this joints per day, or what we call lay rates, were proved to be too aggressive and we've not been able to achieve production at those levels. *As is typically the case in the Construction business, when you start a project with a poor bid assumption it's hard to recover.*
>
> .  .  .  .   *These [Three Qatar Projects] were affected by delays from preceding jobs in the queue. The delays from earlier jobs has [sic] caused us to start projects later than the bid schedules proposed* and we are prioritizing our resources to minimize the schedule effect on the customers by using a different vessel than we assumed in the bid. Neither situation has or will really mitigate the financial impact as this change in assumptions increased our cost.
>
> The final common problem is excessive downtime. We spoke about weather being a problem in the first quarter and it was. . . . Any of these problems alone would be a concern, but how they compound when taken together is really the issue. .  . . Because our productivity is less than anticipated we're spending more days in the field, which increases our exposure to weather and mechanical downtime. These extra days spent on the job also mean the next projects in the queue have schedule impacts as well. *With the schedule being compromised we found ourselves starting*

---

[3] The Magistrate Judge's error on this issue infects virtually all of the opinion. *See, e.g.,* Mem. at 17 (finding of ambiguity is "fatal"); 20 (because Fees' statement is ambiguous, "it is insufficient to raise an inference of scienter"); 28 (no liability for individual defendants' materially false or misleading SEC Form 144 certifications because "the statement by Fees on which Plaintiffs rely is at best ambiguous . . . and so, it is insufficient to raise an inference of scienter"); and 30 (unnecessary to consider whether stock sales bolstered inference of scienter because Plaintiffs failed to raise *any* inference of scienter with respect to peak season performance issue).

00159437

*projects in historically bad weather windows, which further hampered
productivity and increased our downtime days.*

¶ 98 (emphasis added).

Thus, Fees admitted that McDermott's "bid assumption" was that the Company would

perform its work on the Three Qatar Projects during the peak summer construction months, and

that delays on other projects caused McDermott to start its work on the Three Quarter Projects

"later than the bid schedules proposed" (*i.e.*, the summer construction months), in "historically

bad weather windows." Since "productivity is much higher and costs much lower" during the

summer months, McDermott's failure to perform the Three Qatar Projects in the summer of 2008

meant that productivity was much lower, and costs much higher, than the Company had assumed

in its bid, eviscerating the profitability of the three projects. Accordingly, a plain reading of

Fees' statement does not support the Magistrate Judge's conclusion that it is "silent" on "when

the Qatar Projects were scheduled, when they had to be profitably completed, or whether

profitability was dependent on 'Peak Season' performance." Mem. at 16.[4]

Even if Fees' statement was "ambiguous" with respect to whether contract performance

during the summer months was a key profitability assumption (Mem. at 16), which it was not,

the Magistrate Judge erred in determining that such ambiguity is "fatal" to three of the five

---

[4] It is not necessary to establish, as the Memorandum appears to assume, that Defendants were aware that the
projects would *lose* money if the summer construction window was blown; it is only necessary to show that they
were aware of facts rendering their Class Period statements about backlog false or misleading. Defendants' class
period statements indicated that the profitability of J. Ray's backlog was not even *affected* by the delays that
occurred at the beginning of the Class Period. Defendants represented that weather delays and maintenance
problems would only result in revenue and profits from backlog being deferred to later periods, or as Defendant
Wilkinson phrased it, being "moved to the right." ¶ 44; *see also* ¶ 35 (delays causing "the deferral of unrecognized
project revenue *and income* to future periods"). Defendants never changed their projected 10-12 % profitability
range for its backlog throughout the class period. ¶¶ 44, 47, 57, 78, 81, 83. Even if Defendants believed – wrongly
as it turned out – that the Three Qatar Projects would still make *some* profit, even if it was substantially reduced,
their Class Period statements were still knowingly false or misleading.

- 4 -

categories of misrepresentations cited in the Complaint (Mem. at 17), requiring dismissal of the allegations concerning these statements without further consideration of additional scienter evidence. Mem. at 20. This conclusion is directly contrary to the Supreme Court's most recent holding in *Tellabs*, which specifically rejected such a bright-line rule:

> We agree that omissions and ambiguities count against inferring scienter, for plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2). ***We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.***

*Id.*, at 326. [5] Accordingly, the Magistrate Judge should have assessed whether Fees' statement, in conjunction with all of the other evidence of scienter in the Complaint, collectively gave rise to a strong inference of scienter.

Finally, the Magistrate Judge was wholly incorrect in finding that Fees' statement was the *only* evidence that the Three Qatar Projects were scheduled to be performed in the summer of 2008, or that construction during the summer was necessary for the projects to be profitable. Mem. at 20 ("Plaintiffs rely exclusively on Fees' statement to infer that Defendants had such knowledge"). Most importantly, McDermott admitted that the Company was exposed to contractually-specified liquidated damages in the fourth quarter of 2008 of over $100 million for

---

[5] Although certain language in *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 540-41 (5th Cir. 2008), cited by the Magistrate Judge (Mem. at 17), suggests that ambiguous statements cannot contribute to a strong inference of scienter, the Fifth Circuit in both that case and *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009), did what *Tellabs* requires and the Magistrate Judge here failed to do: it carefully considered *all* facts supporting scienter, both individually *and collectively*, to determine whether the facts gave rise to a strong inference of scienter. Moreover, nothing in the Fifth Circuit's opinions suggests that the merest hint of ambiguity is sufficient to render a statement useless for purposes of a scienter analysis. Indeed, the *Indiana Electrical Workers'* decision analyzed the statements at issue, discussed an alternative inference that was not consistent with scienter, and determined that this innocent interpretation was the most likely one.   537 F.3d at 537-38. Here, in contrast, the Magistrate Judge's Memorandum does not indicate what non-culpable inference *could* be drawn from Fees' statement, nor does the opinion state why such a non-culpable explanation is more likely than Plaintiffs' straightforward interpretation.

- 5 -

failure to meet the schedule for completing the Three Qatar Projects. Compl. ¶ 97 (quoting McDermott's Third Quarter, 2008 10-Q Report), raising a strong inference that the contracts were supposed to be substantially performed during the summer of 2008. Moreover, Confidential Witness No. 1 reported that the wellhead platforms for the first of the Three Qatar Projects was supposed to be shipped from the fabrication facility in Jebel Ali in March of 2008 for installation off the shore of Qatar (¶ 113), again strongly indicating that summer of 2008 was the scheduled construction period. The Complaint also contains evidence, in addition to Fees' remarks, that McDermott considered the summer months to be the most productive, and thus profitable, of construction seasons in the Middle East, quoting Defendant Wilkinson's remarks in a May 13, 2008 Conference Call stating that McDermott hoped to make up for weather delays in the first quarter of 2008 during the second and third quarters "since the summer months are considered the construction season." ¶ 43.

## II. The Memorandum Wrongly Concludes That The Three Qatar Projects Were Not Sufficiently Important to the Company to Support an Inference of Scienter

The Magistrate Judge also erred in rejecting Plaintiffs' argument that a strong inference of scienter could be drawn from the fact that the Three Qatar Projects were critical to McDermott, finding that "Plaintiffs do not detail any facts in the Complaint to support" the argument. Mem. at 26.[6] However, the Complaint contains numerous factual allegations that give rise to a strong inference that the Three Qatar Projects were extremely important to the

---

[6] The Magistrate Judge apparently accepted Plaintiffs' argument that a strong inference of scienter is created by facts showing that the matters at issue are critical to a company's business and financial results. Mem. at 27, citing, *inter alia, Plotkin,* 407 F.3d at 700.

- 6 -

00159437

Company's profitability and financial performance.[7]

First, the critical importance of timely performance of the Three Qatar Projects to McDermott's financial results and profitability is vividly demonstrated by the allegation that the failure to perform the work on schedule exposed the Company to liquidated damages in excess of *$100 million.* ¶ 97. To put the size and significance of these liquidated damages into perspective, McDermott's entire net income, for the third quarter of 2008, was only $85.6 million. ¶ 94. With potential penalties of $100 million dependent upon timely performance, there is a strong inference that Defendants – the CEO of J. Ray and the CEO and CFO of McDermott – were aware that the Company's performance under the Three Qatar Contracts had fallen *300 days* behind schedule.

Second, the importance of the Company's performance under the Three Qatar Projects is confirmed by the factual allegations quantifying the financial impact of the projects on McDermott's financial results. Contrary to the Magistrate Judge's Memorandum (Mem. at 27), the Three Qatar Projects were extremely large and had ability to severely reduce McDermott's profitability. As discussed above, the Three Qatar Projects represented $1.4 billion in revenue and anticipated profits of $140-$170 million. ¶ 94.[8] The profitability of J. Ray, the Company's

---

[7] The Magistrate Judge's opinion discussed this scienter evidence only in the context of Plaintiffs' claims that Defendants were aware of construction delays and operational problems during the Class Period. Mem. at 20-27. However, these facts give rise to a strong inference of scienter for *all* of the categories of false or misleading statements set out in the Complaint, including, but not limited to, Defendants' Form 144 certifications filed in connection with their substantial stock sales, representing that they were not aware of any material, non-public negative information. Thus, the Magistrate Judge's determination that Plaintiffs failed to plead scienter as to all of these categories of misrepresentations was also erroneous.

[8] The $1.4 billion in backlog was so large that it constituted one-third J. Ray's backlog. ¶ 102. These were fixed-price contracts, which meant that McDermott bore the entire risk of loss if the contract price was insufficient to cover the costs of completion.

- 7 -

largest business segment, which was responsible for nearly two-thirds of McDermott's total net income during fiscal year 2007 (¶ 2), was decimated by the failure to complete the Three Qatar Projects on time, causing J. Ray to report a $19 million *loss* in the third quarter of 2008, and causing CFO Taff to project that it would take more than a year for J. Ray to recover from the failure of the Three Qatar Projects. ¶ 94. Indeed, McDermott's stock price dropped by one third in the course of a single day when the bad news about the Three Qatar Projects was announced.[9] Thus, Plaintiffs' allegations concerning the importance are not an attempt to show "fraud by hindsight" (Mem. at 27), but constitute circumstantial evidence that the Three Qatar Projects were sufficiently important to allow the Court to strongly infer that Defendants were aware that the projects were experiencing numerous problems, substantially behind schedule, unable to meet their peak season construction window, and consequently unprofitable.

Finally, the nature and extent of the problems described by the Confidential Witnesses that delayed the Three Qatar Projects and caused the Company to miss the peak summer construction season were themselves large and significant. For example, Confidential Witness No. 2 explained that during the spring of 2008, J. Ray incurred millions of dollars of costs to recover an undersea pipeline that "buckled" as it was being lowered to the ocean floor. ¶ 115. Similarly, Confidential Witness No. 3 described welding defects that rendered millions of dollars of undersea pipeline defective (¶ 116); indeed, the Company subsequently admitted in November of 2008 that "welding issues" also undermined the profitability of the Three Qatar Projects. ¶ 98.

---

[9] *See, e.g.,* ¶ 103, quoting a Jeffries & Co. report on November 6, 2008, downgrading the stock from "buy" to "hold." Under the heading, "Three Qatar Contracts Break the Bank," the report states that "in addition to very disappointing 3Q performance that included recognizing roughly $90 million of charges on three jobs in Qatar, it now appears that problem contracts that account for about $1.2-1.3 billion in revenue will drag J. Ray margins for several quarters."

- 8 -

00159437

Confidential Witness No. 1 discussed labor shortages and space constraints at the Jebel Ali fabrication site that prevented the well-heads for the Three Qatar Projects from being timely completed and shipped to the Qatar coast for installation. ¶ 113-114. And, Confidential Witnesses 4 and 5 discussed severe maintenance problems with J. Ray's pipe-laying barges, regularly reported to the Board of Directors, that caused excessive downtime.[10] McDermott had only seven vessels capable of laying pipelines, of which only two were stationed in the Middle East. 2007 10-K Report, at 3 (attached to Defendants' Motion to Dismiss as Exh. 2). As noted by Defendant Taff, the work schedule for these vessels was booked out over a year and a half in advance; excessive downtime severely impacted the Company's ability to maintain its schedule. ¶ 100. The nature and characteristics of these problems are such that they would not be unknown to Defendants, and  confirms the plausibility of Plaintiffs' allegations that Defendants were aware of them.

All of the foregoing facts concerning the importance of the Three Qatar Projects strongly support an inference of Defendants' scienter. The Magistrate Judge wrongly concluded that the Three Qatar Projects did not hold "the same significance for McDermott" as transactions in cases where courts had drawn a strong inference of scienter from the critical nature of the transactions or problems at issue (Mem. at 26-27). In *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 987-88 (9th Cir. 2008) (Kozinski, *J.*), the Ninth Circuit held that it was proper to strongly infer that the CEO and CFO of Applied Signal were aware of communications received from

---

[10] The Memorandum wrongly finds that the Complaint fails to allege that most of the problems identified by Plaintiff's Confidential Witnesses "actually delayed the Qatar Projects." Mem. at 22. As discussed below, however, there is a direct nexus between the systemic problems described by the Confidential Witnesses and delays on the Three Qatar Projects. *See infra* pp. 12-13.

- 9 -

customers *temporarily* stopping work on various contracts, based on the significance of the contracts. For example, the Court noted that the first stop-work order affected "between $10 and $15 million of work on the company's largest contract with one of its most important customers." *Berson*, 527 F.3d at 988. Significantly, this amounted to between 9-13.5% of Applied Signal's total backlog, which at the time of the allegedly false and misleading statement was $111 million. *In re Applied Signal Technology, Inc. Sec. Litig.*, No. C 05-1027 SBA, 2006 WL 1050174, * 6 (N.D. Cal. Feb. 8, 2006). Here, in contrast, the Complaint alleges that contracts amounting to approximately *one third* of J. Ray's backlog were not only temporarily halted, they had become *completely unprofitable*.[11] McDermott's CEO and CFO *admitted* that the disastrous financial results McDermott reported in November of 2008 were caused by the Three Qatar Projects (¶¶ 98-100), and analysts specifically cited the problems with the Three Qatar Project as the reason to downgrade the Company's stock (¶¶ 102-03).[12]

---

[11] The Memorandum notes that J. Ray is only "one of McDermott's three business segments." Mem. at 26. While this is true, it is irrelevant. First, one of the individual Defendants is Robert Deason, who was the CEO of J. Ray; the Three Qatar Projects were one third of *his* segment's backlog. Second, J. Ray was not just "one" of the Company's business segments, it was the driver for the Company's profitability. ¶ 2. Indeed, reference to page 101 of the Company's 2007 Form 10-K Report, attached to Defendants' Motion to Dismiss as Exhibit 2, demonstrates that J. Ray (aka the "Offshore Oil and Gas Segment") had accounted for over half of the Company's operating income every year since 2005, with one year even reaching 70 percent. Similarly, in *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, * 14 (N.D. Ill. Sept. 23, 2008), the court found it was "almost inconceivable" that Motorola's CEO and other top executives "were not aware of the production problems faced by the significant new product launch *in the division that accounted for the largest share of sales in the company.*" (emphasis added). Finally, the Three Qatar Projects represented over 11 percent of the backlog for McDermott as whole, which is roughly comparable to the ratio of the contract at issue in *Berson* to Applied Signal's total backlog.

[12] Here, as in *Berson*, there is little question that revelation of the undisclosed problems cited in the complaints caused the precipitous drop in the stock's price; Defendants did not even argue that Plaintiffs failed to plead loss causation. The stock drop here – a third – is substantially greater than the 16 percent stock drop that followed revelation of the first stop-work order in *Berson*. *Compare In re Applied Signal Technologies*, 2006 WL 1050174, at * 6, *with* ¶ 104. Although scienter cannot be inferred simply from a stock drop, the fact that revelation of the unprofitability of the Three Qatar Projects caused McDermott to lose over a third of its market capitalization in a day *does* suggest, contrary the Magistrate Judge's determination, that these three projects "held the same" – or *greater* – "significance for McDermott as did the transactions in" at least some of the cases on which Plaintiffs rely (Mem. at 26-27).

- 10 -

00159437

Similarly, the court in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), dismissed as "patently incredible" an argument by *outside directors* that the Complaint did not plead facts sufficient to raise a strong inference that they were aware of issues regarding, *inter alia*, maintenance problems with its airplane fleet and settlement of an FAA investigation. *Id.* at 943, n.21. In particular, the Court found that it was "absurd to suggest" that the Board of Directors was unaware of "FAA investigations or negotiations, especially considering the fact that the FAA had indicated that it was considering penalties of up to $11 million." *Id.* Here the penalties to which McDermott was exposed as a result of the delays in the Three Qatar Projects – over $100 million – were an order of magnitude greater than the potential penalties in *America West*, and the systemic maintenance problems at J. Ray affected the profitability of the entire business segment. If it was "patently incredible" that outside directors were aware of the maintenance problems in *America West*, it is even less credible to assume that McDermott's top management, including the CEO of J. Ray, were unaware of the problems with the Three Qatar Projects set forth in the Complaint.

The Magistrate Judge did not even attempt to distinguish *Berson* and wrongly suggested that the hidden facts at issue in *America West* related to a bankruptcy proceeding (Mem. at 27). While the Magistrate Judge concluded, based on *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008), that courts rarely impute knowledge to corporate defendants "without particularized allegations about the defendants' access to the relevant information" (Mem. at 27), the Magistrate Judge failed to note that *Killinger* cited *Berson* with approval as an example of when it *is* appropriate to draw such an inference without additional evidence. *Id.* A plain reading of the cases indicates that the significance of the facts alleged to have been known

- 11 -

by Defendants here were *at least* as critical to McDermott as the facts at issue in cases such as *Berson* or *America West*.[13] Thus, the Magistrate Judge clearly erred by finding that the critical importance of the Three Qatar Projects failed to raise a strong inference of scienter.

## III.   The Complaint Alleged Facts Demonstrating that Defendants Were Aware of Problems Affecting the Three Qatar Projects

The Magistrate Judge also erroneously found that Plaintiffs had failed to allege facts giving rise to an inference that Defendants were aware of the problems and delays on the Three Qatar Projects that were described by Plaintiffs' Confidential Witnesses, on the grounds that (i) the events described by the Confidential Witnesses were not alleged to have delayed the Qatar Projects (Mem. at 22); and (ii) the allegations concerning McDermott's internal reporting system were insufficient to raise an inference that Defendants were made aware of the problems with these projects (Mem. at 23-25). Contrary to the Magistrate Judge's findings, the allegations in the Complaint create a strong inference that the events described by the Confidential Witnesses actually contributed to the delay in the Three Qatar Projects, and that Defendants actually used McDermott's internal reporting systems to monitor the company's work on the projects.

Contrary to the Magistrate Judge's ruling, the Complaint alleges facts that demonstrate that the problems described by Confidential Witnesses contributed to delays in the Three Qatar Projects. Confidential Witness No. 3 describe costly welding defects with undersea pipelines (¶ 116); when CEO Fees described the reasons for delay with the Three Qatar Projects in

---

[13] The Magistrate Judge did discuss two other cases cited by Plaintiffs – *Plotkin* and *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008) – and concluded that they involved problems of greater concern to the companies at issue than the facts here (Mem. at 27). Even assuming this to be the case, however, neither court indicated that they had intended, in denying the respective motions to dismiss, to make the factual findings of either case a threshold beneath which *no* inference of scienter could be drawn.

- 12 -

November of 2008, he specifically mentioned welding problems as a contributing factor.  ¶ 98.
Confidential Witnesses 4 and 5 indicated that J. Ray's pipe-laying barges were in very poor
condition, requiring excessive "downtime" when they were unable to lay pipeline segments
(¶¶ 117-19); in November of 2008 Fees stated that one of the problems affecting the Three Qatar
Projects was "excessive downtime" and noted that "every time a vessel goes down, and what we
mean by that is it stops laying pipe, for whatever reason, the interruption impacts productivity
. . . ."  *Id.*  Moreover, even to the extent that these problems affected other J. Ray projects in
addition to the Three Qatar Projects, the problems with other projects scheduled to be performed
*before* the Three Qatar Projects also contributed to the delays which prevented the Three Qatar
Projects from being performed during the peak summer construction season:  "These [three]
projects were affected by delays from preceding jobs in the queue.  The delays on earlier jobs has
[*sic*] caused us to start projects later than the bid schedules proposed . . ." (¶ 98) (Fees); "We
were planning on laying these projects all with the same vessel and we basically had this vessel
scheduled out over about a year and a half period . . . we got behind on the first job and then we
had that snowball effect . . . ." (¶100) (Taff).

The Magistrate Judge also incorrectly determined that there was no evidence in the
Complaint to show that Defendants were aware of the problems affecting J. Ray's ability to
perform the Three Qatar Projects, finding that Plaintiffs had failed to show that Defendants
actually used McDermott's sophisticated contract tracking systems, or that the systems showed
any problems.  Mem. at 25.  However, CEO Wilkinson specifically represented that he and his
management team *did* use the system, every month, to monitor and evaluate the progress of each
major construction project, adjusting the schedule as necessary to take into account any problems

- 13 -

that developed, and adjusting revenue projections accordingly:

> [W]e've a project review methodology, for every month all the major
> projects go through a project review that cover productivity, target
> schedules absolutely everything going on in it and so what you have is the
> best judgment of management on a month-to-month basis in effect
> rescheduling every project and recalibrating every project looking at its
> then reality. And so . . . when we say 2.8 billion currently believe to be
> [recognized] in '08 that's based upon the judgment everybody looking at
> all the backlog then making that judgment.

¶ 132 (emphasis added).  The most reasonable inference from Wilkinson's acknowledgement

that the system contains "absolutely everything going on," is that he and "everybody" in top

management was fully aware that the Three Qatar Projects had fallen hundreds of days behind

schedule, and the reasons for the delay.  *Nursing Home Pension Fund, Local 144 v. Oracle*

*Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (Oracle CEO's assurance that management tracked

detailed sales tracking system contributed to strong inference of scienter).  In addition, Plaintiffs'

Confidential Witnesses provided substantial information about these reporting systems which

confirmed Wilkinson's description.  McDermott used a sophisticated software tool for tracking J.

Ray projects and regularly reported the status of projects to senior management, including: (1)

monthly Project Status Reviews between J. Ray's Dubai management team and Houston offices

regarding all projects, including presentations on start and estimated completion dates for project

tasks and percentage completion; (2) project team meetings 3-4 times weekly discussing all

facets of a project with client representatives, with detailed documentation of problems or issues

discussed; (3) oversight by Area Vice Presidents of all geographic areas in which J. Ray's

Marine Division operated, with reports to senior management in Houston regarding schedules;

and (4) frequent meetings between Deason, J. Ray's President/CEO, and employees regarding J.

- 14 -

Ray performance.  ¶¶ 130-132.

The Complaint also contains evidence demonstrating that Defendants were *in fact* well aware of the problems plaguing the Three Qatar Projects and also showing that McDermott's project tracking systems were properly informing top management about serious ongoing problems with these projects.  Wilkinson's presentations to investors during the Class Period indicated that he was well aware of scheduling and maintenance problems in Qatar which impacted the Three Qatar Projects.  During the May 13, 2008 conference call, in which both CEO Wilkinson and CFO Taff participated, Wilkinson discussed delays caused by bad weather in Qatar during the first quarter of 2008, and stated that the problems were "compounded by having the DB50 and KPI [pipelaying derrick barges] in dry dock for almost the entire period, collectively working only about seven days in the quarter."  ¶ 43.  Furthermore, the Complaint alleges that the poor condition of the derrick barges was an issue that was regularly discussed by the Board of Directors itself.  ¶ 119.  Similarly, during an August 12, 2008 Conference Call, Defendant Wilkinson stated that J. Ray had been encountering projects delays that could subject it to liquidated damages, and, in consequence, "Bob Deason and his team . . . [are] actively addressing current execution issues, pursuing operational improvement initiatives . . . and working with customers to limit schedule-driven penalties . . . ."  ¶ 78.  The Company's subsequent disclosures, in November of 2008, confirmed that these exact problems (and more besides) were plaguing the Three Qatar Projects.  ¶¶ 97-98.

In light of these facts, clearly set out in the Complaint, Plaintiffs have clearly established that Defendants were aware of the problems with the Three Qatar Projects throughout the Class

- 15 -

Period.[14]

## IV. The Magistrate Wrongly Failed to Consider Insider Stock Sales As Additional Evidence of Scienter

The Magistrate Judge erroneously refused to even consider evidence that Defendants and other insiders obtained substantial concrete benefits from Class Period sales of Company stock that were suspicious in both timing and amount. The Magistrate Judge wrongly determined that Plaintiffs had failed to raise any inference of knowledge or conscious behavior that could be "enhanced" by motive and opportunity evidence. Mem. at 30. As discussed at length above, Plaintiffs alleged numerous facts from which the Court should infer that Defendants knew, or were reckless in not knowing, the adverse facts that rendered Defendants' Class Period statements false or misleading. Even if this evidence were not enough, standing alone, to give rise to a strong inference of scienter -- which Plaintiffs dispute -- it was clearly sufficient to give rise to *an* inference -- and one which should have been "meaningfully enhanced" by the evidence of insider stock sales set out in the Complaint.

The Complaint alleges that, during the Class Period, Company insiders sold over $50 million in McDermott stock (¶ 134), and Individual Defendants alone sold over $27 million worth of their personal holdings, at artificially inflated prices (¶¶ 8, 29, 31, 38, 52, 56, 59, 61, 62, 66, 74, 134). Furthermore, the Complaint alleges many facts which support the allegation that

---

[14] This same evidence demonstrates that Defendants were aware, throughout the Class Period, that J. Ray's construction schedule no longer permitted the Three Qatar Projects to be performed during the peak summer construction season, thus undermining one of the Company's key profitability assumptions with respect to these projects. Because the Magistrate Judge wrongly determined that there was no basis for concluding that the Three Qatar Projects were supposed to be performed during the summer months, or that their profitability would be impacted by *not* being performed in the summer months, this additional scienter evidence was not considered in connection with the "peak season" issue. *See supra* Section I.

- 16 -

these insider sales were suspicious in timing and amount.  For example, the amount of stock sold during the Class Period was suspicious, as Defendant Deason sold over 132,000 McDermott shares (over 65% of his stock holdings) for proceeds exceeding $6 million (¶¶ 31, 52, 56, 134(a)); Defendant Taff sold 26,500 shares of his McDermott stock (including 73% of his exercisable options holdings) for proceeds of over $1.6 million (¶¶ 59, 62, 134(b)); and Defendant Wilkinson sold over 400,000 McDermott shares (including 52% of his exercisable options holdings) for proceeds exceeding $20 million.  ¶¶ 29, 38, 52, 61, 66, 74, 134(c).[15]  In addition, the Complaint alleges facts showing that the timing of these sales was extremely suspicious because *all* of the sales from the exercise of options were derived from options that were not set to expire for several *years*.  ¶¶ 29-30, 34, 38, 53-55, 59-61, 64, 66, 74, 134.[16]  It was clear error for the Magistrate Judge not to consider this additional scienter evidence in conjunction with the rest of the scienter evidence discussed above.

## V.   Plaintiffs' Numerous Scienter Allegations, In the Aggregate, Give Rise to An Even Stronger Inference of Scienter.

The Memorandum, finally, fails to follow both Supreme Court and Fifth Circuit precedent by failing to "consider the complaint in its entirety," and determine "whether all of the

---

[15] Other Company insiders engaged in sales of McDermott stock of similar scope.  During the Class Period, John T. Nesser sold over 192,000 shares (including 100% of his options holdings) for proceeds exceeding $10.6 million (¶¶ 30, 52, 53, 134(d)); Louis Sannino sold over 112,000 shares (over 52% of his holdings) for proceeds exceeding $6.8 million (¶¶ 33, 52, 64, 134(e)); John Fees sold over 55,000 shares (including nearly 51,000 shares, representing 100% of his exercisable options, in a single day) for proceeds exceeding $4.5 million (¶¶ 34, 52, 55, 134(f)); Liane Hinrichs sold over 26,000 shares (including 25,290 options exercised in a single day) for proceeds exceeding $1.5 million (¶¶ 52, 54, 134(g)); and Ronald Cambre sold 18,600 shares (all from options exercised in a single day for proceeds exceeding $1.1 million (¶¶ 60, 134(h)).

[16] *See, e.g., Southland Securities,* 365 F.3d at 380 ("We conclude that these Dunham sales and this sequence of events, considered in light of all the other facts and circumstances alleged, including Dunham's position as CEO, [and] . . . his total sales throughout the class period of over 40 percent of his INSpire stock, and his personal involvement in promoting the Arrowhead contract and touting the increased revenues and earnings it would produce, suffice . . . to create a strong inference of the requisite scienter on Dunham's part . . . .").

- 17 -

facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. 308, 322-23, and *Lormond,* 565 F.3d at 251.   Contrary to this clear ruling, the Memorandum improperly analyzed each of Plaintiff's various scienter allegations in isolation.   For example, the Magistrate Judge concluded that the alleged "ambiguity" in Fees' November 6, 2008 statement rendered it incapable of even *contributing* to an inference of scienter, and determined not to consider evidence of substantial insider class period sales of Company stock that were suspicious in both timing and amount. *See supra* pp. 4-5 and 15-16.   Similarly, the Magistrate Judge cited *Killinger* for the proposition that facts demonstrating the importance of a project are rarely sufficient, standing alone, to create a strong inference of scienter (Mem. at 27), but ignored the *Killinger* court's holding that such facts, even when insufficient by themselves, can create a strong inference of scienter when coupled with other facts, such as admissions that defendants monitored information systems containing the adverse, nonpublic information. *Id.* at 785.   Plaintiffs here alleged both types of scienter evidence. *See supra* Sections II and III.

The Complaint specifically states that the facts set forth in it, "individually *and collectively,* give rise to a strong inference that Defendants' misrepresentations . . . were made with scienter."   ¶ 128 (emphasis added).   When all of Plaintiffs' scienter allegations are considered, as they should have been, in the aggregate, the inference of scienter is even more compelling than it is when the individual facts are considered independently.   Fees admitted that performance of the Three Qatar Projects during the peak summer season was an "assumption" McDermott made in its bids, and the profitability of those projects was eliminated because the work was not performed during the Peak Season (¶98) ("The estimates used . . . were based upon

- 18 -

. . . projects [that] were performed during peak summer construction months . . . when you start a projects with a poor bid assumption it's hard to recover."). The Company's failure to perform the Three Qatar Projects during the summer of 2008 not only wrecked the profitability of the projects, expected to be between $140 and $170 million, but it also exposed the Company to $110 million in liquidated damages. The Company had to record a $90 million charge to earnings for the completion of the Three Qatar Projects, and candidly admitted that it would take J.Ray, the Company's largest business segment, more than a year to recover. These projects were critically important to McDermott, and it is highly unreasonable to infer that Defendants were unaware that the Three Qatar Projects were almost a year behind schedule. An inference of scienter is even more likely since Defendants used a sophisticated project tracking system gave Defendants the means to monitor the projects. Wilkinson admitted that he and his team actually used the system, and his statements during the Class Period indicated that he was *actually aware* of key problems that delayed the Three Qatar Projects and caused them to miss their profitable construction season. Finally, Defendants' massive stock sales during the Class Period provide additional evidence that the individual Defendants were personally well aware of the problems with the Three Qatar Projects, and were selling out of the Company before the bad news hit.

Although alternative explanations are possible – the stock selling was a coincidence; Defendants were unaware of the schedule for the Three Qatar Projects or the importance of peak season performance – such explanations are not even *as* plausible, let alone – as they must be for a motion to dismiss – *more* plausible. *Lormand*, 565 F.3d at 252.[17]

---

[17] The Magistrate Judge also concluded that Plaintiffs' Section 20(a) claims should be dismissed on the grounds that Plaintiffs failed to show a violation of § 10(b), Rule 10b-5, or any other Exchange Act provisions or rules. Mem. at

- 19 -

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully object to the Magistrate Judge's Memorandum and Recommendation, and submit that Defendants' Motion to Dismiss should be denied in its entirety.[18]

---

30-31.  Since, for the reasons set forth above, Plaintiffs *have* properly alleged such violations, it follows that the Magistrate Judge's conclusion with respect to Section 20(a) liability is also incorrect.

[18] The Magistrate Judge's opinion does not indicate that the Complaint should be dismissed with prejudice. Although Plaintiffs strongly believe, for the reasons set forth above, that the Complaint is more than adequate under the PSLRA, *Tellabs,* and *Lormand,* in the event that the Court determines that the Complaint should be dismissed, Plaintiffs respectfully request leave to file an amended complaint to address any deficiencies the Court might find in the existing Complaint.

00159437

Date:   March 12, 2010

Respectfully submitted,

SCHWARTZ, JUNELL, GREENBERG
   & OATHOUT, LLP

By:      ___/s/___
Roger B. Greenberg
Texas State Bar No 08390000
Federal I.D. No. 3932
Two Houston Center
909 Fannin, Suite 2700
Houston, Texas 77010
Telephone: 713/752-0017
Facsimile: 713/752-0327

*Liaison Counsel for Plaintiffs*

IZARD NOBEL LLP
Robert A. Izard
Jeffrey S. Nobel
Mark P. Kindall
Matthew L. Tuccillo
29 South Main Street
Suite 215
West Hartford, CT 06107
Tel.:  (860) 493-6292
Fax:  (860) 493-6290

*Lead Counsel for Plaintiffs*

- 21 -

00159437

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Gregory M. Castaldo
Benjamin J. Sweet
Bharati O. Sharma
Michelle Newcomer
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

COUGHLIN STOIA
GELLER RUDMAN & ROBBINS, LLP
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173

*Additional Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2010, I electronically filed the foregoing ***Objections to the Memorandum and Recommendation on Defendants' Motion to Dismiss*** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email address denoted below, and I hereby certify that I have mailed the foregoing documents via the United States Postal Service to the non-CM/ECF participants as indicated below:

Mark Glasser:  mark.glasser@bakerbotts.com

Richard B. Harper
Seth T. Taube
Baker Botts LLP
30 Rockefeller Plz, 4th Floor
New York, NY 10112

/s/
ROGER B. GREENBERG

- 22 -