**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ADAMS FAMILY, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 4:09-cv-01208 |
| | ) | |
| McDERMOTT INTERNATIONAL, INC., | ) | |
| BRUCE W. WILKINSON, MICHAEL S. | ) | |
| TAFF, and ROBERT A. DEASON, | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO**
**MAGISTRATE JUDGE'S MEMORANDUM AND**
**RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

NATURE AND STATE OF THE PROCEEDING ...................................................................... v

STATEMENT OF THE ISSUE.............................................................................................. v

STANDARD OF REVIEW .................................................................................................. v

SUMMARY OF THE ARGUMENT.................................................................................... vii

ARGUMENT ................................................................................................................... 1

    A.   The Magistrate correctly concluded that Plaintiffs failed to raise a strong inference of scienter based upon their fictional "Peak Season" theory. ................................................. 1

    B.   The Magistrate properly rejected Plaintiffs' "core operations" claim that the Projects were so significant to McDermott that Defendants must have acted with scienter. ........... 7

    C.   The Magistrate correctly found that Plaintiffs' allegations concerning Confidential Witness and Internal Reporting fail for lack of particularity and credibility..................... 9

    D.   The Magistrate correctly rejected Plaintiffs' argument that Defendants' stock trades gave rise to an inference of scienter................................................................................. 13

    E.   The Magistrate properly considered Plaintiffs' allegations collectively and concluded that neither any individual allegation nor the Complaint taken as a whole gives rise to a strong inference of scienter. ...................................................................................... 14

    F.   The Court should grant Defendants' Motion to Dismiss on the grounds not reached by the Magistrate........................................................................................................ 15

    G.   The Court should dismiss the Complaint with prejudice................................................. 17

CONCLUSION................................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
291 F.3d 336 (5th Cir. 2002) ...................................................................................11

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ............................................................11, 12, 13, 14, 15

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...................................................................................8

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) ............................................................................17, 18

*Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*,
304 F.3d 476 (5th Cir. 2002) ...................................................................................15

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ...................................................................................14

*In re Enron Corp. Sec., Derivative & "ERISA Litig."*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ......................................................................14

*In re The Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) .................................................................................14

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
537 F.3d 527 (5th Cir. 2008) .........................................................3, 11, 12, 14, 15

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ...........................................................................2, 9, 15

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ...................................................................................8

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ...................................................................................8

*Schiller v. Physicians Res. Group Inc.*,
342 F.3d 563 (5th Cir. 2003) ............................................................................17, 18

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
365 F.3d 353 (5th Cir. 2004) ........................................... vi, 3, 7, 11, 12, 14, 15, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................3, 8, 13, 15

**STATUTES**

15 U.S.C. § 78u-4(b)(1)-(2) (2006) .................................................................................. vi

15 U.S. C. § 78u-5(c)(1)(A)-(B) .....................................................................................16

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5 (2009).........................................................................................15

Federal Rule of Civil Procedure 72(b)(3) ...................................................................v, 15

## NATURE AND STATE OF THE PROCEEDING

This securities fraud action is purportedly filed on behalf of purchasers of the stock of McDermott International, Inc. ("McDermott") between February 27, 2008 and November 5, 2008 (the "Class Period").   On May 22, 2009, Plaintiffs filed their amended Consolidated Complaint (the "Complaint").   Defendants filed a Motion to Dismiss Plaintiff's Complaint on July 1, 2009.[1]   On September 1, 2009, Judge Gilmore referred the Motion to Dismiss and all other pretrial matters to Magistrate Mary Milloy.[2]   On February 24, 2010, the Magistrate entered her Memorandum and Recommendation on Defendants' Motion to Dismiss (the "Memorandum" or "Mem.").[3]   Plaintiffs have filed Objections to the Memorandum.[4] Defendants McDermott, Bruce W. Wilkinson, Michael S. Taff, and Robert A. Deason ("Defendants") now file this Response to Lead Plaintiffs' Objections to the Magistrate Judge's Memorandum and Recommendation on Defendants' Motion to Dismiss.

## STATEMENT OF THE ISSUE

At issue is whether Defendants' Motion to Dismiss Plaintiffs' Complaint should be granted, either as recommended in the Memorandum or on one or more of the other grounds urged in the Motion.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 72(b)(3), "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."   FED. R. CIV. P. 72(b)(3).   "The district judge may accept, reject, or modify the

---

[1]       Dkt. No. 71.  Plaintiffs filed a Response to the Motion to Dismiss (the "Response") on August 3, 2009 (Dkt. No. 86), and Defendants filed a Reply in Support of the Motion to Dismiss (the "Reply") on August 24, 2009. (Dkt. No. 90.)

[2]       Dkt. No. 99.  The referral of dispositive motions such as the Motion to Dismiss was within the Court's authority under 28 U.S.C. § 636(b)(1)(B).

[3]       Dkt. No. 102, at 31.

[4]       Dkt. No. 105.

recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  *Id.*

Thus, this Court is required to determine de novo whether the Magistrate Judge correctly concluded that Plaintiffs failed to plead facts with sufficient particularity to give rise to a strong inference of scienter, as required by the Private Securities Litigation Reform Act ("PSLRA").[5]  The pleading standards for scienter in a securities fraud case are well established, and set forth in Defendants' Motion to Dismiss, which standard is incorporated herein by reference.[6]  While the Court must accept "the facts alleged . . . as true and construe the allegations in the light most favorable to the plaintiff . . . .  [it should] not strain to find inferences favorable to the plaintiffs." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal quotation marks and citations omitted).

---

[5]   15 U.S.C. § 78u-4(b)(1)-(2) (2006).

[6]   (Mot. to Dismiss at v.)

SUMMARY OF THE ARGUMENT

The Court should adopt the Magistrate's recommendation and dismiss Plaintiffs' Complaint.  After careful consideration of the Complaint's allegations as a whole, and in a thoughtful and detailed 31-page opinion, the Magistrate correctly concluded that the Complaint fails to plead particularized facts raising a strong inference of scienter.  The Magistrate's Memorandum correctly identifies Plaintiffs' allegations and arguments regarding scienter, provides a full analysis of those allegations and arguments, and recommends the only proper disposition of Defendants' Motion.

Notwithstanding the Magistrate's detailed review and carefully reasoned analysis of the record before her, Plaintiffs raise five objections to the Magistrate's conclusions and recommendation.  Many of the objections rely on misstatements of the Magistrate's findings.  Many of the objections rely on misstatements of the record.  All of the objections are baseless.

Plaintiffs first argue that the Magistrate erred in concluding that the Complaint fails to plead facts supporting the Plaintiffs' "Peak Season" theory, a theory that the Projects had to be performed during the summer months to be profitable and that Defendants knew but failed to timely disclose this to investors.  Plaintiffs further argue that a November 2008 statement by the Company's Chief Executive Officer, John Fees, constitutes an "admission" of this.  The Magistrate correctly found that Fees's statement constituted no such admission, as Fees stated only that, *in retrospect*, the Projects' bid assumptions for pipe laying rates turned out to be too aggressive.  According to Fees, that is because the assumptions were based on earlier projects that happened to be performed during the summer months.  Fees's statement cannot possibly be said to support a strong inference that any Defendant knew but failed to timely disclose that failure to complete the Projects during a "Peak Season" would render them unprofitable, and the Magistrate was correct in so finding.

Plaintiffs next argue that the Magistrate erred in rejecting their contention that the Projects were so important to the Company that the Court should *presume* Defendants' earlier knowledge of the alleged problems and delays on the Projects. Plaintiffs are mistaken. The Magistrate correctly found that such a presumption may be made only in exceedingly rare circumstances involving facts completely unlike those alleged in the Complaint. As the Magistrate found, the Complaint does not allege facts showing that the Projects were in any way vital to McDermott's financial survival, such that the Defendants must have anticipated the alleged problems when scheduling of the Projects moved from the summer to later months.

Third, Plaintiffs contend that the Magistrate erred in rejecting their argument that the facts alleged by Confidential Witnesses (concerning operational problems and the supposed existence of internal reporting systems) created a strong inference of scienter. Plaintiffs are again mistaken. The Magistrate considered and properly rejected Plaintiffs' reliance upon their Confidential Witnesses for proof of scienter. The Confidential Witnesses either failed to allege a connection between the Projects and the purported operational problems or they fail to allege that Defendants knew of the problems before they were publicly disclosed. Plaintiffs' allegations about internal tracking systems similarly fail to raise a strong inference of scienter. The Complaint lacks any particularized allegations of such, including any indication of the character and extent of information that was included in the system, when that information was present in the system, who utilized the systems, and when those individuals utilized the systems.

Fourth, Plaintiffs assert that the Magistrate erred in rejecting their argument that Defendants' stock sales meaningfully enhance an inference of scienter. But the Magistrate correctly found that because Plaintiffs' other scienter allegations raise no inference of scienter at all, there is no inference to meaningfully enhance. Even if there were, Plaintiffs have not

pleaded the facts required to demonstrate that any Defendants' stock trades were suspicious in timing and amount.

Fifth, Plaintiffs complain that the Magistrate considered the scienter allegations only in isolation and erred in doing so.  The Magistrate did nothing of the sort.  Rather, as the Memorandum makes clear, the Magistrate understood and correctly applied Fifth Circuit precedent, evaluating the allegations collectively.  The Magistrate then went further, giving individualized attention to every allegation of scienter and correctly concluding that none met the test.  It is apparently Plaintiffs' view that an adequate number of inadequate allegations should suffice to support an inference of scienter simply as a matter of mass.  This is not the law, and the Magistrate's findings demonstrate a proper understanding of this.

The Magistrate unquestionably recommended the only proper disposition of Defendants' Motion.  Moreover, the Complaint is dismissible on one or more of the grounds raised in Defendants' Motion but not reached by the Magistrate.  Those other grounds are reviewed below.

Finally, the Court should dismiss the Complaint with prejudice.  While seeking yet another opportunity to properly plead their case (having already been given two, with the latest Complaint being 71-pages), Plaintiffs do not even attempt to show how the manifest defects in two prior pleadings might be cured by the filing of a third.

ARGUMENT

**A.    The Magistrate correctly concluded that Plaintiffs failed to raise a strong inference of scienter based upon their fictional "Peak Season" theory.**

Plaintiffs complain that the Magistrate erred in finding that the Complaint contains an insufficient factual basis for the theory that Defendants were aware that the profitability of the Projects depended on performance during a "Peak Season."[7]  Their argument comprises three parts: (1) the Magistrate was wrong to conclude that a plain reading of CEO John Fees's statement provides no support for the Peak Season theory; (2) the Magistrate erred by concluding that the statement was ambiguous and therefore did not support an inference of scienter; and (3) other evidence supports the Peak Season theory.  As discussed below, none of these contentions has merit.

First, the Magistrate was correct in finding that a plain reading of Fees's statement provides no support for the theory that the profitability of the Projects depended on performance during a "Peak Season" and that Defendants knew but did not disclose that "fact."[8]

John Fees said this:

> The estimates used in our bid for all three projects were based upon similar completed successful projects.   These reference projects were performed during peak summer construction months so they experienced high productivity and few downtime days.  Productivity is measured in how many joints of pipe a day we expect to accomplish.  In hindsight this joints per day, or what we

---

[7]        (Objs. at 2-6.)

[8]        (Mem. at 17.)   Although not all are addressed in the Magistrate's Memorandum, the infirmities and inconsistencies in Plaintiffs' Peak Season theory are abundant.  Apart from Mr. Fees's single and casual reference to "peak summer months," Plaintiffs offer no factual support for their central contention that a definable "Peak Season" exists and that the inability to perform a project in that season dooms a project to failure.  Additionally, the Complaint defines "Peak Season" as "the Spring and Summer of 2008" (Compl. ¶ 3), while the Response defines it as "peak summer construction months" (Resp. at 1), and the Objections define it as "the Summer of 2008."  (Objs. at vii.)  If Plaintiffs cannot tell what "Peak Season"—their own term—means with any greater consistency than this, how can Plaintiffs legitimately allege that Defendants knew that performance during that ill-defined period was critical to the success of the Projects?  The difference between a summer "Peak Season" and a spring and summer "Peak Season" is 100%.  That Plaintiffs can do no better than this in articulating the central premise of their Complaint should tell the Court just how frail that Complaint is, from start to finish.

call lay rates, were proved to be too aggressive and we've not been able to achieve production at these levels.  As is typically the case in the construction business, when you start a project with a poor bid assumption it's hard to recover.[9]

Plaintiffs contend that Fees here "admitted that McDermott's 'bid assumption' was that the Company would perform its work on the Three Qatar Projects during the peak summer construction months . . . ."[10]  This is an obvious mischaracterization of Fees's statement, and the Magistrate correctly recognized it as such.  As the Magistrate stated, "[a] plain reading of the statement reveals only that the estimated 'lay rates' for the Qatar Projects 'proved to be too aggressive'" and that "while J. Ray's 'lay rates' were based on 'successful . . . reference projects' that happened to have been performed during 'peak summer construction months,' *there is no indication that their success or profitability necessarily depended on performance during that time*."[11]  Nor does Fees's statement raise any inference "that any Defendant knew, but did not disclose, 'that failure to perform the Three Qatar Projects during peak season would render them unprofitable.'"[12]  Fees's statement reveals only that the Projects were based on assumptions that, *in hindsight*, proved to be too aggressive.  The Magistrate correctly concluded that "courts will not infer 'that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly.'"[13]

Next, Plaintiffs assert that the Magistrate erred in concluding that Fees's

---

[9]     (*E.g.*, Compl. ¶ 98 (emphasis omitted); *see also* Mem. at 16 (correctly noting that "Plaintiffs rely on [this] single statement" as the support for their Peak Season theory.").)  Plaintiffs' Response cites exclusively to this quotation in support of the "Peak Season" theory.  (*See, e.g.*, Resp. at ix, 1, 2, 6, 8, 12.)  In their Objections, Plaintiffs continue to cite—and distort—the same comments as their only evidence for the theory that *profitability* on the Projects *depended* on their performance during the "Peak Season."  (Objs. at 3-4, 13, 18-19.)

[10]    (Objs. at 4.)

[11]    (Mem. at 16 (second alteration in original; emphasis added).)

[12]    (*Id.* at 17.)  In fact, any fair reading of Fees's statement supports only the innocent inferences argued in the Motion to Dismiss—e.g., that Defendants truthfully expressed their belief that delays incurred early in the Projects could be made up for later, but that when continuing, unanticipated bad weather and associated downtime in non-summer and summer months denied J. Ray the opportunity to catch up to schedule, MII took appropriate and timely accounting charges and made appropriate and timely disclosures.  (*See, e.g.*, Mot. to Dismiss at 2-4, 18-19.)

[13]    (Mem. at 16 (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009)).)

statement is ambiguous and that such ambiguity was fatal to three out of five categories of alleged misrepresentations.[14]  Plaintiffs mischaracterize the Magistrate's finding in this regard. As discussed above, the Magistrate clearly found that Fees's statement unambiguously *does not* support the Plaintiffs' Peak Season theory.  The Magistrate also reasoned, *in the alternative*, that even if the statement *could* be given the meaning for which Plaintiffs argue, the statement would *at best* be ambiguous.[15]  In other words, it would be "susceptible to many interpretations, including innocent ones'" and therefore does not support a strong inference of scienter under *Shaw* and *Tellabs*.[16]  Plaintiffs assert that the Magistrate found that "such ambiguity is 'fatal' to three of the five categories of misrepresentations" in the Complaint.  This is another mischaracterization of the Magistrate's recommendation.  The discussion of ambiguity was not the basis of the conclusion that the Plaintiffs' failure to support the Peak Season theory warranted dismissal as to most of the alleged misrepresentations.  On the contrary, the basis for that conclusion was the plain meaning of the statement and the lack of any compelling inference that any Defendant knew, but did not disclose, that the Projects must be performed during a Peak Season to be profitable.[17]

---

[14]      (Objs. at 4-5.)
[15]      (Mem. at 16. ("Even if the court were to imbue Fees's statement with the significance the Plaintiffs afford it, the statement would be, at best, ambiguous.").)
[16]      (Mem. at 17 (quoting *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 537-38 (5th Cir. 2008)).)  Plaintiffs quote language from *Tellabs* indicating that the Court should not scrutinize each allegation in isolation but rather assess all the allegations holistically.  (Objs. at 5.)  That broad principle does not mean that the Court should strain to read ambiguous statements as supporting a strong inference of scienter.  The Memorandum discusses the *Shaw* case, in which the court found that an ambiguous statement by an individual defendant made during the class period did not give rise to an inference of scienter.  (Mem. at 16-17.)  Here, the case against scienter is even more compelling than in *Shaw*, as Fees's statement was made by a non-Defendant who was assessing what happened in hindsight.  This is no evidence of scienter.  *See also Southland Sec. Corp*, 365 F.3d at 361 (noting that the court "will not strain to find inferences favorable to the plaintiffs" when conducting a de novo review of a 12(b)(6) motion to dismiss).
[17]      (Mem. at 17-18. ("On these pleadings, Plaintiffs have failed to show that any Defendant knew, but did not disclose, 'that failure to perform the Three Qatar Projects during peak season would render them unprofitable.'").  The Magistrate correctly concluded that Plaintiffs' inability to support their assertion—that Peak Season performance was necessary to profitability—disposed of at least three categories of the alleged misrepresentations. *Id.* These three categories were Defendants' alleged statements concerning: (1) "the amount and profitability of the

Finally, Plaintiffs complain that "the Magistrate was wholly incorrect in finding that Fees' statement was the *only* evidence that the Three Qatar Projects were scheduled to be performed in the summer of 2008, or that construction during the summer was necessary for the projects to be profitable."[18]  This is another of Plaintiffs' many misstatements of the Magistrate's findings.  The Magistrate *did not* find that Fees's statement was the only "evidence" that the Projects were scheduled for the summer of 2008 or that summer construction was essential to their profitability.  The Magistrate found, *as the parenthetical quote cited by Plaintiffs plainly states*, that "Plaintiffs rely exclusively on Fees' statement *to infer that Defendants had such knowledge* [that profitability depended on Peak Season performance]."[19]  It is unmistakably the Magistrate's point that Fees's statement provides no support for the inference that any Defendant *knew* that Peak Season performance was necessary for profitability,[20] an assessment that is indisputably correct.  Reference to the Complaint and to Plaintiffs' Response to the Motion to Dismiss demonstrates this.  Fees's statement *is* the only evidence to which Plaintiffs pointed in support of their contention that Defendants had actual knowledge that the Projects' profitability depended on performance during a "Peak Season."[21]  That is presumably why the Magistrate

---

Offshore Segment backlog," (2) "the effect of project delays on that backlog," and (3) MII's accounting for "contract losses due to the failure to complete the projects during the 'Peak Season.'"  (*Id.* at 17-20 & nn.4-6.)  The Magistrate properly recognized that scienter for each of these categories "turns on whether Defendants knew that the profitability of the Qatar Projects depended on 'Peak Season' performance."  (*Id.* at 20.)  Because the Complaint fails to plead facts establishing the necessity of Peak Season performance, the Complaint does not and cannot establish a strong inference that any Defendant knew of such alleged necessity.  Plaintiffs do not attempt to explain how the Complaint could raise any inference of scienter with respect to these categories of allegations without first establishing the underlying premise that Peak Season performance was necessary to profitability.

[18]     (Objs. at 5.)

[19]     (*Id.* (emphasis added).)

[20]     (Mem. at 20 ("It is easily seen that each of these categories turns on whether *Defendants knew* that the profitability of the Qatar Projects depended on 'Peak Season' performance.  To make this showing, Plaintiffs rely exclusively on Fees' statements to infer that *Defendants had such knowledge*.") (emphasis added); *see also id.* at 16 ("To show *that McDermott's officers were aware* that the profitability depended on 'Peak Season' performance, Plaintiffs rely on a single statement by John Fees.") (emphasis added) (citing Resp. at ix); *see also id.* at 17 ("On these pleadings, Plaintiffs have failed to show that any Defendant knew, but did not disclose, 'that a failure to perform the Three Qatar Projects during peak season would render them unprofitable.'") (quoting Compl. ¶ 129).)

[21]     (*E.g.*, Resp. at ix, 1.)

gave extensive consideration to Fees's statement, identifying all of the reasons that the statement does not support Plaintiffs' contention that McDermott's officers knew or believed that profitability depended on Peak Season performance, and correctly concluding that the statement is no evidence of scienter.

The Magistrate did not then ignore other putative allegations of scienter, as Plaintiffs contend. On the contrary, the Magistrate then turned to an equally careful and detailed consideration of those allegations upon which Plaintiffs relied to demonstrate that incriminating knowledge *should be imputed* to the Defendants. The Magistrate considered these allegations separately and collectively, concluding that none of them could support an inference of scienter. The Magistrate did not miss anything. Rather, the Magistrate made specific findings with respect to every one of the scienter allegations to which Plaintiffs directed the Court in their Response to the Motion to Dismiss.[22]

Interestingly, even if it were true that the Magistrate failed to expressly consider these allegations, it is apparent on their face that none of them remotely supports the Peak Season theory. Plaintiffs point to: (1) the allegation that McDermott was exposed to liquidated damages in the fourth quarter of 2008; (2) the Confidential Witness allegation that wellhead platforms for one of the Projects were supposed to be shipped in March 2008; and (3) a statement by Wilkinson that McDermott hoped to make up for weather delays in the first quarter

---

[22]      (Mem. at 20-30.) Plaintiffs' Response argued that the Complaint pleaded the following facts establishing a strong inference of scienter: (1) "Defendants knew throughout the Class Period that the Three Qatar Projects were unprofitable because the profitability of these projects was based on an internal conclusion that they had to be completed during 'peak summer construction months' that would result in high productivity and few downtime days" (quoting and citing Fees's statement); (2) McDermott had a system in place to monitor every project's progress; (3) Confidential Witnesses alleged that J. Ray suffered from welding problems and delays; (4) the Projects were important to the Company; and (5) Defendants' stock sales. (Resp. at ix-x; *see also id.* at 12-16.) The Magistrate considered and analyzed *every one* of these arguments and correctly determined that they failed to establish a strong inference of scienter. (Mem. at 15-30.)

of 2008 during the second and third quarters.[23]

These allegations do not support a claim that the Projects needed to be performed during the summer months to be profitable or that the Defendants knew that "fact" before the losses on the Projects were disclosed.  At most, these allegations raise an inference that the Projects were *scheduled* to be performed in part during the summer of 2008.[24]  For example, Plaintiffs contend that the potential for liquidated damages "rais[es] a strong inference that the contracts were supposed to be substantially performed during the summer of 2008."[25]  This proves nothing.  Even if such an inference could be drawn from this allegation, it is no proof of scienter, as it does not establish that performance during a Peak Season was essential to profitability or that any Defendant knew or believed that it was.[26]

Similarly, Plaintiffs point to their allegation that a Confidential Witness said that wellhead platforms for one of the Projects were supposed to be shipped from the fabrication facility in March of 2008.[27]  Plaintiffs contend that this allegation "again strongly indicat[es] that summer of 2008 was the scheduled construction period."[28]  This, too, proves nothing.  *Plaintiffs do not even argue* that an inference of the necessity of Peak Season performance or Defendants'

---

[23]     (Objs. at 6.)
[24]     Defendants have never disputed that much of the construction work on the Projects was in fact *scheduled* for the summer of 2008.  But that fact is irrelevant to the scienter analysis.  The relevant question is whether and when—if ever—any Defendant knew that performance during certain months of the year was necessary for the Projects to be profitable.  On this issue the Complaint is totally silent.
[25]     (Objs. at 5-6.)
[26]     Plaintiffs rely on the disclosure in November 2008 that certain contracts "have milestone due dates that must be met or we may be subject to penalties for liquidated damages if claims are asserted and we are ultimately responsible for the delays," and that liquidated damages in this instance could reach "approximately $110 million." (Compl. ¶¶ 97, 129.)  Plaintiffs, however, conflate "milestone due dates" with project completion dates, even though this statement says nothing about the latter.  The risk of liquidated damages due to McDermott's failure to achieve certain "milestone due dates" cannot support the "Peak Season" theory and therefore cannot support a strong inference of scienter.  Nor does the risk of liquidated damages based on the "milestone due dates" support any inference that the Projects had to be completed during a Peak Season to be profitable or that any Defendant had knowledge to that effect.  Finally, Plaintiffs do not, and cannot, allege that McDermott ever actually had to recognize the vast majority of these *potential* liquidated damages, because these damages were never probable of being assessed.  (*See* Mot. to Dismiss at 9 & n.30.)
[27]     (Objs. at 6.)
[28]     (*Id.*)

knowledge of such can be drawn from this allegation.

Finally, Plaintiffs argue that there is evidence that "McDermott considered the summer months to be the most productive, and thus profitable" because Wilkinson stated that McDermott hoped to make up for incurred weather delays during the second and third quarters of 2008 "since the summer months are considered the construction season."[29]  This statement is not probative of scienter because it does not even hint that any Defendant *knew* that performance during the summer months was *required* for profitability.[30]  Any inference of scienter drawn from these allegations would be strained at best, and therefore impermissible.[31]

**B.      The Magistrate properly rejected Plaintiffs' "core operations" claim that the Projects were so significant to McDermott that Defendants must have acted with scienter.**

Plaintiffs claim that the Magistrate erred in rejecting their argument that the Projects' importance to McDermott, standing alone, raises a strong inference of scienter.[32]  According to Plaintiffs, the Magistrate should have presumed, based on the financial importance of the Projects, that the Defendants had full knowledge of the problems associated with the Projects, even in the absence of any specific evidence of such knowledge.[33]  This argument represents both a distortion and a misapplication of the Ninth Circuit's "core operations" exception to conventional rules of pleading regarding scienter.  The "core operations" exception is a judicial rule from the Ninth Circuit that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the

---

[29]      (*Id.* (citing Compl. ¶¶ 43, 113).)
[30]      Nor does the statement that "the summer months are considered the construction season" even support the weak inference for which Plaintiffs argue—that the summer months are the most profitable.  (*See* Objs. at 6.)
[31]      *Southland Sec. Corp.*, 365 F.3d at 361 (stating that while the court must accept "the facts alleged . . . as true and construe the allegations in the light most favorable to the plaintiff . . . .  *[it] will not strain to find inferences favorable to the plaintiffs.*")(emphasis added) (internal quotation marks and citations omitted).
[32]      (Objs. at 6.)
[33]      (*Id.* at 6-12; Resp. at x, 12-14.)

company and its key officers."[34]   As the Magistrate recognized, cases "in which courts make a 'core operations inference' . . . are 'exceedingly rare.'"[35]

The Magistrate properly determined that Plaintiffs have alleged no facts that would justify shoehorning these allegations into this rarely-applied exception.[36]   Nowhere do Plaintiffs allege that the Projects were as important to McDermott as the operations in the cases on which Plaintiffs rely.[37]   For example, the Complaint contains no allegations that the Projects had a significance to MII that resembled the *thirty-fold* revenue increase for a small, struggling company in *Plotkin*.   Similarly, Plaintiffs do not allege problems with "key products" that affected over half of the company's sales as in *Tellabs*.[38]

In support of their core operations argument, Plaintiffs argue that the *potential* for $100 million in liquidated damages was of such magnitude that Defendants must have been aware that the Projects were behind schedule.[39]   As argued in the Motion to Dismiss, however, the Complaint in fact accurately reflects Defendants' belief they would not be ultimately liable for the full measure of any potential liquidated damages.[40]   The remote potential for assessment of liquidated damages cannot support a "core operations" inference under the case law relied

---

[34]      *See, e.g.*, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (internal quotation marks and citation omitted).   Only one of the cases cited by Plaintiffs applying this type of exception is from the Fifth Circuit.   *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005).   But that case is easily distinguishable for the reasons explained in the Memorandum and Defendants' Reply, including that the company in question was a small, struggling company and that the agreement at issue amounted to a thirty-fold increase in revenue.   (*See* Mem. at 25-27; Reply at 7 n.19.)

[35]      (Mem. at 27 (quoting *S. Ferry LP,  No. 2 v. Killinger*, 542 F.3d 776, 785 & n.3 (9th Cir. 2008)); *see also* Reply at 7 n.19.)

[36]      (Mem. at 26 ("Plaintiffs do not detail any facts in the Complaint to support this conclusion [that the Three Qatar Projects 'were critical to the Company's business, involving hundreds of millions of dollars of profit and a substantial portion of its operations.'].").)

[37]      (*See* Mem. at 25-27; Reply at 7 n.19 (distinguishing cases).)

[38]      (*See* Mem. at 25-27; Reply at 7 n.19.).

[39]      (Objs. at 7.)

[40]      (Mot. to Dismiss at 9 n.30 (citing Compl. ¶ 78 (quoting Mr. Wilkinson on Aug. 12, 2008: "Frequently, customers tell you verbally they do not plan to assess any penalty or history will indicate they don't enforce the charge.   We also may have an offset to LD claims such as contractually excusable delays."); *id.* Compl. ¶ 97 (Nov. 5 2008 Form 10-Q: "we do not believe that claims for these liquidated damages are probable of being assessed")).)

upon by Plaintiffs.

Plaintiffs next rely on the fact that the company's stock price dropped significantly as a result of the disclosures concerning the Projects.[41]  From this they circularly reason that the Defendants must have known of the problems all along.  In refuting this argument, the Magistrate observed, "it is well-settled that courts will not infer 'that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly.'"[42]  Such "fraud-by-hindsight" does not establish a viable claim for securities fraud.[43]

## C.     The Magistrate correctly found that Plaintiffs' allegations concerning Confidential Witness and Internal Reporting fail for lack of particularity and credibility.

Plaintiffs object to the Magistrate's conclusion that the Complaint pleads no particularized facts demonstrating the Defendants' knowledge of problems with the Projects. They point to allegations by the Confidential Witness concerning those problems and to allegations concerning internal reporting systems, arguing that these allegations create a strong inference that the Defendants were fully aware of the Projects' status at all relevant times.[44]  The Magistrate, however, correctly found that none of these allegations was sufficient to raise a strong inference of scienter.

The only Confidential Witness who references any of the Three Qatar Projects in the Complaint, CW-1, does not contribute anything to the scienter analysis.[45]  As the

---

[41]     (Objs. at 7-8.)

[42]     (Mem. at 27 (citing *Lormand*, 565 F.3d at 254).)

[43]     (*Id.*)  Plaintiffs finally argue that "the nature and extent of the problems described by the Confidential Witnesses . . . were themselves large and significant."  (Objs. at 8-9.)  As discussed below, only one of the Confidential Witnesses suggests any connection whatsoever between the problems described and the Three Qatar Projects.  *See infra* Part C.  As to this witness, Plaintiffs argue only that "Confidential Witness No. 1 discussed labor shortages and space constraints at the Jebel Ali fabrication site that prevented the well-heads for the Three Qatar Projects from being timely completed and shipped to the Qatar coast for installation."  (Objs. at 9.)  This allegation does not raise *any* inference that the problems on the Projects were so critical to McDermott's financial survival that the Defendants must have known about those problems.

[44]     (Objs. at 12-16.)

[45]     (Compl. ¶ 113; Mem. at 23.)

Memorandum correctly notes, the allegations by CW-1—namely, that construction of wellheads for the RasGas 2 project was behind schedule—are deficient because, among other things, they do not show a connection between the alleged wellhead delays and Defendants' alleged knowledge of the financial impact of those delays.[46]

The other four Confidential Witnesses make no reference whatsoever *in the Complaint* to any of the Three Qatar Projects.  To remedy this glaring defect, Plaintiffs now attempt to tie these vague allegations to the Projects by listing certain types of problems vaguely described by the Confidential Witnesses and then pointing to scattered, partial quotations in the Complaint that reference similar-sounding problems.[47]  For example, Plaintiffs insist that the welding defects alleged by CW-3 in general terms *must be* the same welding issues mentioned by Fees in the November 2008 conference call.[48]  Yet no connection exists other than Plaintiffs' argument in their Objections (not the Complaint) that both the allegations and the disclosures in question happen to mention "welding."[49]  The same failure to tie general allegations to the Three Qatar Projects dooms Plaintiffs' Confidential Witnesses' other allegations for failure to plead scienter with anything resembling the required particularity.  Plaintiffs fail to show any connection between delays on the Projects and Defendants' alleged knowledge of the alleged pipe buckling,[50] pipe-laying barge conditions,[51] or any facts that may have been reported internally.[52]

Even if the Confidential Witnesses had tied their vague allegations to the Three

---

[46]        (Mem. at 23-25; Compl. ¶¶ 130-3.)  As stated in the Motion to Dismiss, "Plaintiffs provide no description of the delays' temporal or financial impact.  And CW-1 does not dispute Defendants' disclosed explanation that the Projects were primarily delayed by unanticipated bad weather."  (Mot. to Dismiss at 13-14 n.48.)

[47]        (Objs. at 12-13.)

[48]        (*Id.*)

[49]        (Compl. ¶ 116; Mem. at 22.)

[50]        (Compl. ¶ 115; Mem. at 22.)

[51]        (Compl. ¶¶ 117-19; Mem. at 22.)

[52]        (Compl. ¶¶ 130-33; Mem. at 22-25.)

Qatar Projects, they have not met the Fifth Circuit's requirements for pleadings supported by confidential witness allegations. The Fifth Circuit has made clear that a plaintiff who alleges fraud and attempts to support such allegations with confidential witnesses *must* corroborate the confidential witness allegations with other facts, or at least describe the witness's position with sufficient particularity to make it clear that a witness in that position probably has the knowledge alleged.[53] Here, there is not even a hint of how the Confidential Witnesses could have come by the information the allege, much less that it is probable that they did possess personal knowledge of such information.[54]

The Magistrate was also correct in rejecting Plaintiffs' allegations regarding McDermott's internal reporting.[55] The Fifth Circuit has held:

> An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. *Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients.*[56]

Plaintiffs' allegations respecting internal tracking systems fail this test. The Complaint provides no details whatsoever about the nature and extent of information contained in any report, who learned that information, when they did so, or how it contradicts any public statement of any Defendant.[57]

---

[53]     *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002).

[54]     The Magistrate Judge did not reach this argument because the Confidential Witnesses' allegations, even if they can be believed, fail to support a strong inference of scienter. (Mem. at 22-25.) These witnesses *cannot* be believed under the *ABC Arbitrage* standard, as argued fully in the Motion to Dismiss. (Mot. to Dismiss at 13.) Because it is improbable that any of the Confidential Witnesses was in a position to possess personal knowledge of the facts alleged, the Complaint's defects could not be cured merely by a repleading which attempts to connect the incidents the witnesses allege to the Three Qatar Projects.

[55]     (*See* Mem. at 23-25; Compl. ¶¶ 130-33.)

[56]     *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (emphasis added); *see also Shaw*, 537 F.3d at 540; *Southland Sec. Corp.*, 365 F.3d at 370; Mem. at 24-25.

[57]     (Compl. ¶¶ 130-33.) Despite alleging the use at J. Ray of "a sophisticated software program called 'Primavera'" and that various meetings took place, not one of the internal reporting allegations contains an allegation of what information was communicated to any Defendant or when. (*Id.*)

Plaintiffs rely heavily on the following quotation by Defendant Bruce Wilkinson:

> [W]e've a project review methodology, for every month all the major projects go through a project review that cover productivity, target schedules absolutely everything going on in it and so what you have is the best judgment of management on a month-to-month basis in effect rescheduling every project and recalibrating every project looking at its then reality.  And so . . . when we say 2.8 billion currently believe to be [recognized] in '08 that's based upon the judgment everybody looking at all the backlog then making that judgment.[58]

Plaintiffs claim that this quote constitutes an admission that Wilkinson and the other Individual Defendants personally and individually used a "system" which contained "absolutely everything going on," relieving Plaintiffs of their burden under *Shaw*, *Abrams*, and *Southland*. to plead with particularity the who, what, when, where, and how of allegations based on internal reporting.[59] Plaintiffs assert that "[t]he most reasonable inference from Wilkinson's acknowledgement that the system contains 'absolutely everything going on,' is that he and 'everybody' in top management was fully aware that the Three Qatar Projects had fallen hundreds of days behind schedule, and the reasons for the delay."[60]  Nothing resembling this pieced-together contention is to be found *in the Complaint*, and for good reason.  Wilkinson does not reference a "system," he does not say that he or anyone else in top management ever used a system, he does not say that any system contains "absolutely everything going on" with the Projects, and he does not say that "everybody in top management was fully of aware" of the purported extent and causes of the delays.  This is all the product of Plaintiffs' revision of Wilkinson's comments.  An inference of scienter here would be manifestly impermissible.  The Magistrate was correct in finding that Plaintiffs' broad allegations of internal reporting contain no details regarding the contents of allegedly contrary reports, their authors, or their recipients, and therefore cannot support an

---

[58]    (Objs. at 13-14 (quoting Compl. ¶ 132).)

[59]    (*Id.*)

[60]    (*Id.* at 14.)

inference of scienter under Fifth Circuit precedent.[61]

Finally, Plaintiffs' own arguments demonstrate that the more compelling inference here is one of innocence.  To support their contention that Wilkinson knew about the problems on the Projects, *Plaintiffs point to disclosures that Wilkinson made during the class period about certain problems on the Projects*.  Plaintiffs argue that:

> Wilkinson's presentations to investors during the Class Period indicated that he was well aware of scheduling and maintenance problems in Qatar which impacted the Three Qatar Projects. During the May 13, 2008 conference call, in which both CEO Wilkinson and CFO Taff participated, Wilkinson discussed delays caused by bad weather in Qatar during the first quarter of 2008, and stated that the problems were "compounded by having the DB50 and KP1 [pipelaying derrick barges] in dry dock for almost the entire period, collectively working only about seven days in the quarter."[62]

The fact that Wilkinson knew about *and disclosed* certain problems about the Projects at one point in time hardly raises an inference that he knew about other problems at other times but did not disclose them.  The far more compelling inference is that he either did not know about any other problems or, if he did know, he disclosed this in a timely manner.  Under *Tellabs*, the Court must dismiss the Complaint because an inference of scienter here, if indeed there can be one, is not at least as compelling as the opposing inference of innocence.[63]

**D.     The Magistrate correctly rejected Plaintiffs' argument that Defendants' stock trades gave rise to an inference of scienter.**

Plaintiffs argue that the Magistrate failed to consider their allegations concerning Defendants' stock sales.[64]  In direct contradiction of Fifth Circuit case law, they invite the Court

---

[61]     (Mem. at 25 (quoting *Abrams*, 292 F.3d at 432).)
[62]     (Obj. at 15 (quoting Compl. ¶ 43).)
[63]     *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).
[64]     (Objs. at 16-17.)

to "infer fraudulent intent from the mere fact that some officers sold stock."[65]   The Magistrate

properly declined this invitation.[66]   As the Magistrate noted, allegations based on insider trading

may only *enhance* an inference of scienter, not raise one.   Because no such inference has been

raised by Plaintiffs' other scienter allegations, there is no inference of scienter to be enhanced by

the stock trades.[67]

      Even if the Court were to find that the Complaint raised some inference of

scienter that *could* be enhanced by the insider trades alleged, the Complaint pleads no facts

concerning any individual's prior trading history and therefore does not raise any inference that

the trades were suspicious in timing or amount.[68]   Plaintiffs insist that the trades were suspicious

due to their size and the fact that some trades involved options which would not expire for

several years.[69]   These arguments are insufficient to demonstrate that the trades were

suspicious.[70]   Accordingly, the allegations concerning Defendants' stock trades provide no

support for finding any inference of scienter.

**E.**    **The Magistrate properly considered Plaintiffs' allegations collectively and concluded that neither any individual allegation nor the Complaint taken as a whole gives rise to a strong inference of scienter.**

      Plaintiffs' final objection is that the Magistrate failed to consider their Complaint

---

[65]    *See, e.g., Shaw*, 537 F.3d at 543 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) (Alito, J.)).

[66]    (Mem. at 29-30.)

[67]    (*Id.*)

[68]    *Abrams*, 292 F.3d at 435 ("Only insider trading in suspicious amounts or at suspicious times is probative of scienter.   Plaintiffs make no allegations that these sales are out of line with prior trading practices or at times calculated to maximize personal profit.") (citation omitted).

[69]    (Resp. at 15; Objs. at 17.)

[70]    *See, e.g., In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002) (stating that "by themselves, large numbers do not necessarily create a strong inference of fraud" and citing cases holding that sales as large as 98% of a defendant's holdings cannot support a strong inference of fraud if divorced from a prior trading history), *abrogated on other grounds by Tellabs*, 551 U.S. 308; *In re Enron Corp. Sec., Derivative & "ERISA Litig."*, 258 F. Supp. 2d 576, 612 n.34 (S.D. Tex. 2003) ("[It is] rational and nonfraudulent to exercise options well before the expiration date if the price significantly exceeds that option's strike price . . . .").

in its entirety.[71]  This is not the case.  The Magistrate expressly recognized that "the facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled."[72]  The Memorandum's analysis is wholly consistent with this principle.  The Magistrate correctly concluded that, taken as a whole, "the Complaint does not show that any particular statement was made with the requisite intent to defraud."[73]

**F.    The Court should grant Defendants' Motion to Dismiss on the grounds not reached by the Magistrate.**

In the unlikely event that the Court does not elect to dismiss the Complaint on the basis of the Magistrate's recommendation with respect to scienter, it should nevertheless do so on the basis of the other grounds raised in Defendants' Motion to Dismiss.  Although the Magistrate did not address these grounds, the Court, in conducting its de novo review, should not deny Defendants' motion to dismiss without considering these additional grounds for dismissal.[74]

The Complaint should be dismissed because it fails to adequately plead that any statement made by any Defendant was materially false or misleading at the time it was made.[75]  The PSLRA and Rule 9(b) require the Complaint to specify *each statement* alleged to have been false or misleading, and *the reason why* the statement is false or misleading, including the "who, what, when, . . . where," and "why" establishing the alleged fraud.[76]  Further, for a misstatement or omission to be actionable, it must also concern a *material* fact.[77]  The Complaint, despite its prolixity, does not adequately identify any statement that is alleged to be false, the reasons why it

---

[71]      (Objs. at 17-19 (citing *Tellabs*, 551 U.S. at 322-23, and *Lormand*, 565 F.3d at 251).)

[72]      (Mem. at 15 (quoting *Shaw*, 537 F.3d at 533).)

[73]      (*Id.* at 11.)

[74]      *See* FED. R. CIV. P. 72(b)(3) ("The district judge may accept, reject, or modify the recommended disposition . . . ."); *cf. Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 486 (5th Cir. 2002) (explaining that a court of appeals "may affirm a district court's grant of a motion to dismiss on a basis not mentioned in the district court's opinion.") (internal quotation marks omitted).

[75]      (*See* Mot. to Dismiss at 5-13.)

[76]      *E.g.*, *Southland Sec. Corp.*, 365 F.3d at 361-62; *Abrams*, 292 F.3d at 431 (affirming this Court's dismissal).

[77]      *E.g.*, *Shaw*, 537 F.3d at 532; *see also* 17 C.F.R. § 240.10b-5 (2009).

was false, or the reason why it was material.  Plaintiffs have failed to meet their burden with respect to each of the Complaint's allegations.

For example, the Complaint alleges that the Defendants' statements about the amount of the company's backlog were false because the backlog was ultimately unprofitable. But these allegations are insufficient because they ignore the Defendants' statements explaining that backlog refers to revenue, not profits.[78]  Plaintiffs' allegations that the Defendants misrepresented the profitability of the backlog lack the requisite particularity because, among other reasons, they offer no quantification of the extent to which any estimates were misrepresented at any point in time and they do not identify specific, material information that was known but not disclosed when necessary to prevent a statement from being misleading.[79] The allegations that the Defendants misrepresented the effect of delays on the profitability of the Projects are inadequate because the Complaint identifies no statement by a Defendant that delays would have no impact on profitability and because the allegations of falsity depend on the unsupportable theory that performance during the "Peak Season" was required for profitability.[80] Plaintiffs' claim that Defendants misrepresented the reason for the delays is deficient because no specific facts are alleged demonstrating that delays resulting from bad weather were not the primary cause of project delays, or that Defendants falsely stated that no other factors impacted the Projects' schedules.[81]

The Complaint should also be dismissed because Defendants' statements were protected by the PSLRA's safe harbor.[82]  MII's disclosures regarding backlog and anticipated

---

[78]     (Mot. to Dismiss at 6-7.)

[79]     (*Id.* at 7-8.)

[80]     (*Id.* at 8-9.)

[81]     (*Id.* at 9-10.)  The Motion to Dismiss also explains the inadequacies of Plaintiffs' allegations concerning SEC Forms 144 and Defendants' accounting for the cost to complete the Projects.  (*Id.* at 10-12.)

[82]     (*See id.* at 19-20.)  *See also Southland Sec. Corp.*, 365 F.3d at 371-72 (citing 15 U.S.C. § 78u-5(c)(1)(A)-

profitability are nonactionable forward-looking statements, and were identified as such, as they concern expectations and projections of revenue and costs.  These disclosures were accompanied by meaningful cautionary language warning that actual costs may exceed estimated costs, possibly resulting in losses and that it recognized revenues on a Percentage of Completion basis and that adjustments made to estimates as work progresses may result in material changes to previously reported income.[83]  Such statements are not actionable under the securities laws.[84]

### G.    The Court should dismiss the Complaint with prejudice.

In the final footnote to the final sentence of the Objections, Plaintiffs express a desire to replead once again.[85]  In instances in which plaintiffs ask for such leave not by formal motion or submission of a proposed amended complaint, but rather "almost as an afterthought," it is proper to dismiss with prejudice.[86]  Plaintiffs' entire statement of what could be done to remedy the manifold defects in the Complaint is that they "request leave to file an amended complaint to address any deficiencies the Court might find in the existing Complaint."[87] Plaintiffs offer the Court no reason to believe that such an amendment could possibly improve their case.

The Magistrate was not asked to and so did not address the question whether dismissal should be with prejudice.  However, as the Fifth Circuit held in a securities fraud case involving a similarly defective complaint,

> Despite this awareness [of weaknesses in the complaint initially exposed by a motion to dismiss], the plaintiffs did not demonstrate to the court how they would replead scienter more specifically if

---

(B)).
[83]    (Mot. to Dismiss at 19-20 & n.72.)
[84]    (*Id.*)
[85]    (Objs. at 20 n.18.)
[86]    *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003); *Schiller v. Physicians Res. Group Inc.*, 342 F.3d 563, 565-66 (5th Cir. 2003).
[87]    (Objs. at 20 n.18.)

> given the opportunity, did not proffer a proposed second amended
> complaint to the district court, and did not suggest in their
> responsive pleading any additional facts not initially pled that
> could, if necessary, cure the pleading defects raised by the
> defendants.[88]

As in *Goldstein*, Plaintiffs have not properly moved for leave to replead their case, much less

demonstrated how the Complaint's defects could possibly be cured by repleading.   Plaintiffs

have already had two bites at the apple.   Granting leave to amend would only postpone the

inevitable, and this request should be denied.   Just as dismissal with prejudice was proper in

*Goldstein*, it is proper here.   When "allowing yet another amendment would be an exercise in

futility," dismissal of the action with prejudice is proper.[89]

## CONCLUSION

For these reasons, and for the other reasons set forth in Defendants' Motion to

Dismiss, Defendants respectfully submit that the Court should dismiss the Complaint in its

entirety, with prejudice.

DATED this 26th day of March, 2010.

---

[88]      *Goldstein*, 340 F.3d at 254-55.
[89]      *Schiller*, 342 F.3d at 569.

By:    /s/ Mark K. Glasser

Of Counsel:                                  Mark K. Glasser
Jeffrey J. McNabb                            Attorney-in-Charge
State Bar No. 24046406                       State Bar No. 08014500
Edward M. Cottrell                           Federal I.D. No. 930
State Bar No. 24065084                       One Shell Plaza
910 Louisiana                                910 Louisiana
Houston, Texas 77002                         Houston, Texas  77002
Telephone: 713.229.1234                      Telephone:  713.229.1281
Facsimile:  713.229.1522                     Facsimile:  713.229.7881
                                             mark.glasser@bakerbotts.com

                                             ATTORNEY FOR DEFENDANTS
                                             MCDERMOTT INTERNATIONAL, INC.,
                                             BRUCE W. WILKINSON, MICHAEL S. TAFF,
                                             AND ROBERT A. DEASON

## CERTIFICATE OF SERVICE

        I hereby certify that on this 26th day of March, 2010, a copy of the foregoing
DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S
MEMORANDUM AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS
was filed with the clerk of the court of the United States District Court for the Southern District
of Texas and will be served on all counsel of record via *electronic notification by the court
and/or certified mail, return receipt requested.*


                                             /s/ Mark K. Glasser
                                             Mark K. Glasser