IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---------------------------------------------------------x
ADAMS FAMILY, *et al.*          :     No. 4-09 Civ. 01208 (VDG)
    *Plaintiffs,*               :
                                :     <u>CLASS ACTION</u>
    v.                          :
                                :
MCDERMOTT INTERNATIONAL, INC., :
BRUCE W. WILKINSON, MICHAEL     :
S. TAFF AND ROBERT A. DEASON,   :
    *Defendants.*               :
---------------------------------------------------------x

## LEAD PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Lead Plaintiffs George R. Adams, Mina J. Adams and George L. Adams ("Plaintiffs") respectfully move for leave to amend the Consolidated Complaint, on the grounds set forth below.

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This is a securities fraud class action brought on behalf of a class of all persons who purchased the publicly-traded common stock of McDermott International, Inc. ("McDermott") between February 27, 2008 and November 5, 2008, inclusive. On March 26, 2010, the Court dismissed the Consolidated Complaint, but expressly did so without prejudice "to give the Plaintiff the opportunity to seek leave to amend their pleadings."

### STATEMENT OF THE ISSUES

The issue presented is whether or not leave to amend should be granted. The standard of review has been articulated as follows. Under Rule 15(a), "leave to amend shall be freely given when justice so requires," and should be granted absent some justification for refusal. *Foman v. David,* 371 U.S. 178, 182 (1962). Rule 15(a)

"evinces a bias in favor of granting leave to amend." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003) (citations omitted). If the district court lacks a "substantial reason" to deny leave, its discretion is not broad enough to permit denial. *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (citations and internal quotation marks omitted).

## ARGUMENT

### I. Introduction

In the Memorandum and Recommendation on Defendants' Motion to Dismiss ("Memorandum"), the Magistrate Judge recommended dismissal of the Consolidated Complaint ('Complaint") for failure to plead scienter, and the Magistrate Judge did not recommend dismissal on any other grounds. Moreover, the Memorandum indicates that the Complaint plead facts concerning insider stock sales sufficient to permit an inference of scienter to be meaningfully enhanced, but declined to do so in this case because the Complaint's other scienter allegations were insufficient. Memorandum at 29-30. Plaintiffs now allege additional facts in the proposed Amended Complaint ("Amended Complaint") that address the previous scienter allegation deficiencies identified in the Memorandum.[1] That inference of scienter is even stronger when meaningfully enhanced by the allegations of insider stock sales acknowledged by the Memorandum.

First, the Court found that the Complaint did not contain a factual basis for Plaintiffs' claims that Defendants were aware that the *profitability of three construction projects* (the "Three Qatar Projects") depended upon the work being performed during the summer of 2008. Memorandum at 16-20. Plaintiffs have remedied that deficiency by alleging that Defendants knew or recklessly ignored the fact that delays in the

---

[1] *See* Exhibit "A" – Lead Plaintiffs' proposed Amended Complaint.

00162083                    2

commencement and performance of the Three Qatar Projects precluded J. Ray from performing the projects in accordance with J. Ray's bid assumptions, which had a material negative impact on J. Ray's and McDermott's profits and precluded J. Ray from earning the 10% - 12% profits Defendants represented J. Ray would earn. Plaintiffs thus have clarified that their allegations do not in any way depend on whether the Three Qatar Projects were or were not profitable in and of themselves. Rather, they concern solely whether the profits of J. Ray and the Company as a whole, and the profit margins of J. Ray, were as represented.

Second, although the Memorandum correctly recognized that Defendants could be charged with knowing about issues that were critical to the Company's business, it determined that the Complaint failed to allege facts sufficient to establish that the Three Qatar Projects were critical. Memorandum at 25-27. Plaintiffs have remedied that deficiency with additional detailed factual allegations demonstrating that J. Ray's profits and profit margins were critical and material to Company's business and profits, and that performance of the Three Qatar Projects was critical and material to J. Ray's profit margins and the profits of J. Ray and McDermott as a whole.

Plaintiffs respectfully submit that all of the facts alleged in the Amended Complaint, *taken collectively*, remedy the scienter allegation pleading deficiencies identified by the Memorandum, and give rise to a strong inference of scienter.

## II.  Leave To Amend Should Be Freely Granted

Under Rule 15(a), "leave to amend shall be freely given when justice so requires," and should be granted absent some justification for refusal. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Consequently, Rule 15(a) "evinces a bias

in favor of granting leave to amend." *Goldstein v. MCI WorldCom,* 340 F.3d 238, 254 (5th Cir. 2003) (citations omitted). In deciding whether to grant leave to file an amended pleading, the district court "may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir. 1993). If the district court lacks a "substantial reason" to deny leave, its discretion is not broad enough to permit denial. *Lyn-Lea Travel Corp. v. American Airlines, Inc.,* 283 F.3d 282, 286 (5th Cir. 2002) (citations and internal quotation marks omitted).

"Futility" means that "the amended complaint would fail to state a claim upon which relief could be granted," and the legal standard developed under Rule 12(b)(6) guides this analysis. *Stripling v. Jordan Production Co., LLC,* 234 F.3d 863, 872-73 (5th Cir.2000). Consequently, the Court should not deny a motion for leave to amend "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (internal quotations and citations omitted). Moreover, the Court should render its decision taking the complaint in the light most favorable to the plaintiff and taking its allegations as true. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir. 1996). As this Circuit stated in a Rule 10b-5 case:

> Motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 570 (5th Cir. 2005). When faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S. Ct. 2499, 2509, 168 L.Ed. 2d 179 (2007) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L.Ed. 2d 517 (1993)). We must also draw all reasonable inferences in the plaintiff's favor. *See*

*Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed. 2d 90, 1974); *Lovick v. Ritemoney, Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief – including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier*, 503 F.3d at 401 (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)).

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

## III. Plaintiffs Have Alleged a Strong Inference of Scienter

Plaintiffs have corrected all of the deficiencies set forth in the Memorandum and alleged facts which give rise to a strong inference of scienter. The "required state of mind" is knowledge or severe recklessness. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009). A "plaintiff alleging fraud in a §10(b) action must only 'plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 250 (5th Cir. 2009). (quotation omitted). "However, [the scienter inference] 'need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences.'" *Id.* at 251 (quotation omitted). In conducting its scienter analysis, the court must "accept[] all of the factual allegations in the complaint as true," "must consider the complaint in its entirety," and must consider "whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (citation omitted). "Allegations of circumstantial evidence justifying a strong inference of scienter will suffice." *Id.*, quoting *Goldstein v. MCI Worldcom*, 340 F.3d 238, 246 (5th Cir. 2003). In addition, "motive and opportunity allegations may meaningfully enhance the strength of

the inference of scienter." *Flaherty*, 565 F.3d at 208. The Amended Complaint's allegations satisfy these standards.

The following facts, individually and collectively, give rise to a strong inference that, contrary to Defendants' misrepresentations, Defendants knew or recklessly ignored the fact that delays in the commencement and performance of the Three Qatar Projects precluded J. Ray from performing the projects in accordance with J. Ray's bid assumptions which had a material negative impact on J. Ray and McDermott's profits and precluded J. Ray from earning the 10% - 12% profits Defendants represented J. Ray would earn.

### A. Defendants Carefully Monitored the Performance of the Three Qatar Projects and the Impact of Delays on Profits and Profit Margins

Certain facts which demonstrate scienter are admitted and not even the subject of inference. For example, Defendants knew that J. Ray's ability to realize profits of approximately 10% - 12% depended on whether J. Ray could perform its pipeline installation work for the Three Qatar Projects "during peak summer construction months" of 2008 using a single, pipelaying barge. *See* ¶¶ 5, 76, 125, 142-145, 150. Moreover, Defendants repeatedly represented throughout the Class Period that they knew about the delays that made it impossible for J. Ray to perform the Three Qatar Projects on schedule. *See* ¶¶ 48-49, 75-78, 111, 125, 143. And, they knew at least by May 2008, that the derrick barge that was to install the pipeline was not even available to perform the Three Qatar Projects. *See* ¶¶ 5, 77-78, 80, 146. Finally, although they had consistently misrepresented to the contrary throughout the Class Period, Defendants finally admitted in November 2008 that J. Ray's inability to perform the pipeline installation work for the

Three Qatar Projects on schedule was the reason that J. Ray did not, and could not, realize profits of approximately 10% - 12%. *See* ¶¶ 6, 120-130, 142, 145, 154.

The following facts further raise a strong inference that, long before November 2008 and throughout the Class Period, Defendants knew or recklessly ignored the fact that delays in the commencement and performance of the Three Qatar Projects precluded J. Ray from performing the projects in accordance with J. Ray's bid assumptions, which had a material negative impact on J. Ray and McDermott's profits and precluded J. Ray from earning the 10% - 12% profits Defendants represented J. Ray would earn. For example, Defendants constantly reviewed and analyzed the performance of the Three Qatar Projects and the impact of delays in that performance on profits and profit margins. *See* ¶¶ 49, 64, 74-79, 109, 112. Well before the Class Period, J. Ray created a rigorous monthly project review process to determine whether J. Ray was behind schedule and whether any steps could or should be taken to "mitigate" delays. *See* ¶¶ 146(a). Indeed, Defendant Wilkinson admitted that senior management, himself included, tracked the performance of "major" J. Ray projects every month, including the impact of project delays ("slippage") on the performance of backlog work and, therefore, revenue and profits, using a sophisticated tracking and reporting system. *See* ¶¶ 146(b). In particular, Defendants Wilkinson and Taff admitted during the May 13, 2008 Conference Call that they were reviewing and analyzing detailed information concerning the delays in the performance of the Three Qatar Projects and the impact of those delays "on recording revenues and profits." *See* ¶¶ 146(b)-(d). Moreover, Defendants admitted that the CEO, CFO and General Counsel of McDermott reviewed all major J. Ray construction contract bids and, therefore, reviewed the performance, cost and profit assumptions upon which

those bids were based. *See* ¶¶ 147. Additionally, Defendants admitted that they carefully reviewed the performance of contracts to prepare dependable estimates from which they could determine the profits and profit margins to report to investors. *See* ¶¶ 148. This detailed review was critical because, as Defendant Wilkinson admitted, stock market analysts and reasonable investors considered J. Ray's profit margins as a significant factor with respect to their evaluation of McDermott as a whole (*see* ¶¶ 26, 78, 149), and J. Ray's ability to derive profit margins of 10% - 12% was critical to McDermott as a whole *See Id.* Since the Three Qatar Projects were indisputably huge projects for both J. Ray and McDermott, upon information and belief, Defendants knew that delays in the Three Qatar Projects precluded J. Ray from performing the projects in accordance with J. Ray's bid assumptions which had a material negative impact on J. Ray and McDermott's profits and precluded J. Ray from earning the 10% - 12% profits Defendants represented J. Ray would earn.[2]

The inference of scienter is strong because Plaintiffs have alleged detailed and specific statements facts concerning Defendants' careful and thorough review and analysis of the extent to which delays in the commencement and performance of the Three Qatar Projects precluded J. Ray from performing the projects in accordance with J. Ray's bid assumptions, which had a material negative impact on J. Ray and McDermott's profits and precluded J. Ray from earning the 10% - 12% profits Defendants represented J. Ray would earn. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (Oracle CEO's assurance that management tracked detailed

---

[2] Indeed, if Defendants did not know that that delays in the Three Qatar Projects precluded J. Ray from performing the projects in accordance with J. Ray's bid assumptions, which had a material negative impact on J. Ray and McDermott's profits and caused J. Ray's profit margins to be materially less than the 10-12% profit margins Defendants represented J. Ray would earn, then Defendants' repeated representations about the care with which they reviewed the performance and profitability of projects is a fraud in and of itself.

sales tracking system contributed to strong inference of scienter). Indeed, "allegations regarding management's role in a company . . . may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information." *South Ferry LP No. 2 v. Killinger,* 542 F.3d 776, 786 (9th Cir. 2008). At the very least, such allegations "may be used in any form along with other allegations that, when read together, raise" a cogent and compelling inference of scienter. *Id.* (citing *Tellabs,* 127 S.Ct. at 2510). On remand, the District Court in *Killinger* found a strong inference of scienter on the part of the CEO because his statements "displayed an intimate knowledge of WaMu's information delivery, risk-management structure, and hedging capacity," and he represented to investors "that he had all of the information necessary to make accurate predictions about WaMu's risk." *South Ferry LP #2 v. Killinger,* No. C04-1599-JCC, 2009 WL 3153067, at *8-10 (W.D. Wash. Oct. 1, 2009); *see also In re CINAR Corp. Sec. Litig.,* 186 F. Supp. 2d 279, 316 (E.D.N.Y. 2002) ("subsequent admissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter on their part") (quoting *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84-85 (2d Cir. 1999)). Here, too, the Court should infer scienter from Defendants' representations demonstrating an intimate knowledge of J. Ray's bids, the schedules for major projects like the Three Qatar Projects, the status of the pipe-laying derrick barges, and the impact that failure to perform the projects in accordance with bid assumptions would have on the Company's profits and J. Ray's profit margins.

### B.  The Critical Importance of the Three Qatar Projects Supports Scienter

In addition to the foregoing facts demonstrating that Defendants knew that delays in the commencement and performance of the Three Qatar Projects precluded J. Ray from performing the projects in accordance with J. Ray's bid assumptions, which had a material negative impact on J. Ray and McDermott's profits and precluded J. Ray from earning the 10% - 12% profits Defendants represented J. Ray would earn, a strong inference of scienter arises from the fact that the Three Qatar Projects, were critically important to McDermott. In *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 700 (5th Cir. 2005), the Fifth Circuit found that a strong inference of scienter based on the importance of particular deals to the defendant company: "[i]t is reasonable to assume, given the importance of these deals to the company, that IPaxess would have familiarized itself" with those facts), *citing Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (an egregious refusal to see the obvious, or to investigate the doubtful, may give rise to an inference of recklessness).

The critical importance of these projects is most clearly demonstrated by the fact that J. Ray's failure to perform the Three Qatar Projects in accordance with bid assumptions resulted in McDermott's profits for the third quarter of 2008 being cut in half – from $182 million to $90 million. ¶ 128. Moreover, the "domino effect" exposed J. Ray to as much as $110 million in liquidated damages for failing to meet key deadlines on the Three Qatar Projects. *Id.* And, as reported on November 6, "virtually all of the gross margin" was eliminated on the $1 billion of revenue left to recognize on the three Qatar Projects as a result of the delay. *Id.* Thus, far from generating $140 - $168 million in profits for J. Ray and the Company, the Three Qatar Projects generated at least $90

million in losses, a shortfall of between $230-$258 million compared to the bid assumptions underlying J. Ray's representations that the work earned profits of 10-12, with the potential to generate far greater losses as a result of liquidated damages. *Id.* Since J. Ray's profits for all of 2008 were only $147 million and the profits for McDermott as a whole were only $551 million, the negative impact of the failure to perform the Three Qatar Projects in accordance with their bid assumptions equaled approximately 41% of McDermott's profits for the year and, depending on the amount of liquidated damages, potentially much more. *Id.*

Performance of the Three Qatar Projects in accordance with bid assumptions was more critical to McDermott than facts deemed to be sufficiently "critical" in other cases which raised a strong inference of scienter. For example, in *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 987-88 (9th Cir. 2008) (Kozinski, *J.*), the Ninth Circuit held that it was proper to strongly infer that the CEO and CFO of Applied Signal were aware of communications received from customers *temporarily* stopping work on various contracts, based on the significance of the contracts. For example, the Court noted that the first stop-work order affected only "between $10 and $15 million of work on the company's largest contract with one of its most important customers." *Berson*, 527 F.3d at 988. Significantly, this amounted to between only 9-13.5% of Applied Signal's total backlog, which at the time of the allegedly false and misleading statement was $111 million. *In re Applied Signal Technology, Inc. Sec. Litig.*, No. C 05-1027 SBA, 2006 WL 1050174, * 6 (N.D. Cal. Feb. 8, 2006). Here, the Complaint alleges that the Three Qatar Projects accounted for 28.5% of J. Ray's backlog and 15% of McDermott's aggregate backlog at the end of the third quarter of 2007. ¶ 45. More importantly, however, the

Complaint alleges specific facts demonstrating – as the Complaint in *Applied Signal* did not – that the Three Qatar Projects were critical to J. Ray's and McDermott's overall *profits*.

Similarly, the court in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.,* 320 F.3d 920 (9th Cir. 2003), dismissed as "patently incredible" an argument by *outside directors* that the Complaint did not plead facts sufficient to raise a strong inference that they were aware of issues regarding, *inter alia*, maintenance problems with its airplane fleet and settlement of an FAA investigation. *Id.* at 943, n.21. In particular, the Court found that it was "absurd to suggest" that the Board of Directors was unaware of "FAA investigations or negotiations, especially considering the fact that the FAA had indicated that it was considering penalties of up to $11 million." *Id.* Here the potential penalties to which McDermott was exposed as a result of the delays in the Three Qatar Projects –$110 million –ten times more than the potential penalties in *America West*. If it was "patently incredible" that outside directors were aware of the maintenance problems in *America West,* it is even less credible to assume that McDermott's top management, *corporate insiders*, not outside directors, were unaware that the bid assumptions for these three enormous projects had not been met, that they were 300 days behind schedule, and that one of the projects had not even started. ¶¶.

Plaintiffs' allegations here are also stronger than those deemed sufficient in *In re OCA, Inc. Sec. and Derivative Litig.,* No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006), where the district court, citing *Plotkin,* inferred scienter from the fact that defendants' alleged misrepresentations concerned patient receivables. *Id.* at *18.

Although plaintiffs in *OCA* pled that defendants misstated the amount of the receivables by a material amount, they did not attempt to quantify the misstatement. Here, Plaintiffs have not only alleged that the misrepresentations concerned the Company's largest business segment and the one that generated the lion's share of the Company's profits, Plaintiffs have quantified the massive negative impact of the Three Qatar Projects *to* that business segment, and to the Company as a whole.[3]

### C. Insider Stock Sales Support a Strong Inference of Scienter

The inference of scienter is enhanced because Defendants and other insiders obtained specific, concrete benefits from sales of Company stock and securities during the Class Period which were suspicious in both timing and amount. It is well-settled that such allegations give rise to a strong inference of scienter if the stock sales were suspicious in timing or amount. *See, e.g., Central Laborers*, 497 F.3d at 553 ("In this circuit, officer trading may give rise to an inference of scienter if it is unusual in timing or scope") (citing *Nathenson*, 267 F.3d at 421); *see also Southland Secs. Corp. v. Inspire Ins. Solutions*, 365 F.3d 353, 368 (5th Cir. 2004) (same).[4] Here, those facts are clearly alleged in the Amended Complaint. *See* ¶¶ 8, 58-63, 67, 85-93, 95-96, 151.

The Amended Complaint does not rely on the "group-pleading doctrine" to allege scienter. To the contrary, as discussed above, the Complaint's scienter allegations are based upon Defendants' admissions, knowledge of material adverse facts and insider

---

[3] Similarly, in *In re Tel Save Sec. Litig.*, No. 98 CV 3145, 1999 WL 999427, at * 5 (ED. Pa. Oct. 19, 2999), the court inferred scienter because the transactions at issue were "important" and "key," but did not – as Plaintiffs have done here – quantify the critical importance of the transactions to the company's profits.

[4] *See, e.g., Southland Securities*, 365 F.3d at 380 ("We conclude that these Dunham sales and this sequence of events, considered in light of all the other facts and circumstances alleged, including Dunham's position as CEO, [and] . . . his total sales throughout the class period of over 40 percent of his INSpire stock, and his personal involvement in promoting the Arrowhead contract and touting the increased revenues and earnings it would produce, suffice…to create a strong inference of the requisite scienter on Dunham's part . . . .").

trading. Moreover, the group pleading doctrine has nothing to do with scienter; it has to do with whether statements issued on behalf of an organization can be attributed to senior officers. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007).

## IV. Plaintiffs Have Alleged the Other Elements of a Rule 10b-5 Claim

"[T]he PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading, the so-called "particularity" requirement. 15 U.S.C. §78u-4(b)(1)." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). The Complaint "specif[ies] the statements contended to be fraudulent, identif[ies] the speaker, state[s] when and where the statements were made, and explain[s] why the statements were fraudulent." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). Here, the Complaint specifically alleges the statements contended to be fraudulent, the speaker of those statements and when and where the statements were made. *See* ¶¶ 54, 64, 68, 72, 74-79, 99, 105-106, 108-112, 115, 136, 139.

The Complaint also adequately alleges the remaining elements of a securities fraud case: reliance (¶ 152), economic loss (¶ 153), and "loss causation." (¶ 120-127, 154). *Lormand*, 565 F.3d at 238. Defendants did not challenge these elements with respect to Plaintiff's initial complaint, and they are unchanged in the present Complaint.

## **CONCLUSION AND RELIEF SOUGHT**

For the reasons set forth above and in the proposed amended complaint, Plaintiffs' Motion for Leave to Amend should be granted.

Date: April 30, 2010

Respectfully submitted,

SCHWARTZ, JUNELL, GREENBERG
& OATHOUT, LLP

By: /s/ Roger B. Greenberg
Roger B. Greenberg
Texas State Bar No 08390000
Federal I.D. No. 3932
Two Houston Center
909 Fannin, Suite 2700
Houston, Texas 77010
Telephone: 713/752-0017
Facsimile: 713/752-0327

*Liaison Counsel for Plaintiffs*

IZARD NOBEL LLP
Robert A. Izard
Jeffrey S. Nobel
29 South Main Street
Suite 215
West Hartford, CT 06107
Tel.: (860) 493-6292
Fax: (860) 493-6290

*Lead Counsel for Plaintiffs*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Gregory M. Castaldo
Benjamin J. Sweet
Bharati O. Sharma
Naumon A. Amjed
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

Case 4:09-cv-01208 Document 110 Filed in TXSD on 04/30/10 Page 15 of 16

00162083                                    15

COUGHLIN STOIA
GELLER RUDMAN & ROBBINS, LLP
Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173

*Additional Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2010, I electronically filed the foregoing *Lead Plaintiffs' Motion for Leave to Amend* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email address denoted below, and I hereby certify that I have mailed the foregoing documents via the United States Postal Service to the non-CM/ECF participants as indicated below:

Mark Glasser: mark.glasser@bakerbotts.com

Richard B. Harper
Seth T. Taube
Baker Botts LLP
30 Rockefeller Plz, 4th Floor
New York, NY 10112

/s/ Roger B. Greenberg
ROGER B. GREENBERG