UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---------------------------------------------------------x
ADAMS FAMILY, *et al.*  :   No. 4-09 Civ. 01208 (VDG)
    *Plaintiffs,* :
                                  :   <u>CLASS ACTION</u>
    v.  :
                                  :
MCDERMOTT INTERNATIONAL, INC., :
BRUCE W. WILKINSON, MICHAEL  :
S. TAFF AND ROBERT A. DEASON, :
    *Defendants.* :
---------------------------------------------------------x

**LEAD PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR LEAVE TO AMEND**

Lead Plaintiffs George R. Adams, Mina J. Adams and George L. Adams ("Plaintiffs") respectfully submit this Reply Memorandum in Support of Their Motion for Leave to Amend and show as follows:

**ARGUMENTS**

Defendants erroneously argue that the Proposed Amended Complaint ("PAC") fails to change the Complaint that was dismissed. Defendants are wrong for a number of reasons.[1]

First, the PAC properly alleges that Defendants misrepresented that J. Ray was earning profits of 10-12%. PAC, at ¶¶ 3-5, 28, 50, 57, 66, 81, 100, 114, 119, 138, 141, 146, and 150. Rather than address these claims, Defendants instead attempt to change Plaintiffs' claims into a failure to disclose "the effect of the *negative profitability* of [three major projects in Qatar] on

---

[1] Defendants wrongly state that this PAC is "Plaintiffs' third attempt to state a claim against Defendants." Defendants' Opposition to Lead Plaintiffs' Motion for Leave to Amend ("Def. Opp."), at vi. As the Court noted the last time Defendants raised the same argument, "[a]lthough there have been two sets of pleadings in this case that were consolidated into the cause of action that is now pending before this Court, the plaintiffs have not actually sought leave from this Court previously to amend their pleadings." Order Adopting Magistrate Judge's Memorandum and Recommendation, at 1.

the overall profitability of J. Ray and McDermott." Def. Opp., at viii (emphasis added). This mischaracterization fails because the PAC has nothing to do with whether J. Ray's work on the Three Qatar Projects was or was not nominally profitable. Rather, Plaintiffs' claims concern whether J. Ray's 10-12 percent profit margins were as represented. Lead Plaintiffs' Motion for Leave to Amend ("Motion"), at 3. The Three Qatar Projects are relevant to this claim in that the significant delays on those projects undermined J. Ray's bid assumptions, which were a basis of the 10-12% profit margin representations. Thus, the issue is not whether significant performance delays in the Three Qatar Projects caused these projects to be nominally profitable or not, but whether they prevented the projects from being as profitable as J. Ray assumed in representing that J. Ray was earning profits of 10-12 percent. This is not, as Defendants pretend, a "meaningless" distinction. Def. Opp., at vii. To the contrary, the Magistrate Judge's ruling stated that Plaintiffs had failed to establish "that failure to perform the Three Qatar Projects during peak season would render *them unprofitable*.'" Memorandum and Recommendation on Defendants' Motion to Dismiss ("Mem."), at 17 (emphasis added). This concern raised by the Magistrate Judge has now been resolved. Under the PAC, whether Defendants knew that the Three Qatar Projects would actually make or lose money is not relevant. The relevant issue, as clearly alleged in the PAC, is whether Defendants knew that the delays in these projects precluded J. Ray from earning 10-12% profit margins. The fact that Defendants do not even address these new allegations, but instead attempt to twist Plaintiffs' new allegations back into the old ones, confirms that amendment would not be futile.

The PAC alleges facts demonstrating that J. Ray's ability to achieve 10-12 percent profit margins was precluded by the Company's failure to meet the bid assumptions for the Three

Qatar Projects. Relying on admissions by Defendants and new McDermott CEO John Fees, the PAC (¶¶ 5, 76, 125, 142-145, 150) alleges that the bid assumptions for the Three Qatar Projects included (1) performing pipe laying operations in the summer months when productivity rates were high, and downtime low; (2) laying the undersea pipe for the Three Qatar Projects with the same derrick barge that was used for other projects; and (3) avoiding liability for approximately $110 million in liquidated damages by completing the projects by the fourth quarter of 2008. Fees and Defendant Taff admitted that the failure to meet these bid assumptions was the reason why J. Ray did not earn 10-12 percent profit margins. PAC, ¶¶ 125-27.

Defendants also incorrectly argue that the PAC fails to allege that Defendants were aware of the facts which rendered their statements false or misleading at the time that they made them. Def. Opp. at 6-9. Unlike the Consolidated Complaint, the PAC does not attempt to show that Defendants were aware of *why* the Three Qatar Projects were behind schedule as those facts are not material to the claims alleged. Under the PAC, mere knowledge that the Projects were behind schedule, regardless of *why* they were behind schedule, is sufficient for scienter. Contrary to Defendants' arguments, the PAC provides substantial new additional factual allegations to support Defendant's scienter. First, the PAC alleges the critical importance Defendants placed on the accuracy of the bid assumptions for J. Ray's major fix-price contracts, including Defendant Wilkinson's specific representation that the CEO, CFO and General Counsel of McDermott reviewed bid assumptions for all major bids. PAC, at ¶¶ 29-31, 147. Second, the PAC alleges, again in great detail, that the Three Qatar Projects were *very* major projects for the Company (*id.* at ¶¶ 32-45), and thus would have been included in the bid review process by McDermott's senior officers. Finally, the PAC demonstrates, not *only* that

- 3 -

Defendants had a sophisticated process for tracking progress on all of their major projects (¶ 146), but that Defendants had *actually been informed* of the delays in the schedule that affected the Three Qatar Projects. *See id.*, at ¶¶ 49, 64, 74-79, 109, 112. Thus, Defendants had actual knowledge of the bid assumptions supporting the 10-12 percent profit margins, and actual knowledge that those assumptions had not been met, at the time that they were representing that J. Ray would still earn 10-12 percent profit margins and these margins would not be affected by the construction delays J. Ray was experiencing.

Defendants wrongly claim that Plaintiffs' Motion "distorts" the allegations of the PAC (Def. Opp. at 7), yet their arguments are incoherent. They claim that Plaintiffs cite to paragraphs 5, 76, 125, and 142-45 "as evidence that Defendants monitored the Three Qatar Projects' performance" (Def. Opp., at 7), when the paragraphs were correctly cited for the proposition that Defendants were aware that the Company's 10-12 percent profit assumptions in the bids for the Three Qatar Projects were based on assumptions concerning performance of pipelaying during the summer of 2008 with a single barge. *See* Motion, at 6. Similarly, Defendants complain that paragraphs 49, 64, 74-79, 109 and 112 do not discuss "any kind of monitoring or review at a per-project level," when the paragraphs of the PAC cite to statements by Defendants evincing *actual knowledge* of the delays, including weather delays, which impacted the Three Qatar Projects.

Defendants also wrongly argue that the PAC's detailed facts addressing their "core business" theory were already contained in the initial complaint and that "[t]he facts regarding the size and importance of the Three Qatar Projects have not changed." Def. Opp., at 11-12. Defendants' evidence for this assertion, however, is the fact that Plaintiffs have not changed their allegations with respect to the amount of revenue expected from the projects in question. *Id.* Of

- 4 -

course not – the revenue numbers were accurate in the initial Complaint, and they have not changed. The PAC contains significant new allegations concerning the importance of the Three Qatar Projects, individually and collectively, to J. Ray's and McDermott's *profits* – the measure that mattered most to investors. PAC, at ¶¶ 34, 41, 44, and 45; *see Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir.2000) (earnings of key importance to investors even if revenue variations are small). In addition, the PAC includes numerous allegations that demonstrate the importance of J. Ray, and in particular, the importance of its 10-12 percent profit margins, to McDermott as a whole. *Id.* at ¶¶ 26-36.[2]

Contrary to Defendants' arguments (Def. Opp., at 13-15), the PAC properly bolsters the new scienter allegations with facts concerning insider stock sales that were suspicious in timing and amount. For example, the amount of stock sold during the Class Period was suspicious, as Defendant Deason sold over 132,000 McDermott shares (over 65% of his stock holdings) for proceeds exceeding $6 million (¶ 151(a)); Defendant Taff sold 26,500 shares of his McDermott stock (including 73% of his exercisable options holdings) for proceeds of over $1.6 million (¶ 151(b)); and Defendant Wilkinson sold over 400,000 McDermott shares (including 52% of his

---

[2] On the grounds that Plaintiffs cited many of the cases supporting the "core business" theory in their brief opposing the Motion to Dismiss, Defendants make no effort to distinguish them, even though Plaintiffs have provided substantially more supporting facts demonstrating that the Three Qatar Projects were sufficiently important to J. Ray and to McDermott that Defendants would have been aware of their bid assumptions, schedules, and the fact that the projects were 300 days behind schedule. Def. Opp., at 13. Defendants' efforts to distinguish *In re OCA, Inc. Sec. and Derivative Litig.*, No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) is flawed, since the *OCA* court found that the importance of patient receivables to the Company supported an inference of scienter, *even though only an unidentified portion of the receivables were incorrectly reported. Id.* at * 18. Similarly, the court in *In re Tel Save Sec. Litig.*, No. 98 CV 3145, 1999 WL 999427, at * 5 (E.D. Pa. Oct. 19, 2999) did not attempt to quantify the importance of the critical transactions. Here, Plaintiffs have not only alleged, based on detailed facts, that J. Ray's profits from its backlog were critical, Plaintiffs have actually quantified the degree to which those profit margins were impacted by the problems with the Three Qatar Projects.

exercisable options holdings) for proceeds exceeding $20 million. ¶ 151(c).[3] Consequently, the amounts of these sales were extraordinary. In addition, the PAC alleges facts showing that the timing of these sales was extremely suspicious because the sales closely followed Defendants' false and misleading statements during the Class Period and *all* of the sales from the exercise of options were derived from options that were not set to expire for several *years*. ¶¶ 29-30, 34, 38, 53-55, 59-61, 64, 66, 74, 134.[4] Contrary to Defendants' argument, as this court has held, "[t]here is no *per se* rule for what constitutes illicit insider trading, and each case must be decided on its own facts." *In re Enron Corp. Sec., Derivative, & "ERISA" Litig.*, 258 F. Supp. 2d 576, 593 (S.D. Tex. 2003). These allegations should be considered, together with Plaintiffs' other scienter allegations, to determine that the inference of scienter is at least as compelling as any alternative inference. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009) ("The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.").

Defendants' remaining arguments also lack merit. They incorrectly argue (Def. Opp., at

---

[3] Other Company insiders engaged in sales of McDermott stock of similar scope. During the Class Period, John T. Nesser sold over 192,000 shares (including 100% of his options holdings) for proceeds exceeding $10.6 million (¶ 151(d)); Louis Sannino sold over 112,000 shares (over 52% of his holdings) for proceeds exceeding $6.8 million (¶ 151(e)); John Fees sold over 55,000 shares (including nearly 51,000 shares, representing 100% of his exercisable options, in a single day) for proceeds exceeding $4.5 million (¶ 151(f)); Liane Hinrichs sold over 26,000 shares (including 25,290 options exercised in a single day) for proceeds exceeding $1.5 million (¶ 151(g)); and Ronald Cambre sold 18,600 shares (all from options exercised in a single day for proceeds exceeding $1.1 million (¶ 151(h)).

[4] *See, e.g., Southland Secs. Corp. v. Inspire Ins. Solutions*, 365 F.3d 353, 380 (5th Cir. 2004) ("We conclude that these Dunham sales and this sequence of events, considered in light of all the other facts and circumstances alleged, including Dunham's position as CEO, [and] . . . his total sales throughout the class period of over 40 percent of his INSpire stock, and his personal involvement in promoting the Arrowhead contract and touting the increased revenues and earnings it would produce, suffice...to create a strong inference of the requisite scienter on Dunham's part . . . .").

00163518

15-16) that the PAC relies on the "group-pleading doctrine" to allege scienter. To the contrary, as discussed above, the PAC's scienter allegations are based upon Defendants' admissions, knowledge of material adverse facts and insider trading. Moreover, the group pleading doctrine has nothing to do with scienter; it has to do with whether statements issued by an organization can be attributed to senior officers. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007). Contrary to Defendants' argument (Def. Opp., at 16, citing PAC, at ¶ 150), the Court should strongly infer that each Defendant was aware of the delays admitted by Defendant Wilkinson during the May 13, 2008 Conference Call with investors. First, Defendant Taff participated in the Conference Call (PAC, ¶ 73) with Wilkinson, which means that he certainly learned about the delays with the derrick barge at that time in the unlikely event he was unaware of it before. Second, Robert Deason was the president of McDermott's J. Ray subsidiary. *Id.* at ¶ 16. If Wilkinson and Taff knew about the delays, then Deason had to know as he had more direct responsibility for J. Ray and had a duty to report to Wilkinson.

Similarly, Defendants wrongly complain that the PAC attributes "at least twenty-two different purported misrepresentations . . . to Defendants generally" and attempts to infer scienter "from that fact." Def. Opp. at 16 (citing PAC ¶ 141). However, Paragraph 141 simply cross-references particular statements by particular individual defendants – specifically identified – in earlier parts of the PAC, and indicates that the facts in the paragraphs that follow ¶ 141 support an inference that those statements were made with scienter. This not "group pleading" since the individuals responsible for each allegedly false or misleading statement are clearly identified.

Despite their complaints about "puzzle pleading," (Def. Opp. at 17), the PAC, like the original Complaint, clearly identifies which statements are alleged to have been materially false

- 7 -

and misleading, when they were made, and why they were materially false or misleading. *See, e.g.*, PAC, ¶¶ 57, 66, 81, 100, 114, 119 and 138. Finally, Defendants' summary, one-paragraph, argument concerning the PSLRA safe-harbor (Def. Opp., at 17-18) is incorrect for the reasons set forth in Plaintiffs' Response to Defendants' Motion to Dismiss the original Complaint: to the extent that any of Defendants' statements can be characterized as "forward-looking," which they were not, Plaintiffs *have* alleged actual knowledge that they were materially false or misleading, and Defendants have not identified any meaningful cautionary language. Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint, at 18-19.

## CONCLUSION

For these reasons, and for the reasons set forth in Lead Plaintiffs' Motion for Leave to Amend, the PAC is more than sufficient to survive a 12(b)(6) Motion, leave to amend would not be futile and therefore Plaintiffs respectfully request that the Court grant leave to amend.

Date: May 27, 2010

Respectfully submitted,

SCHWARTZ, JUNELL, GREENBERG
& OATHOUT, LLP

By: /s/ Roger B. Greenberg
Roger B. Greenberg
Texas State Bar No 08390000
Federal I.D. No. 3932
Two Houston Center
909 Fannin, Suite 2700
Houston, Texas 77010
Telephone: 713/752-0017
Facsimile: 713/752-0327

*Liaison Counsel for Plaintiffs*

- 8 -

00163518

IZARD NOBEL LLP
Robert A. Izard
Jeffrey S. Nobel
Mark P. Kindall
Matthew L. Tuccillo
29 South Main Street
Suite 215
West Hartford, CT 06107
Tel.: (860) 493-6292
Fax: (860) 493-6290

*Lead Counsel for Plaintiffs*


BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Gregory M. Castaldo
Benjamin J. Sweet
Bharati O. Sharma
Michelle Newcomer
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

ROBBINS GELLER RUDMAN & DOWD, LLP
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173

*Additional Counsel for the Class*

00163518

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2010, I electronically filed the foregoing *Lead Plaintiffs' Reply Memorandum in Support of Their Motion for Leave to Amend* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email address denoted below, and I hereby certify that I have mailed the foregoing documents via the United States Postal Service to the non-CM/ECF participants as indicated below:

Mark Glasser:  mark.glasser@bakerbotts.com

Richard B. Harper
Seth T. Taube
Baker Botts LLP
30 Rockefeller Plz, 4th Floor
New York, NY 10112

/s/ Roger B. Greenberg
ROGER B. GREENBERG

00163518