IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

----------------------------------------------------x
ADAMS FAMILY, *et al.* : No. 4-09 Civ. 01208 (VDG)
    *Plaintiffs,* :
 : <u>CLASS ACTION</u>
v. :
 :
MCDERMOTT INTERNATIONAL, INC., :
BRUCE W. WILKINSON, MICHAEL :
S. TAFF AND ROBERT A. DEASON, :
    *Defendants.* :
----------------------------------------------------x

**LEAD PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
OBJECTIONS TO THE MAGISTRATE JUDGE'S MEMORANDUM AND
RECOMMENDATION ON PLAINTIFF'S MOTION FOR
<u>LEAVE TO AMEND COMPLAINT</u>**

Defendants' Response to Plaintiffs' Objections to Magistrate Judge's Memorandum and Recommendation on Plaintiffs' Motion For Leave to Amend Complaint ("Def. Resp.") contains numerous arguments that are factually and legally incorrect.

- Defendants repeatedly state that this is Plaintiffs' "third attempt to state a claim against Defendants. Def. Resp., at vi; *see also id.* at xi. This is false. The Adams Family has filed *one* Complaint in this action – the one which the Court dismissed – and now seeks to leave to file a proposed amended Complaint.

- Defendants wrongly claim that Plaintiffs fail to properly allege that they made materially false or misleading statements, on the grounds that "'Courts will not infer 'that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly,' or so-called 'fraud by hindsight.'" Def. Resp. at 2. The language Defendants quote from the Magistrate Judge's opinion relates to the scienter analysis, not whether

Plaintiffs properly alleged false or misleading statements. The Proposed Amended Complaint ("PAC") alleges that Defendants made statements concerning the profitability of J. Ray McDermott's ("J. Ray's") backlog that were materially false and misleading because J. Ray's backlog was *not* as profitable as stated, due to events that had transpired at the time the statements were made. *See, e.g.,* PAC, at 57, 66, 81, 114, and 119. Whether Defendants *knew* about the facts that rendered the statements false is only relevant to scienter, and has no bearing on whether Plaintiffs properly allege that Defendants' statements were false or misleading when made.

- Plaintiffs relied, in part, on a statement by McDermott CEO John Fees concerning the productivity assumptions used in the bids for the Three Qatar Projects to support an inference that Defendants knew that the company's profitability assumptions for the projects depended upon performance of the pipelaying during the "peak" summer months, when productivity rates were highest. The Magistrate Judge – incorrectly, in Plaintiffs' view – found that Fees' statement was "at best, ambiguous." Mem. at 16. As a result of this purported ambiguity, however, the Magistrate Judge refused to consider the statement as contributing *anything* to an inference of scienter. Defendants argue that this is not so, on the grounds that the Magistrate Judge correctly cited the proper standard – that ambiguity merely "counts against" a finding of scienter. Def. Resp. at 4. The Magistrate Judge *cited* the correct standard, but failed to apply it. *If* Fees' statement was "ambiguous," and if ambiguity was merely "counted against" a finding of scienter, then the Magistrate Judge should have concluded that Fees' statement created *some* evidence of scienter, but not, by itself, a strong one. However, the Magistrate Judge refused to consider insider stock sales as evidence of scienter on the grounds that Plaintiffs' other

allegations – *including Fees' statement* – had not raised *any* inference of scienter that could be "meaningfully enhanced" by motive and opportunity evidence. Mem. at 20-21.

- In their brief opposing the Magistrate Judge's recommendation, Plaintiffs pointed out that the Magistrate Judge's scienter analysis failed to address statements by John Fees and Defendant Taff concerning other bid assumptions for the Three Qatar Projects apart from the productivity assumption that the Magistrate Judge found to be "ambiguous" – an assumption that the projects would be done in accordance with a pre-set bid schedule, and an assumption that the pipelaying operations for all three projects could be performed with a single vessel. Plaintiffs' Objections to Magistrate Judge's Memorandum and Recommendations on Plaintiffs' Motion for Leave to Amend Complaint ("Pl. Obj. Br."), at 7-8. Defendants erroneously argue that these other undisclosed bid assumptions "are still other ways of saying that summer 2008 performance was required." Def. Resp. at 5. This is untrue: Regardless of when the schedule envisioned pipelaying being done, and regardless of when J. Ray assumed the vessel would be available, these assumptions were not met. More importantly, these additional bid assumptions do not contain the "ambiguity" that the Magistrate Judge found to be fatal to a scienter inference with respect to the productivity assumption. Fees unequivocally stated that the "delays on earlier jobs has caused us to ***start projects later than the bid schedules proposed*** and we are prioritizing our resources to minimize the schedule effect on the customers by ***using a different vessel than what we assumed in the bid . . . this change in assumptions increased our cost.***" PAC, ¶ 125 (emphasis added). Fees thus admitted that the schedule and the availability of the vessel were bid assumptions, and admitted that these bid assumptions were not met. The only question is whether Defendants were *aware*, earlier

in the Class Period, that these bid assumptions existed and could no longer be met. The PAC sets out numerous facts to demonstrate that Defendants *were* aware of the bid assumptions and of the severe problems with the schedule and the availability of the vessel from the very beginning of the Class Period. Pl. Obj. Br., at 6-8.

- Defendants' arguments concerning what they characterize as the "core operations" presumption are wrong.

  - *First*, Defendants wrongly claim that the "core operations" presumption is "a judicial rule from the Ninth Circuit . . . ." Def. Resp. at 6, n.41. The concept that some projects are sufficiently important to a company that top management is presumed to know about them is not restricted to the Ninth Circuit. *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) (Posner, J.) (inferring that CEO knew about problems with the Company's two primary products; contrary inference was "conceivable . . . but exceeding unlikely"); *In re Tel Save Sec. Litig.*, No. 98 CV 3145, 1999 WL 999427, at * 5 (E.D. Pa. Oct. 19, 1999) (inferring scienter because the transactions at issue were "important" and "key"). Most significantly, the Fifth Circuit applied the same reasoning in *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 700 (5th Cir. 2005), where the court held that "[i]t is reasonable to assume, given the importance of these deals to the company, that IPaxess would have familiarized itself" with those facts (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

  - *Second*, Defendants wrongly argue that the allegations in the PAC that show the impact of the failure of the Three Qatar Projects on McDermott's profitability amounts to "fraud by hindsight." Def. Resp. at 7. Not every contract or project

has the *capacity* to cause serious damage to a company. It is logical to assume that contracts that are large enough, and expensive enough, to cause the kind of catastrophic damage which the Three Qatar Projects caused would be carefully tracked by top management, and would not fall 300 days behind schedule without anyone noticing that there was a problem.[1]

- *Third,* Defendants wrongly claim that the magnitude and importance of the Three Qatar Projects is not relevant to the scienter analysis, because "[w]hat is at issue is the scope of any material, *undisclosed* impact about which Defendants knew. . . ." Def. Resp. at 9. This is circular. The point of the scienter pleading inquiry is to evaluate inferences about what Defendants knew. Defendants' knowledge can be inferred here, because "[i]t is reasonable to assume, given the importance of these deals to the company" that top management would have familiarized itself with the details. *Plotkin,* 407 F.3d at 700.

- *Fourth,* Defendants erroneously argue that importance of the Three Qatar Projects to the success of McDermott's J. Ray subsidiary cannot be considered evidence of scienter as to J. Ray's CEO, Robert Deason, unless Plaintiffs "demonstrate" – presumably through direct evidence – that "Deason would have known any material facts due to his position at J. Ray before those facts were disclosed by Defendants." Def. Resp., at 9. Again, the point of the presumption employed by

---

[1] Defendants argue that the fact the projects were 300 days behind schedule doesn't prove anything, because "Plaintiffs never say *when* this fact was allegedly known but not disclosed." Def. Resp. at 8. The point, however, is not when Defendants knew the projects had fallen 300 days behind schedule, but rather, when they knew that the projects were no longer *on* schedule. A bit of a time lag is believable, even in projects as large and important as the Three Qatar Projects, and even in a company with the detailed reporting systems employed by McDermott. Maybe thirty or even sixty days could go by before scheduling problems were known at the top – but an assumption that ten months could go by without anyone in top management knowing that the projects were critically far behind is not credible.

the Fifth Circuit and numerous other courts is that scienter can be *inferred* from facts concerning the importance of certain projects or contracts to a company. The Three Qatar Projects collectively represented nearly 30 percent of the backlog for J. Ray subsidiary and a huge amount of its projected near-term profits. PAC, ¶ 45. These facts create a strong inference that Deason was familiar with the project bids, the profitability assumptions, and the delays and equipment problems that undermined both from the beginning of the Class Period.

- *Finally,* Defendants' claim that Plaintiffs "distort the caselaw" with respect to *Berson v. Applied Signal Technology, Inc.,* 527 F.3d 982 (9th Cir. 2008) (Def. Resp. at 8) is offensive. Lead Counsel for Plaintiffs argued *Berson* before both the District Court and the Ninth Circuit, but even without that direct knowledge, the language of the Ninth Circuit's opinion clearly supports Plaintiffs' interpretation of the case. Although Defendants are correct that *Berson* involved four stop work orders that were **collectively** worth more than 20 percent of the company's backlog, they were issued at different times and thus the court analyzed whether *each* stop work order was sufficiently important to raise an inference the CEO and CFO of the Company were aware of it. The Ninth Circuit found that "[t]he first stop-work order halted between $10 and $15 million of work . . . [t]he size of the contract and the prominence of the client raise a strong inference that defendants would be aware ***of this order.***" *Berson,* 527 F.3d at 988, n.5 (emphasis added). The $10-15 million contract affected by the first stop-work order was, as Plaintiffs here represented, worth between 9-13.5 percent of Applied Signal's $111 million backlog. Pl. Op. Br. a 13. Defendants further distort

*Berson* by claiming that the Magistrate Judge's finding here that the contracts in *Berson* were "effectively cancelled" is supported by the Ninth Circuit's finding that the contracts were "*at serious risk* of being cancelled." Def. Resp. at 8 (emphasis added). As Judge Kozinsky pointed out in a slightly different context in *Berson*, there is a big difference between a risk and a certainty, and "[i]t goes without saying that investors" – or, for that matter, senior company executives – "would treat the two differently." 527 F.3d at 987.

- Defendants erroneously claim that Plaintiffs are "near reckless" in arguing that the Magistrate Judge failed to consider the scienter allegations as a whole, but rather, scrutinized each in isolation. Def. Resp. at 11. The Magistrate Judge correctly quoted the standard, but again, the opinion does not actually analyze the scienter allegations collectively. Thus, although the Magistrate Judge found Fees' statements about "peak season" performance were ambiguous, the statements should have been considered as *some* evidence of scienter, even if it was a weakened inference. Similarly, if the Court did not believe that the Three Qatar Projects were as important to McDermott as in other cases where courts have found a strong inference of scienter, the contracts clearly were *very* important, and this should at least have been considered as *some* evidence of scienter. When these facts are added to the insider stock sales that the Court failed to consider, they should have been sufficient – collectively – to raise a *strong* inference of scienter.[2] There is no indication in the memorandum that any such analysis was done.

---

[2] Defendants state that "[t]he Dismissed Complaint lacked any allegations sufficient to establish suspicious [insider] trading, as the Court correctly concluded." This is false on two levels. First, neither the Magistrate Judge, nor this Court, ruled on whether Plaintiffs adequately alleged that the stock sales were suspicious in timing and amount; not surprisingly, Defendants give no citation for their bald assertion to the contrary. Second, both the Original Complaint and the PAC contain ample allegations that the stock sales were suspicious in timing and amount; since the Court did not evaluate these

- Defendants also argue that the Magistrate Judge's opinion should be upheld on other grounds, but these also lack merit. They incorrectly argue (Def. Resp. at 12) that the Complaint relies on the "group-pleading doctrine" to allege scienter. To the contrary, the Complaint's scienter allegations are based upon Defendants' admissions, knowledge of material adverse facts and insider trading. Moreover, the group pleading doctrine has nothing to do with scienter; it has to do with whether statements issued on behalf of an organization can be attributed to senior officers. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007). Despite their complaints about "puzzle pleading," (Def. Resp. at 12-13), the Proposed Amended Complaint, like the original Complaint, clearly identifies which statements are alleged to have been materially false and misleading, when they were made, and why they were materially false or misleading. *See, e.g.*, PAC, ¶¶ 57, 66, 81, 100, 114, 119 and 138. Moreover, Defendants' Brief demonstrates that they are not unaware of the substance of Plaintiffs' allegations. Finally, Defendants' one-paragraph argument concerning the PSLRA safe-harbor (Def. Opp., at 13-14) is incorrect for the reasons set forth in Plaintiffs' Response to Defendants' Motion to Dismiss the original Complaint: to the extent that any of Defendants' statements can be characterized as "forward-looking," Plaintiffs *have* alleged actual knowledge that they were materially false or misleading. Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint, at 18-19.

---

allegations they were effectively unchanged between the two complaints. Defendant Deason sold over 132,000 McDermott shares (over 65% of his stock holdings) for proceeds exceeding $6 million (PAC, ¶ 151(a)); Defendant Taff sold 26,500 shares of his McDermott stock (including 73% of his exercisable options holdings) for proceeds of over $1.6 million (PAC, ¶ 151(b)); and Defendant Wilkinson sold over 400,000 McDermott shares (including 52% of his exercisable options holdings) for proceeds exceeding $20 million. PAC, ¶ 151(c). Consequently, the amounts of these sales were extraordinary. In addition, the Complaint alleges facts showing that the timing of these sales was extremely suspicious because *all* of the sales from the exercise of options were derived from options that were not set to expire for several years. PAC, ¶¶ 29-30, 34, 38, 53-55, 59-61, 64, 66, 74, 134.

## CONCLUSION

For the reasons set forth above, and in Lead Plaintiffs' Objection to the Magistrate Judge's Memorandum, the Proposed Amended Complaint is more than sufficient to survive a 12(b)(6) Motion; thus, leave to amend would not be futile. Therefore, Plaintiffs respectfully request that the Court decline to follow the Magistrate Judge's recommendation, and grant leave to amend.

Dated: February 7, 2011.

Respectfully submitted,

SCHWARTZ, JUNELL, GREENBERG & OATHOUT, LLP

By:     */s/ Roger B. Greenberg*
Roger B. Greenberg
Texas State Bar No 08390000
Federal I.D. No. 3932
Two Houston Center
909 Fannin, Suite 2700
Houston, Texas 77010
Telephone: 713/752-0017
Facsimile: 713/752-0327

*Liaison Counsel for Plaintiffs*

IZARD NOBEL LLP
Robert A. Izard
Jeffrey S. Nobel
Mark P. Kindall
Matthew L. Tuccillo
29 South Main Street
Suite 215
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290

*Lead Counsel for Plaintiffs*
BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP
Gregory M. Castaldo
Benjamin J. Sweet
Bharati O. Sharma

Michelle Newcomer
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

COUGHLIN STOIA
GELLER RUDMAN & ROBBINS, LLP
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173

*Additional Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2011, I electronically filed the foregoing *Lead Plaintiffs' Reply Memorandum in Support of Their Objections to the Magistrate Judge's Memorandum and Recommendations on Plaintiffs' Motion for Leave to Amend* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email address denoted below, and I hereby certify that I have mailed the foregoing documents via the United States Postal Service to the non-CM/ECF participants as indicated below:

Mark Glasser: mark.glasser@bakerbotts.com

Richard B. Harper
Seth T. Taube
Baker Botts LLP
30 Rockefeller Plz, 4th Floor
New York, NY 10112

                                                     */s/ Roger B. Greenberg*
                                                     ROGER B. GREENBERG